KEKER, VAN NEST & PETERS LLP
JOHN W. KEKER - # 49092
jkeker@keker.com
R. JAMES SLAUGHTER - # 192813
rslaughter@keker.com
BRYN WILLIAMS - # 301699
bwilliams@keker.com
NICHOLAS GREEN - # 323959
ngreen@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:     415 397 7188

Attorneys for Plaintiff ANNE KIRKPATRICK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISIONS

| ANNE KIRKPATRICK, an individual | Case No. |
|---|---|
| Plaintiff, | **COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983** |
| v. | |
| THE CITY OF OAKLAND, CALIFORNIA, a public corporation, | |
| Defendant. | **DEMAND FOR JURY TRIAL** |

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION
OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

Plaintiff Anne Kirkpatrick, by and through her counsel of record, for her Complaint against Defendant the City of Oakland, California, alleges as follows:

## NATURE OF THE CASE

1. The Oakland Police Commission is the product of hard work, creative thinking, and close collaboration—it represents an innovative and progressive step towards effective civilian oversight and the restoration of public confidence in the Oakland Police Department ("OPD").

2. Unfortunately, some Oakland Police Commissioners have no regard for the law or the scope of their power and authority. Despite holding critical positions of public trust, those same Commissioners routinely abuse their power and ignore their oath of office. By way of example, some Commissioners corruptly look for special treatment from OPD in their personal affairs. Others frequently abuse and harass OPD staff and interfere in day-to-day operations, including by seeking unlawful access to confidential documents. Commissioners regularly attempt to exceed their authority. Anybody who speaks out about these abuses is bullied, threatened, and retaliated against.

3. For nearly three years, Chief Kirkpatrick raised a series of alarms about this Commissioner misconduct, which she believed violated the law. Those alarms went largely unheeded. Finally, caving to pressure from those same lawless Commissioners, the City fired its most progressive Chief in decades in retaliation for blowing the whistle.

4. Put simply, the City, acting through its agents Mayor Libby Schaaf and the Police Commission, fired Chief Kirkpatrick in retaliation for her repeated reports of Police Commission misconduct. The Chief's termination violated the California Labor Code and the Chief's federal constitutional rights. Through this lawsuit, Chief Kirkpatrick seeks to shine a brighter light on this abuse of the public trust and to be made whole for the injuries she suffered as a result of the City's unlawful conduct.

## THE PARTIES

5. Plaintiff Anne Kirkpatrick is a law enforcement professional with deep experience, including senior leadership roles within the Spokane, Washington Police Department, the

2
COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

Chicago, Illinois Police Department, and most recently as Chief of the Oakland Police Department. Chief Kirkpatrick is a resident and citizen of the State of Washington.

6. Defendant, the City of Oakland, California, is a public municipal corporation and a California Charter City situated within Alameda County, California.

## JURISDICTION

7. This Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1332, because this is a civil suit between citizens of two different states and the amount in controversy exceeds $75,000.

8. This Court also has subject matter jurisdiction over Chief Kirkpatrick's First Amendment Claim pursuant to 28 U.S.C. § 1331, because it arises under the Constitution and laws of the United States. The Court has supplemental subject matter jurisdiction over Chief Kirkpatrick's claim under California Labor Code § 1102.5 pursuant 28 U.S.C. § 1367(a), because that claim is so related to the claim in the action within the Court's original jurisdiction that it forms part of the same case or controversy.

9. The Court has personal jurisdiction over the City because it is a California municipal corporation organized under a charter adopted pursuant to the Constitution of the State of California.

## VENUE

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the only Defendant in this action, the City, resides in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## INTRADISTRICT ASSIGNMENT

11. Pursuant to Local Rules 3-2(c) and 3-2(d), this case may be assigned to either the Oakland or San Francisco Divisions of this Court, because a substantial part of the events or omissions giving rise to Chief Kirkpatrick's claims occurred in Alameda County, California.

## CLAIM PRESENTATION

12. Pursuant to Cal. Gov't Code §§ 905, 910, and 915, Chief Kirkpatrick presented her claim for damages to the City of Oakland on May 6, 2020. Her claim included all required

elements under § 910, including: Chief Kirkpatrick's name and post office address, the post office address for notices related to the claim, the date, place, and other circumstances of the occurrence that gave rise to her claim, a general description of the City's indebtedness and the Chief's injury, the names of the City employees who caused the Chief's injury, and the fact that the Chief's injuries exceed the jurisdictional minimum for an unlimited civil case under the laws of the State of California.

13. The City of Oakland rejected Chief Kirkpatrick's claim by letter dated June 25, 2020. This civil suit for damages is therefore authorized under The Government Claims Act, Cal. Gov't Code § 945.4.

## FACTUAL ALLEGATIONS

**A.  Measure LL and the Oakland Police Commission**

14. When Chief Kirkpatrick arrived at OPD on February 27, 2017, she took the helm of a Department still reeling from a series of destabilizing events that undermined OPD's credibility and respect in the community it serves.

15. A reformer and advocate for police transparency, Chief Kirkpatrick began her tenure as Chief of Police against the backdrop of a citizen ballot initiative called Measure LL, approved by Oakland residents in the November 2016 elections. Measure LL created the current manifestation of the Oakland Police Commission, a body designed to provide robust civilian oversight of OPD and restore public faith and confidence the department.

16. Under Measure LL, the Commission received a specific mandate: to oversee, review, and reform OPD's "policies, procedures, customs, and General Orders[.]"  The text of the initiative enumerated six areas of responsibility and authority within the Commission's purview:

   i)    conduct public hearings at least annually related to policy and procedures;

   ii)   propose changes to policies and procedures;

   iii)  exercise oversight authority to approve or reject OPD's own suggested changes to Department policies and procedures;

   iv)   review and comment, at its discretion, on all other policies and procedures;

4
COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

        v)    review the City's budget for OPD to ensure it is in alignment with OPD's policies and procedures; and

        vi)    substantial input into hiring and firing the Chief of Police.

17. The Police Commission's hiring and firing authority includes the ability to propose four candidates from whom the Mayor may choose to hire as Chief, as well as the ability to fire the Chief of Police for cause. Where, as in Chief Kirkpatrick's case, the Chief is fired without cause, the Mayor must consent.

18. Under Measure LL, the scope of the Commission's authority is clear—it is empowered to examine and, if necessary, adjust OPD's governing policies and procedures. It may also exercise authority with respect to OPD's most senior leadership in the form of its hiring and firing power. Those are the limits of the Commission's authority.

19. But, in its oversight role, the Police Commission has no authority over the day-to-day operations of the Department; it is not empowered to direct or assign lower-level OPD staff and it is explicitly prohibited from accessing legally protected OPD personnel records except in certain limited circumstances.

20. Following Measure LL's enactment, the Police Commission began meeting in November 2017, about nine months after the City hired Chief Kirkpatrick.

21. It was a rocky start—three Commissioners left their roles in the Police Commission's first months. In addition, the Police Commission suffered from significant tension between mayoral appointees and Selection Panel appointees.[1]

22. As a mayoral appointee herself and a newcomer to Oakland, Chief Kirkpatrick received her share of animosity from the Selection Panel appointees on the Police Commission.

23. Compounding these problems, the Police Commission evidenced a misunderstanding of its role right from the start. Although the scope of its authority is clearly limited to policy and procedure, the Police Commission sought to involve itself in the daily

---

[1] Measure LL gave the Mayor of Oakland authority to appoint three of the first regular members of the Police Commission and then created a "Selection Panel" empowered to recommend candidates for the remaining positions to the Oakland City Council for subsequent appointment.

affairs and operations of OPD and acted as if OPD employees were Police Commission staff.

24. In addition, the City failed to provide the Police Commission with the necessary staff and support for a successful start, shortcomings that the Police Commission wrongly attributed to OPD. When Police Commission meetings eventually began in the late fall of 2017, they were chaotic, often marked by discordant exchanges between Commissioners, OPD representatives, other City officials, and the community.

**B.    Chief Kirkpatrick's Reports of Commissioner Misconduct**

25. Even under these challenging circumstances, Chief Kirkpatrick's time as OPD's leader was marked by many successes and improvements.

26. For example, during Chief Kirkpatrick's tenure, the City's homicide rate decreased to its lowest level in twenty years, and the City was on pace for a sixty-four-year low homicide rate at the time of the Chief's termination. Other notable reform efforts included OPD's implementation of new policies, strategy, and training around police-citizen encounters that resulted in a fifty percent reduction in stops involving African-American and Latinx citizens. The Chief's reform efforts extended to OPD's disciplinary process as well; according to an outside Disparity in Discipline Study, OPD made significant strides in reducing divergent disciplinary outcomes during Chief Kirkpatrick's time leading the Department.

27. But a series of incidents involving individual Police Commissioners ultimately drove the Chief to submit multiple reports of inappropriate and unlawful conduct to the Oakland City Attorney's Office, the City Administrator, and the Mayor of Oakland—the officials she understood had the capacity to take action to stop the Commissioner's unlawful conduct and prevent future recurrences.

28. But City leaders all ignored Chief Kirkpatrick's repeated reports of Commission misconduct. Instead, the Police Commission and Mayor orchestrated Chief Kirkpatrick's termination in retaliation for the Chief's repeated whistleblowing.

### 1. Commissioners Threaten Neighborhood Services

29. Chief Kirkpatrick's first report of Commissioner misconduct arose out of two Commissioners' inappropriate efforts to steer resources towards their own neighborhoods and related bullying, threats, and intimidation of two low-level OPD employees.

30. On March 2, 2018, Commissioners Ginale Harris and Jose Dorado met with two supervisory OPD Neighborhood Services Coordinators ("NSCs") who work with the community to facilitate partnerships between citizens and the Department.

31. During this encounter, Commissioner Harris made several demands, including for information related to OPD hiring processes and internal OPD documents.

32. Commissioner Harris told these two OPD employees that she "had a history of having people fired" and that she believed NSCs "should be Oakland residents."

33. Commissioner Dorado, for his part, expressed displeasure with the NSCs assigned to his neighborhood before emphasizing his view that the Ghost Ship fire, an event that resulted in thirty-six deaths, could have been prevented "had the NSC [done] her job."

34. Upon receiving a report of this incident, Chief Kirkpatrick made a report to the City Attorney's Office and City Administrator Sabrina Landreth.

35. The Chief made this report because she reasonably believed that Commissioner Harris and Commissioner Dorado violated Oakland regulations prohibiting misuse of official positions for personal gain.

### 2. Commissioner Harris Seeks Special Treatment

36. Chief Kirkpatrick submitted her next report of Police Commission misconduct in connection with an individual Commissioner's corrupt efforts to obtain special treatment from OPD.

37. On September 17, 2018 Chief Kirkpatrick was working in her office on the eighth floor of OPD headquarters when Officer Johnna Watson, a staff assistant to the Chief, reported that Commissioner Harris was "basically throwing a fit" over a tow ticket in the Records Department.

38. When citizens receive citations or fines, they may pay them in person in the Records Department.

39. A supervisor from Records arrived and told the Chief that Commissioner Harris had displayed her Commission badge to Records Staff and asked if they "knew who I am?" The Chief also understood that Commissioner Harris felt she had been illegally towed, that she was willing to pay her citation, but refused to pay the fee for a tow truck.

40. Records staff told Commissioner Harris that she could pursue a hearing if she felt she was towed illegally, to which Commissioner Harris replied along the lines of "do I need to call the Chief" or "I'm going to have to call the Chief."

41. The Chief understood that Commissioner Harris was asking for a personal favor and special treatment.

42. Because her staff had escalated the matter to her desk, Chief Kirkpatrick felt that the situation was serious. She instructed Officer Watson to bring Commissioner Harris to her office.

43. When Commissioner Harris arrived, the Chief told her that she would not grant any favors for Police Commissioners and recommended that Commissioner Harris follow the ordinary appeals process. Commissioner Harris then denied that she was seeking "a favor," and ultimately left the Chief's office without obtaining any change in her fine.

44. After Commissioner Harris left, the Chief documented the events in an internal report.

45. Chief Kirkpatrick also sent an email to City leaders, informing them of the confrontation. The Chief wrote that Commissioner Harris was "bullying" her staff and expressed concerns regarding retaliation.

### 3.  The Police Commission Insults Alameda County's Public Defender

46. On March 28, 2019, Alameda County Public Defender Brendon Woods addressed a Police Commission meeting that Chief Kirkpatrick attended. In the middle of Woods's remarks, Commissioner Harris interjected to the effect that Woods's "skin color is black" but that he "may not live like a black man."

8
COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

47. Woods took offense and responded with a brief personal history.

48. The next day, the Chief sent an email to City leaders titled "Potential Complaint," and explained that she found Harris's remark "so unacceptable that I personally apologized to Mr. Wood[s]."

49. The Chief believed that this incident possibly triggered her mandatory reporting obligation under City Administrative Instruction 71 ("AI 71"), a policy governing harassment and workplace misconduct. Indeed, in the Chief's view, a comment of this tenor would subject an OPD Officer to serious discipline.

50. The final line of her email is particularly ominous in retrospect: "I am concerned that the Police Commission could be retaliatory toward me for reporting this to you."

**4.     The Police Commission Seeks Confidential Information**

51. The Chief submitted several reports to City leadership related to Police Commissioners' unlawful efforts to obtain confidential personnel information in connection with an investigation into racial bias within OPD, as well as Police Commissioners' attempts to intimidate and harass the Chief into commenting on the investigation in violation of her legal duty of confidentiality.

52. Sometime in October 2018, Sergeant Aaron Smith, the President of the Oakland Black Officers' Association ("OBOA"), sought a meeting with Chief Kirkpatrick. She understood this meeting to involve Smith's difficulties with his supervisor, Captain Jake Bassett. The Chief knew that many perceived Bassett to be a poor communicator, and although she found him quite competent, the Chief had received complaints regarding his leadership style in the past. At the time, Bassett oversaw the OPD Academy, which also retained responsibility for recruitment efforts.

53. The Chief partially misunderstood the nature of Smith's visit. She believed Smith's complaint was with Bassett's communication skills and leadership; while Smith did have such concerns, he also wanted to raise issues related to Bassett's handling of diversity and recruiting. By her own admission, Chief Kirkpatrick missed the possible bias issues in Smith's presentation because the focus of his remarks was directed towards moving a different individual,

Virginia Gleason, into the position overseeing recruiting. Gleason was the Deputy Director of the Bureau of Support Services and Chief Kirkpatrick's top civilian aide.

54. In part due to concerns about a non-union civilian employee supervising sworn officers and union members, the Chief did not immediately take action, although she was working on a solution behind the scenes.

55. Ninety days after her meeting with Smith, the OBOA released an open letter that was highly critical of the Chief, Captain Bassett, and diversity and race issues within OPD. The letter caused serious disruption within the Department. The Chief immediately recognized that an AI 71 investigation was appropriate and welcomed outside scrutiny of the issues OBOA presented in its letter.

56. After the City announced an investigation, the Police Commission placed a status update on the probe on every meeting agenda. But, Chief Kirkpatrick could not speak to the issue in any capacity because she was legally precluded from discussing an open internal investigation. Moreover, she could in no circumstance comment on an investigation of which she was a focus. Nevertheless, in a transparent effort to harass and intimidate the Chief, the Police Commission continued noticing a status report that it knew the Chief could not lawfully provide, even after the Chief informed them that she could not answer any questions.

57. By April 2019, the situation had reached a boiling point. The Chief attended a Police Commission meeting where the status of the AI 71 investigation was again on the agenda. After refusing to address the topic, the Chief drafted an email to Mayor Schaaf and City Administrator Landreth (among others), titled "Complaint," where she decried the Police Commission's conduct. She explained that it was her "understanding that employment law prevents me from addressing" the issue and lamented that she was "being challenged as insubordinate" for refusing to violate her legal obligations.

**5.   The Police Commission Inappropriately Directs Staff**

58. Chief Kirkpatrick reported again on the Police Commission's campaign of interference in the early summer of 2019. On May 29, 2019, Commissioner Harris emailed Chief Kirkpatrick to request that Deputy Chief LeRonne Armstrong serve as OPD's liaison to the Police

10

1389483

Commission. In the request, Commissioner Harris explained that "I often have many question[s] in regards to East Oakland that I believe and trust that Deputy Armstrong can answer. I do appreciate your staff that you bring to the meetings, however they are not from East Oakland or Oakland period. I am a firm believer that you can only be an expert if you have experienced it."

59.     After some back and forth with Commissioners Harris and Regina Jackson, Chief Kirkpatrick ultimately informed them that she had spoken to Deputy Chief Armstrong and that he was not interested in serving as a liaison.

60.     Commissioner Jackson responded that the Commission "would like to have DC Armstrong be the liaison whether he likes it or not."

61.     Finally, on June 5, 2019, the Chief sought the intervention of City leaders, writing that they needed to explain the issue of having a commissioner directing staff to the Police Commission.

62.     On June 20, 2019, in the face of repeated demands and inaction from City administrators, the Chief concluded she had no recourse; she relented and assigned Deputy Chief Armstrong as the OPD liaison to the Police Commission.

**6.     The Police Commission Serves an Unlawful Subpoena**

63.     In the early summer of 2019, Chief Kirkpatrick raised further concerns about the lawfulness of Police Commission activity with senior City officials.

64.     OPD's internal investigations into the shooting death of Joshua Pawlik were coming to a close; OPD officers shot and killed Pawlik, a homeless man, after they observed him sleeping with a firearm. Eventually, the Executive Force Review Board, the Community Police Review Agency, and Chief Kirkpatrick concluded that the use of force in the Pawlik shooting was within OPD policy.

65.     The Police Commission and federal monitor Robert Warshaw were not satisfied with OPD's review and Commissioners sought to obtain confidential records related to the

Department's internal investigation.[2] Chief Kirkpatrick could not lawfully comply because the requested files contained protected personnel records, leading to several contentious Police Commission meetings.

66. The Chief reasonably believed that Commissioners were again attempting to force her to disclose confidential information in violation of law and the terms of her contract. Despite repeated requests, nobody in City Administration was willing to appear and defend the Chief at the Police Commission's meetings.

67. In June 2019, the Police Commission issued a subpoena for all of OPD's internal communications related to the Pawlik case. Although Measure LL did vest the Police Commission with subpoena power, this request exceeded the lawful boundaries of that power because it sought information protected by state law. The Chief believed this request was unlawful and reported it to City administrators. Ultimately, the Chief delivered the subpoenaed materials to Mike Nisparos, the head of the CPRA. In his role at the CPRA, Nisparos was authorized to view sensitive personnel information, unlike the Commissioners. Nisparos refused to turn over the communications to the Police Commission, telling the Chief that he believed the Police Commissioners were acting maliciously.

**7.     The Commission Harasses and Intimidates Senior OPD Staff**

68. The Police Commission's campaign of intimidation, harassment, and interference with OPD leadership reached its climax in the fall of 2019.

69. Representatives from the Police Commission informed Chief Kirkpatrick's senior civilian aide, Virginia Gleason, that the Police Commission desired a report on OPD's efforts to increase diversity and inclusion in its hiring practices. Gleason was now responsible for leading these efforts, so preparation and presentation of the report were her responsibility. Gleason informed Chrissy Love, the administrator in charge of scheduling for the Police Commission, that

---

[2] Chief Warshaw serves as a court-appointed federal monitor under a negotiated settlement agreement entered into by the City of Oakland and several civil rights plaintiffs, arising out of a case that predated Chief Kirkpatrick's tenure with OPD.

12
COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

the first-choice date, October 10, 2019, conflicted with Gleason's pre-approved family vacation. Love and Gleason agreed on October 24, 2019 instead.

70. Then, without Gleason's advanced knowledge, the Police Commission placed her presentation on the agenda for October 10. The Police Commission knew Gleason had planned to be out of town on that date and sought to embarrass both Gleason and OPD by scheduling the presentation for a time when Gleason could not appear. Nevertheless, Gleason canceled her vacation, attended the October 10, 2019 meeting, and delivered her report. Chief Kirkpatrick also attended the meeting.

71. But the Police Commission was not to be denied; Commissioners launched into heated criticism of Gleason's report almost immediately. At least one Commissioner called the report "disgraceful." Commissioner Harris told Gleason that, based on the content of the report, she "should be ashamed of herself." The Commissioners' breathtakingly abusive and harassing conduct, unbecoming of public officials—and recorded on video—was a bridge too far. Chief Kirkpatrick directed Gleason to step off the dais and took the microphone herself. She admonished the Police Commission not to "speak to our staff in that manner" and emphasized that targeted abuse "is not acceptable." The Chief demanded an apology on Gleason's behalf; Commissioner Harris responded that "[s]he will not get one from me. And neither will you."

72. The next day, the Chief wrote a "Formal Complaint," addressed to Barbara Parker (the City Attorney) and City Administrator Landreth, among others. Her Complaint described the facts leading to the conflagration at the October 10, 2019 meeting in detail. She also noted that Commissioner Smith and John Alden, the new director of the CPRA, reached out to her following the meeting. Alden, she reported, characterized the events as "horrifying" and told the Chief that the Commissioners' motivations were "personal." The Chief also noted that Deputy Chief Armstrong had told Gleason that the Police Commission knew the change in meeting date would interfere with Gleason's vacation and that it was "personal." The Chief further observed that the Police Commission continued to notice the OBOA investigation for a status update and had noticed it for the October 10 meeting.

13
COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

73. Chief Kirkpatrick's report noted her belief that the Commissioners' behavior could be retaliation for the Chief's report of Harris's challenge to her tow ticket. Her complaint ended by listing the other senior OPD staff present at the Commission meeting: Assistant Chief Darren Allison, Lieutenant Bobby Hookfin, Deputy Chief Roland Holmgren, and Lieutenant Wilson Lau.

### C.   Chief Kirkpatrick's Termination

74. At an open session of the Oakland City Council on January 28, 2020, Councilmember Rebecca Kaplan revealed the existence of a highly confidential internal investigation into repeated instances of misconduct by Police Commissioner Ginale Harris. Councilmember Kaplan disclosed a document that described the scope of the investigation and its approximate cost.

75. Chief Kirkpatrick was involved in several of the incidents under scrutiny, including Commissioner Harris's threats to two NSCs in March 2018 and the September 2018 tow ticket incident. The investigative team, from Public Interest Investigations, interviewed Chief Kirkpatrick in May 2019. To be clear, Chief Kirkpatrick did not commission the investigation, nor did she direct its aims or conduct. Her sole involvement was as a percipient witness to several of the events the City believed merited further investigation. Notably, the very document Councilmember Kaplan disclosed, outlining the scope of the investigation, highlighted that Chief Kirkpatrick was already on record as being concerned about the prospect of retaliation for her reports related to Commissioner Harris's misconduct.

76. Two days after Councilmember Kaplan revealed the investigation of Commissioner Harris, on January 30, 2020, an article appeared in the Oakland Post describing the investigation and suggesting that it was the product of "repeated moves by the Chief of Police Anne Kirkpatrick and the City Administrator Sabrina Landreth against Oakland Police Commission Vice Chair Ginale Harris." The retaliation Chief Kirkpatrick feared had begun in earnest.

77. Following the article's publication, the City Council met in closed session on February 5, 2020. Less than two weeks later, Mayor Schaaf visited Chief Kirkpatrick in her home and told the Chief that the Police Commission intended to fire her. Mayor Schaaf also

14
COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

suggested that the federal monitor, Robert Warshaw, supported firing the Chief. The Mayor asked Chief Kirkpatrick not to return to work.

78.     On Thursday, February 20, 2020, Mayor Schaaf called Chief Kirkpatrick and informed her over the telephone that the City had terminated her employment as Chief of Police without cause, effective immediately. The City never offered the Chief an administrative hearing as required under the Peace Officer's Bill of Rights, nor did it afford her an opportunity to appeal the City's decision before a neutral decision maker.

## FIRST CAUSE OF ACTION
## FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5

79.     Chief Kirkpatrick reincorporates and realleges all preceding paragraphs as if set forth fully herein.

80.     At all relevant times, through her termination on February 20, 2020, the City of Oakland employed Anne Kirkpatrick in the position of Chief of Police.

81.     Chief Kirkpatrick provided information related to Police Commissioner misconduct, which was not publicly known, to her employer the City of Oakland, a public body. The information disclosed included, without limitation:

i)      Commissioners Harris's and Dorado's attempts to bully and harass, through threats and intimidation, two OPD Neighborhood Services Coordinators in an effort to obtain preferential policing for their own neighborhoods;

ii)     Commissioner Harris's misuse of her official position in an effort to obtain special treatment from OPD;

iii)    The Police Commission's unlawful attempts to obtain confidential employment records to which it had no right of access;

iv)     The Police Commission's harassment and open contempt for OPD staff.

82.     Chief Kirkpatrick had reasonable cause to believe that the information she provided disclosed violations of state law and local regulations, including without limitation:

i)      Unlawful attempts to obtain confidential peace officer personnel records in violation of Cal. Penal Code § 832.7 and Oakland Municipal Code § 2.45.80;

15
COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

        ii)      Unlawful attempts to misuse official positions for personal gain in violation of Cal. Penal Code § 68(a) and Oakland Municipal Code § 2.25.06; and

        iii)     Abuse of authority and retaliatory conduct in violation of Oakland Municipal Code § 2.24.100.

83. The City of Oakland discharged Chief Kirkpatrick, effective February 20, 2020.

84. Chief Kirkpatrick's disclosures were, at a minimum, a contributing factor in the City's decision to terminate her employment at OPD.  Chief Kirkpatrick was terminated only four months after making a "formal complaint" against the Police Commissioners, expressing her belief that Commissioners were retaliating against her, at least in part, due to her *prior* reports of misconduct.  Indeed, the Chief's reports, made in close temporal proximity to her termination, disclosed blatant corruption and misconduct by the very officials that terminated her employment. Throughout her employment as Chief of Police, Chief Kirkpatrick expressed concern, in writing, that the Police Commission might retaliate against her for reporting Commissioner misconduct; those fears eventually became reality in February 2020.

85. Chief Kirkpatrick was damaged by her unlawful discharge, in at least the following ways:

        i)       Lost compensation from February 2020 through the conclusion of her contractual term of employment, February 26, 2022.

        ii)      Lost health, retirement, and fringe benefits through the conclusion of her contractual term of employment, February 26, 2022.

        iii)     Mental suffering caused by the City's extreme and outrageous conduct in terminating her employment for reporting Commissioner misconduct.

**SECOND CAUSE OF ACTION**
**FOR VIOLATION OF FIRST AMENDMENT RIGHTS, 42 U.S.C § 1983**

86. Chief Kirkpatrick reincorporates and realleges all preceding paragraphs as if set forth fully herein.

87. Chief Kirkpatrick's reports to City administrators amounted to protected speech that substantially addressed matters of public concern.  The Chief's reports concerned

16
COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

wrongdoing at high levels of City government, within a body specifically created to provide accountable civilian oversight and restore public confidence and trust in OPD.  The Chief also disclosed corrupt acts, self-serving conduct, and violations of law.  The Chief's speech bore directly on critical issues of governmental mismanagement at systemic levels involving an essential public safety agency, and were not mere employment grievances.

88. The Chief's reports were not made in the ordinary course of her job duties, which involved managing OPD's day-to-day operations.  Instead, her speech was made in her capacity as a concerned citizen, and involved reports that were necessary to root out public corruption.  The Chief directed her protected speech to the only City administrators potentially capable of putting an end to Commissioner misconduct.

89. The Chief's protected speech, made in her capacity as a private citizen and which substantially addressed matters of public concern, was a substantial motivating factor in the City's adverse employment action.  Specifically, the City terminated the Chief's employment in direct retaliation for her repeated whistleblowing activities.  The City fired the Chief on February 20, 2020, only four months after her October 11, 2019 "formal complaint."

90. The City had no adequate justification for terminating the Chief's employment based on her protected whistleblowing speech under *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968).  The Chief's protected speech did not disrupt the City's ability to control its work environment or the relationships between coworkers within OPD; indeed just the opposite is true.  Nor did the Chief's speech impair her ability to perform her job duties or obstruct OPD's routine operations.

91. The Chief's protected speech was the logical and proximate cause of her termination.  The City fired Chief Kirkpatrick *because* of her repeated efforts to cast sunshine on Police Commissioner misconduct.

92. Oakland Mayor Libby Schaaf and the Police Commission jointly terminated Chief Kirkpatrick.  These individuals, acting on behalf of the City and as the City's agents, are the City officials responsible for establishing final policy with respect to OPD, as evidenced by § 604(b)(10) of the Oakland City Charter and Measure LL.  As such, the Chief's termination was

the decision of a final policymaker for purposes of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

93. Chief Kirkpatrick was damaged by her retaliatory discharge, in at least the following ways:

    i)    Lost earnings from February 20, 2020 through the conclusion of her contractual term of employment, February 26, 2022.

    ii)    Lost health, retirement, and fringe benefits from February 20, 2020 through the conclusion of her contractual term of employment, February 26, 2022.

    iii)    Mental suffering caused by the City's extreme and outrageous conduct in terminating her employment for reporting Commissioner misconduct.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Anne Kirkpatrick prays for judgment against the City of Oakland as follows:

1. A judgment that the City terminated Chief Kirkpatrick in retaliation for protected disclosures to a public body, in violation of Cal. Labor Code § 1102.5;

2. A judgment that the City violated Chief Kirkpatrick's rights under the First Amendment to the United States Constitution;

3. General damages according to proof, including, without limitation, mental pain and anguish cause by the City's extreme and outrageous conduct;

4. Special damages according to proof, including without limitation:

    i)    Lost earnings for the period between February 20, 2020 and February 26, 2022, inclusive;

    ii)    Lost future health, retirement, and fringe benefits for the period between February 20, 2020 and February 26, 2022, inclusive;

    iii)    Damage to future earning potential through injury to professional reputation;

5. Prejudgment interest in an amount according to proof;

6. Reasonable attorneys' fees and costs;

7. Any such other relief as the Court may deem just and proper.

**Plaintiff Anne Kirkpatrick demands a trial by jury.**

Dated: August 19, 2020                                            KEKER, VAN NEST & PETERS LLP

                                                    By:  */s/ R. James Slaughter*
                                                         JOHN W. KEKER
                                                         R. JAMES SLAUGHTER
                                                         BRYN WILLIAMS
                                                         NICHOLAS GREEN

                                                         Attorneys for Plaintiff ANNE
                                                         KIRKPATRICK

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483