1   KEKER, VAN NEST & PETERS LLP
    JOHN W. KEKER - # 49092
2   jkeker@keker.com
    R. JAMES SLAUGHTER - # 192813
3   rslaughter@keker.com
    BRYN WILLIAMS - # 301699
4   bwilliams@keker.com
    NICHOLAS GREEN - # 323959
5   ngreen@keker.com
    633 Battery Street
6   San Francisco, CA 94111-1809
    Telephone:   415 391 5400
7   Facsimile:    415 397 7188

8   Attorneys for Plaintiff ANNE KIRKPATRICK

9                 UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12  ANNE KIRKPATRICK,                    Case No. 3:20-cv-05843-JSC

13         Plaintiff,                    **DECLARATION OF R. JAMES
                                         SLAUGHTER IN SUPPORT OF
14     v.                                PLAINTIFF ANNE KIRKPATRICK'S
                                         MOTION TO COMPEL ROBERT A.
15  THE CITY OF OAKLAND, CALIFORNIA,     WARSHAW'S, WARSHAW &
    a public corporation,                ASSOCIATES', AND POLICE
16                                       PERFORMANCE SOLUTIONS'
           Defendant.                    COMPLIANCE WITH SUBPOENAS**
17
                                         Date:     May 27, 2021
18                                       Time:     9:00 a.m.
                                         Dept:     Courtroom E, 15th Floor
19                                       Judge:    Hon. Jacqueline S. Corley
20                                       Date Filed:  August 19, 2020
21                                       Trial Date:  May 16, 2022
22
23
24
25
26
27
28

1674658

I, R. James Slaughter, declare as follows:

1.      I am an attorney, duly licensed to practice law in California, and a partner associated with the law firm of Keker, Van Nest & Peters LLP, counsel of record for Plaintiff Anne Kirkpatrick. I submit this declaration in support of Plaintiff's Motion to Compel Robert A. Warshaw's, Warshaw & Associates', and Police Performance Solutions' Compliance with Subpoenas.  I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently as to them under oath.

2.      My firm, Keker, Van Nest & Peters LLP served subpoenas on Mr. Warshaw and Police Performance Solutions on March 9, 2021. True and correct copies of these subpoenas are attached to this declaration as Exhibits A and B.  On March 24, 2021, my firm, Keker, Van Nest & Peters LLP served a subpoena on Warshaw & Associates. A true and correct copy of this subpoena is attached to this declaration as Exhibit C.

3.      On March 12, 2021, I discussed the subpoenas with Ed Swanson of Swanson & McNamara, LLP. Mr. Swanson confirmed that he represents Mr. Warshaw and the subpoenaed entities and that he was able to accept service of the subpoena to Mr. Warshaw, but that Police Performance Solutions may have been dissolved. In that call, Mr. Swanson noted that Judge Orrick has issued orders in the *Allen* case that may impact the scope of the subpoena, potentially precluding Mr. Warshaw from producing documents or testifying.

4.      On March 19, 2021 I met and conferred with Mr. Swanson again.  He stated that he could accept a subpoena to the entity Warshaw & Associates. He informed me that orders issued in the *Allen* case prohibited Warshaw from responding to the subpoena. After this call, Mr. Swanson provided me with a letter confirming his authorization to accept all three subpoenas. Mr. Swanson asserted that orders issued in *Allen* prohibit Mr. Warshaw from "testify[ing] and/or respond[ing] to subpoenas or documents in other matters relating to the City and OPD, except as authorized by the Court."  A true and correct copy of this letter is attached to this declaration as Exhibit D.

1674658

5.      On March 19, 2021, Mr. Swanson also provided me with the orders that he claimed prohibited Warshaw from responding to the subpoenas. True and correct copies of those orders are attached to this declaration as Exhibits E-I.

6.      On March 22, 2021, I sent an email to Katharine Van Dusen who represents the City of Oakland in this matter, attaching Mr. Swanson's letter. In that email I explained that "Mr. Warshaw is taking the position that he is precluded from producing documents or testifying in this matter" and that we sought a stipulation from the City agreeing that it "will not rely upon, introduce, or otherwise refer at trial or in connection with any dispositive motion, to evidence regarding the Negotiated Settlement Agreement or to Mr. Warshaw (including his roles as Compliance Director and Monitor), including but not limited to his involvement in matters pertaining to the Pawlik shooting."

7.      On March 23, Ms. Van Dusen replied, stating: "Nothing about the letter you attached to yesterday's email would warrant the sort of stipulation you're proposing."

8.      On April 5, 2021, I met-and-conferred with Mr. Swanson who informed me that an informal resolution of this discovery dispute would not suffice for his client and that a formal court order would be required before Mr. Warshaw or Warshaw & Associates would respond to the subpoenas.

9.      A true and correct copy of Defendant's Responses to Interrogatory No. 1, served on Plaintiff on February 25, 2021, is attached to this declaration as Exhibit J.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the State of California. Executed this 22nd day of April, 2021 at San Francisco, California.


/s/ R. James Slaughter
R. JAMES SLAUGHTER

DECLARATION OF R. JAMES SLAUGHTER IN SUPPORT OF PLAINTIFF ANNE KIRKPATRICK'S MOTION TO COMPEL ROBERT A. WARSHAW'S, WARSHAW & ASSOCIATES', AND POLICE PERFORMANCE SOLUTIONS' COMPLIANCE WITH SUBPOENAS
Case No. 3:20-cv-05843-JSC

1674658

# EXHIBIT A

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | |
|---|---|
| ANNE KIRKPATRICK | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 3:20-cv-05843-JSC |
| | ) |
| THE CITY OF OAKLAND, CALIFORNIA | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: ROBERT WARSHAW

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
See Attachment A.

| Place: Keker, Van Nest & Peters LLP<br>        633 Battery Street<br>        San Francisco, CA  94111 | Date and Time:<br>April 9, 2021<br>9:00am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  March 9, 2021

| *CLERK OF COURT* | |
|---|---|
| | OR   */s/ R. James Slaughter* |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |
| | R. James Slaughter |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Anne Kirkpatrick
_____ , who issues or requests this subpoena, are:
R. James Slaughter, Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111; (415) 391-5400, rslaughter@keker.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).



American LegalNet, Inc.
www.FormsWorkFlow.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 3:20-cv-05843-JSC

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* Robert Warshaw

on *(date)* March 9, 2021

&#x2612; I served the subpoena by delivering a copy to the named person as follows: By electronic mail pursuant to an

agreement between the Plaintiff and the witness.

on *(date)* March 9, 2021 ; or

&#x2610; I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.

Date: March 9, 2021

*/s/ Jennifer Gray*

*Server's signature*

Jennifer Gray, Legal Secretary

*Printed name and title*

Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111

*Server's address*

Additional information regarding attempted service, etc.:


American LegalNet, Inc.
www.FormsWorkFlow.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

 **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

---


American LegalNet, Inc.
www.FormsWorkFlow.com

## ATTACHMENT A

**Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action**

For purposes of this subpoena, the following defined terms shall have the following meaning:

## DEFINITIONS

1.      "YOU" and "YOUR" shall mean Robert Warshaw and any and all agents, representatives, attorneys, or anyone else acting or purporting to act on YOUR behalf or at YOUR direction.

2.      The term "THE CITY" shall refer to the City of Oakland, California, all of its employees, agents, and CITY OFFICIALS, and any entity acting at the direction or on behalf of the City of Oakland, including without limitation contractors, subcontractors, and consultants.

3.      The term "CITY OFFICIALS" shall refer to the Mayor of the City of Oakland, the Oakland City Council, the Police Commission and all past and present Police Commissioners, the City Clerk and Clerk's Office employees, the City Attorney and City Attorney Office employees, the City Auditor and Auditor Office employees, the City's Human Resources Department, and the Oakland Police Department and all of its employees.

4.      The term "NEGOTIATED SETTLEMENT AGREEMENT" shall refer to the settlement agreement entered into by THE CITY and the Plaintiffs in *Delphine Allen v. City of Oakland*, Case No. 3:00-cv-04599-WHO, in the United States District Court for the Northern District of California, originally commenced in December 2000.

5.      This "ACTION" shall refer to the above-captioned litigation, *Anne Kirkpatrick v. The City of Oakland, California*, No. 3:20-cv-05843-JSC, currently pending in the United States District Court for the Northern District of California.

6.      The term "PLAINTIFF" shall refer to Chief Anne Kirkpatrick.

7.      The term "POLICE COMMISSION" shall refer to the City of Oakland's Police Commission.  The term "POLICE COMMISSIONERS" shall refer to ALL past AND present members of the POLICE COMMISSION.

8.      The term "PAWLIK SHOOTING" shall refer to the officer-involved shooting of Joshua Pawlik on March 11, 2018 in Oakland, California.

9.      The term "PAWLIK INVESTIGATIONS" shall refer to ALL investigations into the PAWLIK SHOOTING, including those undertaken by YOU, the Oakland Police Department, the Community Police Review Agency/Community Police Review Board, or any other investigating entity.

10.      The term "PII REPORT" shall refer to the report Public Interest Investigations prepared regarding POLICE COMMISSIONER Ginale Harris and released on March 2, 2020.

11.      The term "CITY AUDITOR REPORT" shall refer to the investigative report about the POLICE COMMISSION released by the Oakland City Auditor on June 1, 2020 and entitled "Performance Audit of the Oakland Police Commission."

12.      "COMMUNICATION" includes any form of transmitting, receiving or exchanging information or ideas from one person to another, including without limitation correspondence, letters, personal and professional electronic mail, face-to-face communications, telephone calls, text or SMS messages, postings, or messages (including status updates, wall comments, or groups joined) through social media services (including but not limited to LinkedIn, Twitter, Facebook, and Instagram) or other instant messaging services (including but not limited to iMessage, WhatsApp, Slack, Skype, and Microsoft Teams), voicemails, faxes,

telegrams, memoranda, reports, discussions, conversations, negotiations, agreements, notes or other forms of information or ideas exchanged, whether oral, electronic or written.

13.     "DOCUMENT" shall have the broadest possible meaning under Federal Rule of Civil Procedure 34 and refers to, without limitation, printed, typed, handwritten, drawn or other graphic matter of any kind or nature, electronically stored information and metadata (regardless of form of storage or media (*e.g.*, server, hard drive, flash drive, CD, DVD, disk, diskette, tape, etc.)), and other data compilations from which information can be obtained and translated, if necessary, into reasonably usable forms (including without limitation databases). This includes the original, and all copies which are annotated or otherwise not identical to the original or to each other, whether by interlineation, receipt stamp, notation, indication of copy sent or received, or otherwise—such documents are deemed separate documents within the meaning of this term.

14.     "PERSON" refers to natural persons and entities including but not limited to corporations, partnerships, firms, proprietorships, joint ventures, unions, associations, groups, federations, governmental agencies, or any other organization or entity and his, her, its, or their officers, agents, and employees, and all predecessors in interest, successors, affiliates, subsidiaries, and related entities.

15.     The terms "REFLECTING," "REFERRING," "RELATING," "IN CONNECTION WITH" or "CONCERNING" (and all variations on those words) shall be construed in their most inclusive sense, and shall mean reflecting, pertaining to, consisting of, mentioning, pertaining to, involving, describing, discussing, detailing, supporting, contradicting, constituting, embodying, or in any way logically or factually connecting with the matter discussed. A document "REFERRING TO" or "RELATING TO" a given subject is any document that reflects, constitutes, contains, embodies, pertains to, mentions, consists of,

comprises, shows, comments on, evidences, describes, or in any other way references that subject.

16.     The term "INCLUDING" means including but not limited to.

17.     The terms "and" and "or" shall be construed in the conjunctive or disjunctive, whichever makes the request more inclusive.

18.     The use of the singular form of any term includes the plural and vice versa.

19.     The terms "each," "any," "all," and "every" are interchangeable.

20.     Any pronoun shall be construed to refer to the masculine, feminine, or neutral gender as in each case is most appropriate.

## INSTRUCTIONS

1.     These requests shall apply to all DOCUMENTS in YOUR possession, custody or control at the present time or coming into YOUR possession, custody or control at any time during the matter captioned above. If YOU know of the existence, past or present, of any DOCUMENTS or things requested below, but are unable to produce such DOCUMENTS or things because they are not presently in YOUR possession, custody, or control, YOU shall so state and shall identify such DOCUMENTS or things, and the PERSON who has possession, custody or control of the DOCUMENTS or things.

2.     If no DOCUMENTS are responsive to a particular request, YOU are to state that no responsive DOCUMENTS exist AND otherwise respond to all parts of the request for which DOCUMENTS do exist.

3.     All DOCUMENTS shall be produced as they are maintained in the usual course of business, including in the file folders or file cartons in which they have been maintained, stored, clipped, stapled or otherwise arranged in the same form and manner as they were found.

Family members shall not be separated—i.e., parent/child relationships shall be maintained at all times.  If YOU choose to produce DOCUMENTS by Document Request, YOU shall identify the Document Request to which the DOCUMENT is responsive.

4.    Electronically stored information ("ESI") shall be produced in accordance with the Northern District of California's Model Stipulated Order re Discovery of Electronically Stored Information for Standard Litigation.  *See* **Attachment B.**

5.    For any responsive DOCUMENTS or tangible things that have been lost or destroyed, YOU shall provide a written statement setting forth:

(a)    the date of the DOCUMENT;

(b)    the identity of the DOCUMENT;

(c)    the nature of the DOCUMENT *(e.g.,* letter, memorandum, chart); and

(d)    the identity of the PERSON(S) who authored the DOCUMENT and all recipients thereof.

6.    If you decline to produce any DOCUMENT or part thereof based on a claim of privilege or any other claim, describe the nature and basis of your claim and the information withheld in a manner sufficient:

(a)    to disclose the facts upon which YOU rely in asserting YOUR claim;

(b)    to permit the grounds and reasons for withholding the information to be identified unambiguously;

(c)    to permit the information withheld to be identified unambiguously; and

(d)    to allow PLAINTIFF or the Court to determine the appropriateness of the privilege claim.

7.     If YOU claim privilege or protection to part of a DOCUMENT, YOU shall redact that portion which is privileged or protected and produce the remainder.  All redactions shall also be included on the privilege log described in the preceding numbered paragraph.

8.     These requests seek all responsive DOCUMENTS in their original language and, if such original language is not English, these requests also seek all English-language translations that may exist for any such DOCUMENTS.

9.     You shall keep and produce a record of the source of each DOCUMENT produced.  This shall include the name and location of the file where each DOCUMENT was located and the name of the PERSON, group or department having possession, custody or control of each DOCUMENT.

10.    Each unique DOCUMENT is to be produced without abbreviation or redaction.

11.    Each page of each DOCUMENT that you produce in response to these requests should include a unique production number.

12.    If subsequent to service of an answer or objection to any request, you obtain or become aware of further DOCUMENTS or things pertaining to said request, you are required to serve an amended answer producing such documents or things, pursuant to Rule 26(e) of the Federal Rules of Civil Procedure.

13.    Please take notice that these instructions are submitted for the purposes of discovery and are not to be taken as waiving any objections which may be made at trial to the introduction of evidence of subjections covered by these requests or as an admission at the trial of the relevance or materiality of any of the matters covered by these requests.

## <u>DOCUMENTS REQUESTED</u>

1.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR
REFERRING TO PLAINTIFF'S employment performance.

2.      ALL DOCUMENTS that support, refute, or otherwise RELATE TO ANY
allegation in the Complaint, attached to this subpoena as **Attachment C.**

3.      ALL DOCUMENTS created between January 1, 2016 and January 1, 2021
RELATED TO OR REFERRING TO YOUR assessment of the CITY's compliance with the
terms of the NEGOTIATED SETTLEMENT AGREEMENT.  Please include in your response
ALL drafts, memoranda, notes, or other materials related to the Oakland Police Department's
performance with respect to compliance with the terms of the NEGOTIATED SETTLEMENT
AGREEMENT.

4.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO THE CITY'S
decision to terminate PLAINTIFF'S employment.

5.      ALL DOCUMENTS AND COMMUNICATIONS between YOU and CITY
OFFICIALS regarding PLAINTIFF, PLAINTIFF'S employment performance, and THE CITY'S
decision to terminate PLAINTIFF'S employment.

6.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO THE CITY'S
decision to hire PLAINTIFF.  Please include in YOUR response ANY AND ALL
DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO YOUR
assessment of PLAINTIFF's fitness for the role of Chief of Police in Oakland AND your
assessment of the fitness for the role of Chief of Police in Oakland of ALL other candidates for
that position.

7.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO THE performance of the POLICE COMMISSION.

8.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO this ACTION.

9.      ALL COMMUNICATIONS with any third party RELATED TO this ACTION.

10.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO the PAWLIK INVESTIGATIONS.  Please include in YOUR response all drafts, memoranda, notes, and other materials in YOUR possession, custody, or control which relate to YOUR investigation of the PAWLIK shooting.

11.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO the Oakland Black Officers' Association's concerns RELATED TO diversity in recruitment within the Oakland Police Department presented to PLAINTIFF in October 2018.

12.     ALL COMMUNICATIONS by or between YOU and any CITY OFFICIAL or any third party that REFER or RELATE TO PLAINTIFF.

13.     ALL COMMUNICATIONS with the POLICE COMMISSION that REFER or RELATE TO PLAINTIFF.

14.     ALL reports and draft reports regarding THE CITY'S compliance with the NEGOTIATED SETTLEMENT AGREEMENT created on or after January 1, 2016.

15.     ALL transcripts of hearings CONCERNING the NEGOTIATED SETTLEMENT AGREEMENT held since January 1, 2016.

16.     ALL DOCUMENTS AND COMMUNICATIONS REFERRING TO OR RELATED TO the PII REPORT.

17.     ALL DOCUMENTS AND COMMUNICATIONS REFERRING TO OR RELATED TO the CITY AUDITOR'S REPORT.

18.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO POLICE

COMMISSION violations of the Brown Act or any other public meeting/disclosure law,

regulation, rule, order, or other requirement.

19.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO THE scope of

the POLICE COMMISSION'S authority.

20.     ALL COMMUNICATIONS with any member of the press or media RELATED

TO PLAINTIFF.

21.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO POLICE COMMISSIONERS Jose Dorado and Ginale Harris's March 2018

interaction with two Oakland Police Department Neighborhood Services Coordinators, in which

COMMISSIONER Harris sought information RELATED TO Oakland Police Department hiring

processes and internal Oakland Police Department documents, and in which COMMISSIONER

Dorado discussed the December 2, 2016 Ghost Ship fire.

22.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO POLICE COMMISSIONER Ginale Harris's September 2018 visit to the

Oakland Police Department's Records Department to discuss a towing ticket and her subsequent

discussion with PLAINTIFF in PLAINTIFF's office at Oakland Police Department headquarters.

23.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO the POLICE COMMISSIONER statements made during the March 28, 2019

POLICE COMMISSION meeting, including ALL DOCUMENTS AND COMMUNICATIONS

RELATED TO OR REFERRING TO the lawfulness AND/OR appropriateness of the POLICE

COMMISSIONERS statements.

24.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO ALL past, current, AND future investigations, probes, reviews, OR other

inquiries that YOU OR THE CITY OR ANY of its agents, consultants, contractors,

subcontractors, private investigators, or attorneys conducted with respect to POLICE

COMMISSIONERS, the POLICE COMMISSION, or POLICE COMMISSIONER conduct,

including ANY witness interview notes OR transcripts, ANY draft reports, interim reports, final

reports, presentations, OR ANY other investigative work product, including, without limitation,

the investigation conducted by Public Interest Investigations regarding POLICE

COMMISSIONER Ginale Harris.

25.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO the Administrative Instruction 71 investigation into the Oakland Black

Officer's Association open letter CONCERNING PLAINTIFF, Captain Bassett, and diversity

and race issues within OPD, including ALL DOCUMENTS AND COMMUNICATIONS

RELATED TO OR REFERRING TO the lawfulness of the POLICE COMMISSION'S requests

for information RELATED TO the status AND substance of the investigation.

26.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO the POLICE COMMISSION'S demand to assign Deputy Chief LeRonne

Armstrong as the Oakland Police Department's liaison to the POLICE COMMISSION,

including ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING

TO the lawfulness of the POLICE COMMISSION'S demand.

27.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO the POLICE COMMISSION subpoena CONCERNING the PAWLIK

INVESTIGATIONS, issued in June 2019, including ALL COMMUNICATIONS AND

DOCUMENTS RELATED TO OR REFERRING TO the lawfulness of the subpoena or the Oakland Police Department's response to the subpoena.

28.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO the POLICE COMMISSION's request for a presentation on the Oakland Police Department's efforts to increase diversity and inclusion in its hiring practices to be presented during the October 10, 2019 POLICE COMMISSION meeting, including ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO the lawfulness or appropriateness of the POLICE COMMISSION'S response to the presentation during the hearing.

29.     ALL DOCUMENTS AND COMMUNICATIONS THAT RELATE TO, REFER TO, OR DESCRIBE the scope of the POLICE COMMISSION'S lawful authority.

# Attachment B

1
2
3
4
5
6

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

7
8
9
10
11
12
13

|  |  |  |
|---|---|---|
|  | ) | Case Number: C xx-xxxx |
|  | ) |  |
|  | ) | [MODEL] STIPULATED ORDER RE: |
| Plaintiff(s), | ) | DISCOVERY OF ELECTRONICALLY |
|  | ) | STORED INFORMATION FOR |
| vs. | ) | STANDARD LITIGATION |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| Defendant(s). | ) |  |
|  | ) |  |

14  **1. PURPOSE**

15   This Order will govern discovery of electronically stored information ("ESI") in this

16  case as a supplement to the Federal Rules of Civil Procedure, this Court's Guidelines for the

17  Discovery of Electronically Stored Information, and any other applicable orders and rules.

18  **2. COOPERATION**

19   The parties are aware of the importance the Court places on cooperation and commit to

20  cooperate in good faith throughout the matter consistent with this Court's Guidelines for the

21  Discovery of ESI.

22  **3. LIAISON**

23   The parties have identified liaisons to each other who are and will be knowledgeable

24  about and responsible for discussing their respective ESI.  Each e-discovery liaison will be, or

25  have access to those who are, knowledgeable about the technical aspects of e-discovery,

26  including the location, nature, accessibility, format, collection, search methodologies, and

27  production of ESI in this matter. The parties will rely on the liaisons, as needed, to confer

28  about ESI and to help resolve disputes without court intervention.

**4.  PRESERVATION**

The parties have discussed their preservation obligations and needs and agree that preservation of potentially relevant ESI will be reasonable and proportionate. To reduce the costs and burdens of preservation and to ensure proper ESI is preserved, the parties agree that:

a) Only ESI created or received between _____ and _____ will be preserved;

b) The parties have exchanged a list of the types of ESI they believe should be preserved and the custodians, or general job titles or descriptions of custodians, for whom they believe ESI should be preserved, e.g., "HR head," "scientist," and "marketing manager." The parties shall add or remove custodians as reasonably necessary;

c) The parties have agreed/will agree on the number of custodians per party for whom ESI will be preserved;

d) These data sources are not reasonably accessible because of undue burden or cost pursuant to Fed. R. Civ. P. 26(b)(2)(B) and ESI from these sources will be preserved but not searched, reviewed, or produced:  [e.g., backup media of [named] system, systems no longer in use that cannot be accessed];

e) Among the sources of data the parties agree are not reasonably accessible, the parties agree not to preserve the following: [e.g., backup media created before _____, digital voicemail, instant messaging, automatically saved versions of documents];

f) In addition to the agreements above, the parties agree data from these sources (a) could contain relevant information but (b) under the proportionality factors, should not be preserved: _____.

**5.  SEARCH**

The parties agree that in responding to an initial Fed. R. Civ. P. 34 request, or earlier if appropriate, they will meet and confer about methods to search ESI in order to identify ESI that is subject to production in discovery and filter out ESI that is not subject to discovery.

**6.  PRODUCTION FORMATS**

The parties agree to produce documents in ☐ PDF, ☐TIFF, ☐native and/or ☐paper or a combination thereof (check all that apply)] file formats. If particular documents warrant a different format, the parties will cooperate to arrange for the mutually acceptable production of such documents. The parties agree not to degrade the searchability of documents as part of the document production process.

**7. PHASING**

When a party propounds discovery requests pursuant to Fed. R. Civ. P. 34, the parties agree to phase the production of ESI and the initial production will be from the following sources and custodians: _____. Following the initial production, the parties will continue to prioritize the order of subsequent productions.

**8. DOCUMENTS PROTECTED FROM DISCOVERY**

a) Pursuant to Fed. R. Evid. 502(d), the production of a privileged or work-product-protected document, whether inadvertent or otherwise, is not a waiver of privilege or protection from discovery in this case or in any other federal or state proceeding. For example, the mere production of privileged or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case or in any other federal or state proceeding.

b) The parties have agreed upon a "quick peek" process pursuant to Fed. R. Civ. P. 26(b)(5) and reserve rights to assert privilege as follows _____ _____.

c) Communications involving trial counsel that post-date the filing of the complaint need not be placed on a privilege log. Communications may be identified on a privilege log by category, rather than individually, if appropriate.

**9. MODIFICATION**

This Stipulated Order may be modified by a Stipulated Order of the parties or by the Court for good cause shown.

**IT IS SO STIPULATED**, through Counsel of Record.

Dated:        _____

Counsel for Plaintiff

Dated:        _____

Counsel for Defendant

**IT IS ORDERED** that the forgoing Agreement is approved.

Dated:        _____

UNITED STATES DISTRICT/MAGISTRATE JUDGE

# Attachment C

1   KEKER, VAN NEST & PETERS LLP
    JOHN W. KEKER - # 49092
2   jkeker@keker.com
    R. JAMES SLAUGHTER - # 192813
3   rslaughter@keker.com
    BRYN WILLIAMS - # 301699
4   bwilliams@keker.com
    NICHOLAS GREEN - # 323959
5   ngreen@keker.com
    633 Battery Street
6   San Francisco, CA 94111-1809
    Telephone:    415 391 5400
7   Facsimile:    415 397 7188

8   Attorneys for Plaintiff ANNE KIRKPATRICK

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11           SAN FRANCISCO/OAKLAND DIVISIONS

12  ANNE KIRKPATRICK, an individual          Case No.

13                  Plaintiff,               **COMPLAINT FOR RETALIATORY
                                             DISCHARGE, CALIFORNIA LABOR
14        v.                                 CODE § 1102.5, AND VIOLATION OF
                                             FEDERAL CONSTITUTIONAL RIGHTS,
15  THE CITY OF OAKLAND, CALIFORNIA,         42 U.S.C. § 1983**
    a public corporation,
16
                    Defendant.
17                                           **DEMAND FOR JURY TRIAL**

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION
OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

Plaintiff Anne Kirkpatrick, by and through her counsel of record, for her Complaint against Defendant the City of Oakland, California, alleges as follows:

## NATURE OF THE CASE

1. The Oakland Police Commission is the product of hard work, creative thinking, and close collaboration—it represents an innovative and progressive step towards effective civilian oversight and the restoration of public confidence in the Oakland Police Department ("OPD").

2. Unfortunately, some Oakland Police Commissioners have no regard for the law or the scope of their power and authority. Despite holding critical positions of public trust, those same Commissioners routinely abuse their power and ignore their oath of office. By way of example, some Commissioners corruptly look for special treatment from OPD in their personal affairs. Others frequently abuse and harass OPD staff and interfere in day-to-day operations, including by seeking unlawful access to confidential documents. Commissioners regularly attempt to exceed their authority. Anybody who speaks out about these abuses is bullied, threatened, and retaliated against.

3. For nearly three years, Chief Kirkpatrick raised a series of alarms about this Commissioner misconduct, which she believed violated the law. Those alarms went largely unheeded. Finally, caving to pressure from those same lawless Commissioners, the City fired its most progressive Chief in decades in retaliation for blowing the whistle.

4. Put simply, the City, acting through its agents Mayor Libby Schaaf and the Police Commission, fired Chief Kirkpatrick in retaliation for her repeated reports of Police Commission misconduct. The Chief's termination violated the California Labor Code and the Chief's federal constitutional rights. Through this lawsuit, Chief Kirkpatrick seeks to shine a brighter light on this abuse of the public trust and to be made whole for the injuries she suffered as a result of the City's unlawful conduct.

## THE PARTIES

5. Plaintiff Anne Kirkpatrick is a law enforcement professional with deep experience, including senior leadership roles within the Spokane, Washington Police Department, the

2

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

Chicago, Illinois Police Department, and most recently as Chief of the Oakland Police

Department. Chief Kirkpatrick is a resident and citizen of the State of Washington.

6. Defendant, the City of Oakland, California, is a public municipal corporation and a California Charter City situated within Alameda County, California.

## JURISDICTION

7. This Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1332, because this is a civil suit between citizens of two different states and the amount in controversy exceeds $75,000.

8. This Court also has subject matter jurisdiction over Chief Kirkpatrick's First Amendment Claim pursuant to 28 U.S.C. § 1331, because it arises under the Constitution and laws of the United States. The Court has supplemental subject matter jurisdiction over Chief Kirkpatrick's claim under California Labor Code § 1102.5 pursuant 28 U.S.C. § 1367(a), because that claim is so related to the claim in the action within the Court's original jurisdiction that it forms part of the same case or controversy.

9. The Court has personal jurisdiction over the City because it is a California municipal corporation organized under a charter adopted pursuant to the Constitution of the State of California.

## VENUE

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the only Defendant in this action, the City, resides in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## INTRADISTRICT ASSIGNMENT

11. Pursuant to Local Rules 3-2(c) and 3-2(d), this case may be assigned to either the Oakland or San Francisco Divisions of this Court, because a substantial part of the events or omissions giving rise to Chief Kirkpatrick's claims occurred in Alameda County, California.

## CLAIM PRESENTATION

12. Pursuant to Cal. Gov't Code §§ 905, 910, and 915, Chief Kirkpatrick presented her claim for damages to the City of Oakland on May 6, 2020. Her claim included all required

3

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

elements under § 910, including: Chief Kirkpatrick's name and post office address, the post office address for notices related to the claim, the date, place, and other circumstances of the occurrence that gave rise to her claim, a general description of the City's indebtedness and the Chief's injury, the names of the City employees who caused the Chief's injury, and the fact that the Chief's injuries exceed the jurisdictional minimum for an unlimited civil case under the laws of the State of California.

13. The City of Oakland rejected Chief Kirkpatrick's claim by letter dated June 25, 2020. This civil suit for damages is therefore authorized under The Government Claims Act, Cal. Gov't Code § 945.4.

## FACTUAL ALLEGATIONS

### A. Measure LL and the Oakland Police Commission

14. When Chief Kirkpatrick arrived at OPD on February 27, 2017, she took the helm of a Department still reeling from a series of destabilizing events that undermined OPD's credibility and respect in the community it serves.

15. A reformer and advocate for police transparency, Chief Kirkpatrick began her tenure as Chief of Police against the backdrop of a citizen ballot initiative called Measure LL, approved by Oakland residents in the November 2016 elections. Measure LL created the current manifestation of the Oakland Police Commission, a body designed to provide robust civilian oversight of OPD and restore public faith and confidence the department.

16. Under Measure LL, the Commission received a specific mandate: to oversee, review, and reform OPD's "policies, procedures, customs, and General Orders[.]" The text of the initiative enumerated six areas of responsibility and authority within the Commission's purview:

    i) conduct public hearings at least annually related to policy and procedures;

    ii) propose changes to policies and procedures;

    iii) exercise oversight authority to approve or reject OPD's own suggested changes to Department policies and procedures;

    iv) review and comment, at its discretion, on all other policies and procedures;

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.
1389483

v)    review the City's budget for OPD to ensure it is in alignment with OPD's policies and procedures; and

vi)    substantial input into hiring and firing the Chief of Police.

17.    The Police Commission's hiring and firing authority includes the ability to propose four candidates from whom the Mayor may choose to hire as Chief, as well as the ability to fire the Chief of Police for cause.  Where, as in Chief Kirkpatrick's case, the Chief is fired without cause, the Mayor must consent.

18.    Under Measure LL, the scope of the Commission's authority is clear—it is empowered to examine and, if necessary, adjust OPD's governing policies and procedures.  It may also exercise authority with respect to OPD's most senior leadership in the form of its hiring and firing power.  Those are the limits of the Commission's authority.

19.    But, in its oversight role, the Police Commission has no authority over the day-to-day operations of the Department; it is not empowered to direct or assign lower-level OPD staff and it is explicitly prohibited from accessing legally protected OPD personnel records except in certain limited circumstances.

20.    Following Measure LL's enactment, the Police Commission began meeting in November 2017, about nine months after the City hired Chief Kirkpatrick.

21.    It was a rocky start—three Commissioners left their roles in the Police Commission's first months.  In addition, the Police Commission suffered from significant tension between mayoral appointees and Selection Panel appointees.[1]

22.    As a mayoral appointee herself and a newcomer to Oakland, Chief Kirkpatrick received her share of animosity from the Selection Panel appointees on the Police Commission.

23.    Compounding these problems, the Police Commission evidenced a misunderstanding of its role right from the start.  Although the scope of its authority is clearly limited to policy and procedure, the Police Commission sought to involve itself in the daily

---

[1] Measure LL gave the Mayor of Oakland authority to appoint three of the first regular members of the Police Commission and then created a "Selection Panel" empowered to recommend candidates for the remaining positions to the Oakland City Council for subsequent appointment.

5

1389483

affairs and operations of OPD and acted as if OPD employees were Police Commission staff.

24.     In addition, the City failed to provide the Police Commission with the necessary staff and support for a successful start, shortcomings that the Police Commission wrongly attributed to OPD.  When Police Commission meetings eventually began in the late fall of 2017, they were chaotic, often marked by discordant exchanges between Commissioners, OPD representatives, other City officials, and the community.

**B.     Chief Kirkpatrick's Reports of Commissioner Misconduct**

25.     Even under these challenging circumstances, Chief Kirkpatrick's time as OPD's leader was marked by many successes and improvements.

26.     For example, during Chief Kirkpatrick's tenure, the City's homicide rate decreased to its lowest level in twenty years, and the City was on pace for a sixty-four-year low homicide rate at the time of the Chief's termination.  Other notable reform efforts included OPD's implementation of new policies, strategy, and training around police-citizen encounters that resulted in a fifty percent reduction in stops involving African-American and Latinx citizens.  The Chief's reform efforts extended to OPD's disciplinary process as well; according to an outside Disparity in Discipline Study, OPD made significant strides in reducing divergent disciplinary outcomes during Chief Kirkpatrick's time leading the Department.

27.     But a series of incidents involving individual Police Commissioners ultimately drove the Chief to submit multiple reports of inappropriate and unlawful conduct to the Oakland City Attorney's Office, the City Administrator, and the Mayor of Oakland—the officials she understood had the capacity to take action to stop the Commissioner's unlawful conduct and prevent future recurrences.

28.     But City leaders all ignored Chief Kirkpatrick's repeated reports of Commission misconduct.  Instead, the Police Commission and Mayor orchestrated Chief Kirkpatrick's termination in retaliation for the Chief's repeated whistleblowing.

6

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

### 1.  Commissioners Threaten Neighborhood Services

29.  Chief Kirkpatrick's first report of Commissioner misconduct arose out of two Commissioners' inappropriate efforts to steer resources towards their own neighborhoods and related bullying, threats, and intimidation of two low-level OPD employees.

30.  On March 2, 2018, Commissioners Ginale Harris and Jose Dorado met with two supervisory OPD Neighborhood Services Coordinators ("NSCs") who work with the community to facilitate partnerships between citizens and the Department.

31.  During this encounter, Commissioner Harris made several demands, including for information related to OPD hiring processes and internal OPD documents.

32.  Commissioner Harris told these two OPD employees that she "had a history of having people fired" and that she believed NSCs "should be Oakland residents."

33.  Commissioner Dorado, for his part, expressed displeasure with the NSCs assigned to his neighborhood before emphasizing his view that the Ghost Ship fire, an event that resulted in thirty-six deaths, could have been prevented "had the NSC [done] her job."

34.  Upon receiving a report of this incident, Chief Kirkpatrick made a report to the City Attorney's Office and City Administrator Sabrina Landreth.

35.  The Chief made this report because she reasonably believed that Commissioner Harris and Commissioner Dorado violated Oakland regulations prohibiting misuse of official positions for personal gain.

### 2.  Commissioner Harris Seeks Special Treatment

36.  Chief Kirkpatrick submitted her next report of Police Commission misconduct in connection with an individual Commissioner's corrupt efforts to obtain special treatment from OPD.

37.  On September 17, 2018 Chief Kirkpatrick was working in her office on the eighth floor of OPD headquarters when Officer Johnna Watson, a staff assistant to the Chief, reported that Commissioner Harris was "basically throwing a fit" over a tow ticket in the Records Department.

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

38.     When citizens receive citations or fines, they may pay them in person in the Records Department.

39.     A supervisor from Records arrived and told the Chief that Commissioner Harris had displayed her Commission badge to Records Staff and asked if they "knew who I am?"  The Chief also understood that Commissioner Harris felt she had been illegally towed, that she was willing to pay her citation, but refused to pay the fee for a tow truck.

40.     Records staff told Commissioner Harris that she could pursue a hearing if she felt she was towed illegally, to which Commissioner Harris replied along the lines of "do I need to call the Chief" or "I'm going to have to call the Chief."

41.     The Chief understood that Commissioner Harris was asking for a personal favor and special treatment.

42.     Because her staff had escalated the matter to her desk, Chief Kirkpatrick felt that the situation was serious.  She instructed Officer Watson to bring Commissioner Harris to her office.

43.     When Commissioner Harris arrived, the Chief told her that she would not grant any favors for Police Commissioners and recommended that Commissioner Harris follow the ordinary appeals process.  Commissioner Harris then denied that she was seeking "a favor," and ultimately left the Chief's office without obtaining any change in her fine.

44.     After Commissioner Harris left, the Chief documented the events in an internal report.

45.     Chief Kirkpatrick also sent an email to City leaders, informing them of the confrontation.  The Chief wrote that Commissioner Harris was "bullying" her staff and expressed concerns regarding retaliation.

      **3.**     **The Police Commission Insults Alameda County's Public Defender**

46.     On March 28, 2019, Alameda County Public Defender Brendon Woods addressed a Police Commission meeting that Chief Kirkpatrick attended.  In the middle of Woods's remarks, Commissioner Harris interjected to the effect that Woods's "skin color is black" but that he "may not live like a black man."

8

1389483

47.     Woods took offense and responded with a brief personal history.

48.     The next day, the Chief sent an email to City leaders titled "Potential Complaint," and explained that she found Harris's remark "so unacceptable that I personally apologized to Mr. Wood[s]."

49.     The Chief believed that this incident possibly triggered her mandatory reporting obligation under City Administrative Instruction 71 ("AI 71"), a policy governing harassment and workplace misconduct.  Indeed, in the Chief's view, a comment of this tenor would subject an OPD Officer to serious discipline.

50.     The final line of her email is particularly ominous in retrospect: "I am concerned that the Police Commission could be retaliatory toward me for reporting this to you."

**4.      The Police Commission Seeks Confidential Information**

51.     The Chief submitted several reports to City leadership related to Police Commissioners' unlawful efforts to obtain confidential personnel information in connection with an investigation into racial bias within OPD, as well as Police Commissioners' attempts to intimidate and harass the Chief into commenting on the investigation in violation of her legal duty of confidentiality.

52.     Sometime in October 2018, Sergeant Aaron Smith, the President of the Oakland Black Officers' Association ("OBOA"), sought a meeting with Chief Kirkpatrick.  She understood this meeting to involve Smith's difficulties with his supervisor, Captain Jake Bassett. The Chief knew that many perceived Bassett to be a poor communicator, and although she found him quite competent, the Chief had received complaints regarding his leadership style in the past. At the time, Bassett oversaw the OPD Academy, which also retained responsibility for recruitment efforts.

53.     The Chief partially misunderstood the nature of Smith's visit.  She believed Smith's complaint was with Bassett's communication skills and leadership; while Smith did have such concerns, he also wanted to raise issues related to Bassett's handling of diversity and recruiting.  By her own admission, Chief Kirkpatrick missed the possible bias issues in Smith's presentation because the focus of his remarks was directed towards moving a different individual,

9

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

Virginia Gleason, into the position overseeing recruiting. Gleason was the Deputy Director of the Bureau of Support Services and Chief Kirkpatrick's top civilian aide.

54. In part due to concerns about a non-union civilian employee supervising sworn officers and union members, the Chief did not immediately take action, although she was working on a solution behind the scenes.

55. Ninety days after her meeting with Smith, the OBOA released an open letter that was highly critical of the Chief, Captain Bassett, and diversity and race issues within OPD. The letter caused serious disruption within the Department. The Chief immediately recognized that an AI 71 investigation was appropriate and welcomed outside scrutiny of the issues OBOA presented in its letter.

56. After the City announced an investigation, the Police Commission placed a status update on the probe on every meeting agenda. But, Chief Kirkpatrick could not speak to the issue in any capacity because she was legally precluded from discussing an open internal investigation. Moreover, she could in no circumstance comment on an investigation of which she was a focus. Nevertheless, in a transparent effort to harass and intimidate the Chief, the Police Commission continued noticing a status report that it knew the Chief could not lawfully provide, even after the Chief informed them that she could not answer any questions.

57. By April 2019, the situation had reached a boiling point. The Chief attended a Police Commission meeting where the status of the AI 71 investigation was again on the agenda. After refusing to address the topic, the Chief drafted an email to Mayor Schaaf and City Administrator Landreth (among others), titled "Complaint," where she decried the Police Commission's conduct. She explained that it was her "understanding that employment law prevents me from addressing" the issue and lamented that she was "being challenged as insubordinate" for refusing to violate her legal obligations.

**5. The Police Commission Inappropriately Directs Staff**

58. Chief Kirkpatrick reported again on the Police Commission's campaign of interference in the early summer of 2019. On May 29, 2019, Commissioner Harris emailed Chief Kirkpatrick to request that Deputy Chief LeRonne Armstrong serve as OPD's liaison to the Police

10

1389483

Commission.  In the request, Commissioner Harris explained that "I often have many question[s] in regards to East Oakland that I believe and trust that Deputy Armstrong can answer.  I do appreciate your staff that you bring to the meetings, however they are not from East Oakland or Oakland period.  I am a firm believer that you can only be an expert if you have experienced it."

59.    After some back and forth with Commissioners Harris and Regina Jackson, Chief Kirkpatrick ultimately informed them that she had spoken to Deputy Chief Armstrong and that he was not interested in serving as a liaison.

60.    Commissioner Jackson responded that the Commission "would like to have DC Armstrong be the liaison whether he likes it or not."

61.    Finally, on June 5, 2019, the Chief sought the intervention of City leaders, writing that they needed to explain the issue of having a commissioner directing staff to the Police Commission.

62.    On June 20, 2019, in the face of repeated demands and inaction from City administrators, the Chief concluded she had no recourse; she relented and assigned Deputy Chief Armstrong as the OPD liaison to the Police Commission.

**6.    The Police Commission Serves an Unlawful Subpoena**

63.    In the early summer of 2019, Chief Kirkpatrick raised further concerns about the lawfulness of Police Commission activity with senior City officials.

64.    OPD's internal investigations into the shooting death of Joshua Pawlik were coming to a close; OPD officers shot and killed Pawlik, a homeless man, after they observed him sleeping with a firearm.  Eventually, the Executive Force Review Board, the Community Police Review Agency, and Chief Kirkpatrick concluded that the use of force in the Pawlik shooting was within OPD policy.

65.    The Police Commission and federal monitor Robert Warshaw were not satisfied with OPD's review and Commissioners sought to obtain confidential records related to the

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

Department's internal investigation.[2]  Chief Kirkpatrick could not lawfully comply because the requested files contained protected personnel records, leading to several contentious Police Commission meetings.

66.     The Chief reasonably believed that Commissioners were again attempting to force her to disclose confidential information in violation of law and the terms of her contract.  Despite repeated requests, nobody in City Administration was willing to appear and defend the Chief at the Police Commission's meetings.

67.     In June 2019, the Police Commission issued a subpoena for all of OPD's internal communications related to the Pawlik case.  Although Measure LL did vest the Police Commission with subpoena power, this request exceeded the lawful boundaries of that power because it sought information protected by state law.  The Chief believed this request was unlawful and reported it to City administrators.  Ultimately, the Chief delivered the subpoenaed materials to Mike Nisparos, the head of the CPRA.  In his role at the CPRA, Nisparos was authorized to view sensitive personnel information, unlike the Commissioners.  Nisparos refused to turn over the communications to the Police Commission, telling the Chief that he believed the Police Commissioners were acting maliciously.

### 7.     The Commission Harasses and Intimidates Senior OPD Staff

68.     The Police Commission's campaign of intimidation, harassment, and interference with OPD leadership reached its climax in the fall of 2019.

69.     Representatives from the Police Commission informed Chief Kirkpatrick's senior civilian aide, Virginia Gleason, that the Police Commission desired a report on OPD's efforts to increase diversity and inclusion in its hiring practices.  Gleason was now responsible for leading these efforts, so preparation and presentation of the report were her responsibility.  Gleason informed Chrissy Love, the administrator in charge of scheduling for the Police Commission, that

---

[2] Chief Warshaw serves as a court-appointed federal monitor under a negotiated settlement agreement entered into by the City of Oakland and several civil rights plaintiffs, arising out of a case that predated Chief Kirkpatrick's tenure with OPD.

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

the first-choice date, October 10, 2019, conflicted with Gleason's pre-approved family vacation. Love and Gleason agreed on October 24, 2019 instead.

70.      Then, without Gleason's advanced knowledge, the Police Commission placed her presentation on the agenda for October 10.  The Police Commission knew Gleason had planned to be out of town on that date and sought to embarrass both Gleason and OPD by scheduling the presentation for a time when Gleason could not appear.  Nevertheless, Gleason canceled her vacation, attended the October 10, 2019 meeting, and delivered her report.  Chief Kirkpatrick also attended the meeting.

71.      But the Police Commission was not to be denied; Commissioners launched into heated criticism of Gleason's report almost immediately.  At least one Commissioner called the report "disgraceful."  Commissioner Harris told Gleason that, based on the content of the report, she "should be ashamed of herself."  The Commissioners' breathtakingly abusive and harassing conduct, unbecoming of public officials—and recorded on video—was a bridge too far.  Chief Kirkpatrick directed Gleason to step off the dais and took the microphone herself.  She admonished the Police Commission not to "speak to our staff in that manner" and emphasized that targeted abuse "is not acceptable."  The Chief demanded an apology on Gleason's behalf; Commissioner Harris responded that "[s]he will not get one from me.  And neither will you."

72.      The next day, the Chief wrote a "Formal Complaint," addressed to Barbara Parker (the City Attorney) and City Administrator Landreth, among others.  Her Complaint described the facts leading to the conflagration at the October 10, 2019 meeting in detail.  She also noted that Commissioner Smith and John Alden, the new director of the CPRA, reached out to her following the meeting.  Alden, she reported, characterized the events as "horrifying" and told the Chief that the Commissioners' motivations were "personal."  The Chief also noted that Deputy Chief Armstrong had told Gleason that the Police Commission knew the change in meeting date would interfere with Gleason's vacation and that it was "personal."  The Chief further observed that the Police Commission continued to notice the OBOA investigation for a status update and had noticed it for the October 10 meeting.

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

73.     Chief Kirkpatrick's report noted her belief that the Commissioners' behavior could be retaliation for the Chief's report of Harris's challenge to her tow ticket.  Her complaint ended by listing the other senior OPD staff present at the Commission meeting: Assistant Chief Darren Allison, Lieutenant Bobby Hookfin, Deputy Chief Roland Holmgren, and Lieutenant Wilson Lau.

**C.      Chief Kirkpatrick's Termination**

74.     At an open session of the Oakland City Council on January 28, 2020, Councilmember Rebecca Kaplan revealed the existence of a highly confidential internal investigation into repeated instances of misconduct by Police Commissioner Ginale Harris. Councilmember Kaplan disclosed a document that described the scope of the investigation and its approximate cost.

75.     Chief Kirkpatrick was involved in several of the incidents under scrutiny, including Commissioner Harris's threats to two NSCs in March 2018 and the September 2018 tow ticket incident.  The investigative team, from Public Interest Investigations, interviewed Chief Kirkpatrick in May 2019.  To be clear, Chief Kirkpatrick did not commission the investigation, nor did she direct its aims or conduct.  Her sole involvement was as a percipient witness to several of the events the City believed merited further investigation.  Notably, the very document Councilmember Kaplan disclosed, outlining the scope of the investigation, highlighted that Chief Kirkpatrick was already on record as being concerned about the prospect of retaliation for her reports related to Commissioner Harris's misconduct.

76.     Two days after Councilmember Kaplan revealed the investigation of Commissioner Harris, on January 30, 2020, an article appeared in the Oakland Post describing the investigation and suggesting that it was the product of "repeated moves by the Chief of Police Anne Kirkpatrick and the City Administrator Sabrina Landreth against Oakland Police Commission Vice Chair Ginale Harris."  The retaliation Chief Kirkpatrick feared had begun in earnest.

77.     Following the article's publication, the City Council met in closed session on February 5, 2020.  Less than two weeks later, Mayor Schaaf visited Chief Kirkpatrick in her home and told the Chief that the Police Commission intended to fire her.  Mayor Schaaf also

14

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1   suggested that the federal monitor, Robert Warshaw, supported firing the Chief.  The Mayor

2   asked Chief Kirkpatrick not to return to work.

3       78.     On Thursday, February 20, 2020, Mayor Schaaf called Chief Kirkpatrick and

4   informed her over the telephone that the City had terminated her employment as Chief of Police

5   without cause, effective immediately.  The City never offered the Chief an administrative hearing

6   as required under the Peace Officer's Bill of Rights, nor did it afford her an opportunity to appeal

7   the City's decision before a neutral decision maker.

8                           **FIRST CAUSE OF ACTION**
         **FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5**
9
10      79.     Chief Kirkpatrick reincorporates and realleges all preceding paragraphs as if set
    forth fully herein.
11
12      80.     At all relevant times, through her termination on February 20, 2020, the City of
    Oakland employed Anne Kirkpatrick in the position of Chief of Police.
13
14      81.     Chief Kirkpatrick provided information related to Police Commissioner
15  misconduct, which was not publicly known, to her employer the City of Oakland, a public body.
    The information disclosed included, without limitation:
16
17          i)      Commissioners Harris's and Dorado's attempts to bully and harass,
18  through threats and intimidation, two OPD Neighborhood Services Coordinators in an effort to
    obtain preferential policing for their own neighborhoods;
19
20          ii)     Commissioner Harris's misuse of her official position in an effort to obtain
    special treatment from OPD;
21
22          iii)    The Police Commission's unlawful attempts to obtain confidential
23  employment records to which it had no right of access;

24          iv)     The Police Commission's harassment and open contempt for OPD staff.

25      82.     Chief Kirkpatrick had reasonable cause to believe that the information she
    provided disclosed violations of state law and local regulations, including without limitation:
26
27          i)      Unlawful attempts to obtain confidential peace officer personnel records in
28  violation of Cal. Penal Code § 832.7 and Oakland Municipal Code § 2.45.80;

---

15

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION
OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

        ii)      Unlawful attempts to misuse official positions for personal gain in violation of Cal. Penal Code § 68(a) and Oakland Municipal Code § 2.25.06; and

        iii)     Abuse of authority and retaliatory conduct in violation of Oakland Municipal Code § 2.24.100.

83.     The City of Oakland discharged Chief Kirkpatrick, effective February 20, 2020.

84.     Chief Kirkpatrick's disclosures were, at a minimum, a contributing factor in the City's decision to terminate her employment at OPD.  Chief Kirkpatrick was terminated only four months after making a "formal complaint" against the Police Commissioners, expressing her belief that Commissioners were retaliating against her, at least in part, due to her *prior* reports of misconduct.  Indeed, the Chief's reports, made in close temporal proximity to her termination, disclosed blatant corruption and misconduct by the very officials that terminated her employment. Throughout her employment as Chief of Police, Chief Kirkpatrick expressed concern, in writing, that the Police Commission might retaliate against her for reporting Commissioner misconduct; those fears eventually became reality in February 2020.

85.     Chief Kirkpatrick was damaged by her unlawful discharge, in at least the following ways:

        i)       Lost compensation from February 2020 through the conclusion of her contractual term of employment, February 26, 2022.

        ii)      Lost health, retirement, and fringe benefits through the conclusion of her contractual term of employment, February 26, 2022.

        iii)     Mental suffering caused by the City's extreme and outrageous conduct in terminating her employment for reporting Commissioner misconduct.

## SECOND CAUSE OF ACTION
### FOR VIOLATION OF FIRST AMENDMENT RIGHTS, 42 U.S.C § 1983

86.     Chief Kirkpatrick reincorporates and realleges all preceding paragraphs as if set forth fully herein.

87.     Chief Kirkpatrick's reports to City administrators amounted to protected speech that substantially addressed matters of public concern.  The Chief's reports concerned

16

1389483

1    wrongdoing at high levels of City government, within a body specifically created to provide

2    accountable civilian oversight and restore public confidence and trust in OPD.  The Chief also

3    disclosed corrupt acts, self-serving conduct, and violations of law.  The Chief's speech bore

4    directly on critical issues of governmental mismanagement at systemic levels involving an

5    essential public safety agency, and were not mere employment grievances.

6           88.    The Chief's reports were not made in the ordinary course of her job duties, which

7    involved managing OPD's day-to-day operations.  Instead, her speech was made in her capacity

8    as a concerned citizen, and involved reports that were necessary to root out public corruption.

9    The Chief directed her protected speech to the only City administrators potentially capable of

10   putting an end to Commissioner misconduct.

11          89.    The Chief's protected speech, made in her capacity as a private citizen and which

12   substantially addressed matters of public concern, was a substantial motivating factor in the

13   City's adverse employment action.  Specifically, the City terminated the Chief's employment in

14   direct retaliation for her repeated whistleblowing activities.  The City fired the Chief on February

15   20, 2020, only four months after her October 11, 2019 "formal complaint."

16          90.    The City had no adequate justification for terminating the Chief's employment

17   based on her protected whistleblowing speech under *Pickering v. Board of Education of*

18   *Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968).  The Chief's

19   protected speech did not disrupt the City's ability to control its work environment or the

20   relationships between coworkers within OPD; indeed just the opposite is true.  Nor did the

21   Chief's speech impair her ability to perform her job duties or obstruct OPD's routine operations.

22          91.    The Chief's protected speech was the logical and proximate cause of her

23   termination.  The City fired Chief Kirkpatrick *because* of her repeated efforts to cast sunshine on

24   Police Commissioner misconduct.

25          92.    Oakland Mayor Libby Schaaf and the Police Commission jointly terminated Chief

26   Kirkpatrick.  These individuals, acting on behalf of the City and as the City's agents, are the City

27   officials responsible for establishing final policy with respect to OPD, as evidenced by

28   § 604(b)(10) of the Oakland City Charter and Measure LL.  As such, the Chief's termination was

17

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION
OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

the decision of a final policymaker for purposes of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

93.     Chief Kirkpatrick was damaged by her retaliatory discharge, in at least the following ways:

i)     Lost earnings from February 20, 2020 through the conclusion of her contractual term of employment, February 26, 2022.

ii)     Lost health, retirement, and fringe benefits from February 20, 2020 through the conclusion of her contractual term of employment, February 26, 2022.

iii)     Mental suffering caused by the City's extreme and outrageous conduct in terminating her employment for reporting Commissioner misconduct.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Anne Kirkpatrick prays for judgment against the City of Oakland as follows:

1.     A judgment that the City terminated Chief Kirkpatrick in retaliation for protected disclosures to a public body, in violation of Cal. Labor Code § 1102.5;

2.     A judgment that the City violated Chief Kirkpatrick's rights under the First Amendment to the United States Constitution;

3.     General damages according to proof, including, without limitation, mental pain and anguish cause by the City's extreme and outrageous conduct;

4.     Special damages according to proof, including without limitation:

i)     Lost earnings for the period between February 20, 2020 and February 26, 2022, inclusive;

ii)     Lost future health, retirement, and fringe benefits for the period between February 20, 2020 and February 26, 2022, inclusive;

iii)     Damage to future earning potential through injury to professional reputation;

5.     Prejudgment interest in an amount according to proof;

6.     Reasonable attorneys' fees and costs;

18

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION
OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

# EXHIBIT B

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the
Northern District of California

| | |
|---|---|
| ANNE KIRKPATRICK<br><span style="text-align:center;display:block">*Plaintiff*</span> | ) |
| | ) |
| v. | )     Civil Action No. 3:20-cv-05843-JSC |
| | ) |
| THE CITY OF OAKLAND, CALIFORNIA<br><span style="text-align:center;display:block">*Defendant*</span> | ) |
| | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: POLICE PERFORMANCE SOLUTIONS, LLC

_____

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
See Attachment A.

| Place: Keker, Van Nest & Peters LLP<br>    633 Battery Street<br>    San Francisco, CA  94111 | Date and Time:<br>April 9, 2021<br>9:00am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

    The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   March 9, 2021

<table>
<tr><td></td><td align="center">CLERK OF COURT</td><td></td></tr>
<tr><td></td><td align="center">OR</td><td></td></tr>
<tr><td></td><td></td><td>/s/ R. James Slaughter</td></tr>
<tr><td align="center">_____<br>*Signature of Clerk or Deputy Clerk*</td><td></td><td align="center">_____<br>*Attorney's signature*<br>R. James Slaughter</td></tr>
</table>

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Anne Kirkpatrick
_____ , who issues or requests this subpoena, are:
R. James Slaughter, Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111; (415) 391-5400, rslaughter@keker.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

1660130.v1



American LegalNet, Inc.
www.FormsWorkFlow.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 3:20-cv-05843-JSC

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* Police Performance Solutions, LLC

on *(date)* March 9, 2021

☒ I served the subpoena by delivering a copy to the named person as follows: By electronic mail pursuant to an

agreement between the Plaintiff and the witness.

on *(date)* March 9, 2021 ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.

Date: March 9, 2021

*/s/ Jennifer Gray*

*Server's signature*

Jennifer Gray, Legal Secretary

*Printed name and title*

Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111

*Server's address*

Additional information regarding attempted service, etc.:



1660130.v1

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

---


American LegalNet, Inc.
www.FormsWorkFlow.com

## ATTACHMENT A

**Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action**

For purposes of this subpoena, the following defined terms shall have the following meaning:

## DEFINITIONS

1.      "YOU" and "YOUR" shall mean Police Performance Solutions, LLC and any and all agents, representatives, attorneys, or anyone else acting or purporting to act on YOUR behalf or at YOUR discretion.  This definition shall include, but is not limited to, Robin Busch-Wheaton and John Girvin.

2.      The term "THE CITY" shall refer to the City of Oakland, California, all of its employees, agents, and CITY OFFICIALS, and any entity acting at the direction or on behalf of the City of Oakland, including without limitation contractors, subcontractors, and consultants.

3.      The term "CITY OFFICIALS" shall refer to the Mayor of the City of Oakland, the Oakland City Council, the Police Commission and all past and present Police Commissioners, the City Clerk and Clerk's Office employees, the City Attorney and City Attorney Office employees, the City Auditor and Auditor Office employees, the City's Human Resources Department, and the Oakland Police Department and all of its employees.

4.      The term "NEGOTIATED SETTLEMENT AGREEMENT" shall refer to the settlement agreement entered into by THE CITY and the Plaintiffs in *Delphine Allen v. City of Oakland*, Case No. 3:00-cv-04599-WHO, in the United States District Court for the Northern District of California, originally commenced in December 2000.

5.      This "ACTION" shall refer to the above-captioned litigation, *Anne Kirkpatrick v. The City of Oakland, California*, No. 3:20-cv-05843-JSC, currently pending in the United States District Court for the Northern District of California.

6.      The term "PLAINTIFF" shall refer to Chief Anne Kirkpatrick.

7.      The term "POLICE COMMISSION" shall refer to the City of Oakland's Police Commission.  The term "POLICE COMMISSIONERS" shall refer to ALL past AND present members of the POLICE COMMISSION.

8.      The term "PAWLIK SHOOTING" shall refer to the officer-involved shooting of Joshua Pawlik on March 11, 2018 in Oakland, Califorina.

9.      The term "PAWLIK INVESTIGATIONS" shall refer to ALL investigations into the PAWLIK SHOOTING, including those undertaken by YOU, the Oakland Police Department, the Community Police Review Agency/Community Police Review Board, or any other investigating entity.

10.      The term "PII REPORT" shall refer to the report Public Interest Investigations prepared regarding POLICE COMMISSIONER Ginale Harris and released on March 2, 2020.

11.      The term "CITY AUDITOR REPORT" shall refer to the investigative report about the POLICE COMMISSION released by the Oakland City Auditor on June 1, 2020 and entitled "Performance Audit of the Oakland Police Commission."

12.      "COMMUNICATION" includes any form of transmitting, receiving or exchanging information or ideas from one person to another, including without limitation correspondence, letters, personal and professional electronic mail, face-to-face communications, telephone calls, text or SMS messages, postings, or messages (including status updates, wall comments, or groups joined) through social media services (including but not limited to

LinkedIn, Twitter, Facebook, and Instagram) or other instant messaging services (including but not limited to iMessage, WhatsApp, Slack, Skype, and Microsoft Teams), voicemails, faxes, telegrams, memoranda, reports, discussions, conversations, negotiations, agreements, notes or other forms of information or ideas exchanged, whether oral, electronic or written.

13.    "DOCUMENT" shall have the broadest possible meaning under Federal Rule of Civil Procedure 34 and refers to, without limitation, printed, typed, handwritten, drawn or other graphic matter of any kind or nature, electronically stored information and metadata (regardless of form of storage or media (*e.g.*, server, hard drive, flash drive, CD, DVD, disk, diskette, tape, etc.)), and other data compilations from which information can be obtained and translated, if necessary, into reasonably usable forms (including without limitation databases). This includes the original, and all copies which are annotated or otherwise not identical to the original or to each other, whether by interlineation, receipt stamp, notation, indication of copy sent or received, or otherwise—such documents are deemed separate documents within the meaning of this term.

14.    "PERSON" refers to natural persons and entities including but not limited to corporations, partnerships, firms, proprietorships, joint ventures, unions, associations, groups, federations, governmental agencies, or any other organization or entity and his, her, its, or their officers, agents, and employees, and all predecessors in interest, successors, affiliates, subsidiaries, and related entities.

15.    The terms "REFLECTING," "REFERRING," "RELATING," "IN CONNECTION WITH" or "CONCERNING" (and all variations on those words) shall be construed in their most inclusive sense, and shall mean reflecting, pertaining to, consisting of, mentioning, pertaining to, involving, describing, discussing, detailing, supporting, contradicting, constituting, embodying, or in any way logically or factually connecting with the matter

discussed. A document "REFERRING TO" or "RELATING TO" a given subject is any document that reflects, constitutes, contains, embodies, pertains to, mentions, consists of, comprises, shows, comments on, evidences, describes, or in any other way references that subject.

16.     The term "INCLUDING" means including but not limited to.

17.     The terms "and" and "or" shall be construed in the conjunctive or disjunctive, whichever makes the request more inclusive.

18.     The use of the singular form of any term includes the plural and vice versa.

19.     The terms "each," "any," "all," and "every" are interchangeable.

20.     Any pronoun shall be construed to refer to the masculine, feminine, or neutral gender as in each case is most appropriate.

## **INSTRUCTIONS**

1.     These requests shall apply to all DOCUMENTS in YOUR possession, custody or control at the present time or coming into YOUR possession, custody or control at any time during the matter captioned above. IF YOU know of the existence, past or present, of any DOCUMENTS or things requested below, but are unable to produce such DOCUMENTS or things because they are not presently in YOUR possession, custody, or control, YOU shall so state and shall identify such DOCUMENTS or things, and the PERSON who has possession, custody or control of the DOCUMENTS or things.

2.     If no DOCUMENTS are responsive to a particular request, YOU are to state that no responsive DOCUMENTS exist AND otherwise respond to all parts of the request for which DOCUMENTS do exist.

3.      All DOCUMENTS shall be produced as they are maintained in the usual course of business, including in the file folders or file cartons in which they have been maintained, stored, clipped, stapled or otherwise arranged in the same form and manner as they were found. Family members shall not be separated—i.e., parent/child relationships shall be maintained at all times.  If YOU choose to produce DOCUMENTS by Document Request, YOU shall identify the Document Request to which the DOCUMENT is responsive.

4.      Electronically stored information ("ESI") shall be produced in accordance with the Northern District of California's Model Stipulated Order re Discovery of Electronically Stored Information for Standard Litigation.

5.      For any responsive DOCUMENTS or tangible things that have been lost or destroyed, YOU shall provide a written statement setting forth:

     (a)      the date of the DOCUMENT;

     (b)      the identity of the DOCUMENT;

     (c)      the nature of the DOCUMENT (*e.g.,* letter, memorandum, chart); and

     (d)      the identity of the PERSON(S) who authored the DOCUMENT and all recipients thereof.

6.      If you decline to produce any DOCUMENT or part thereof based on a claim of privilege or any other claim, describe the nature and basis of your claim and the information withheld in a manner sufficient:

     (a)      to disclose the facts upon which YOU rely in asserting YOUR claim;

     (b)      to permit the grounds and reasons for withholding the information to be identified unambiguously;

     (c)      to permit the information withheld to be identified unambiguously; and

        (d)        to allow PLAINTIFF or the Court to determine the appropriateness of the privilege claim.

7.      If YOU claim privilege or protection to part of a DOCUMENT, YOU shall redact that portion which is privileged or protected and produce the remainder.  All redactions shall also be included on the privilege log described in the preceding numbered paragraph.

8.      These requests seek all responsive DOCUMENTS in their original language and, if such original language is not English, these requests also seek all English-language translations that may exist for any such DOCUMENTS.

9.      You shall keep and produce a record of the source of each DOCUMENT produced.  This shall include the name and location of the file where each DOCUMENT was located and the name of the PERSON, group or department having possession, custody or control of each DOCUMENT.

10.      Each unique DOCUMENT is to be produced without abbreviation or redaction.

11.      Each page of each DOCUMENT that you produce in response to these requests should include a unique production number.

12.      If subsequent to service of an answer or objection to any request, you obtain or become aware of further DOCUMENTS or things pertaining to said request, you are required to serve an amended answer producing such documents or things, pursuant to Rule 26(e) of the Federal Rules of Civil Procedure.

13.      Please take notice that these instructions are submitted for the purposes of discovery and are not to be taken as waiving any objections which may be made at trial to the introduction of evidence of subjections covered by these requests or as an admission at the trial of the relevance or materiality of any of the matters covered by these requests.

## **DOCUMENTS REQUESTED**

1.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO PLAINTIFF'S employment performance.

2.      ALL DOCUMENTS that support, refute, or otherwise RELATE TO ANY

allegation in the Complaint, attached to this subpoena as **Attachment B.**

3.      ALL DOCUMENTS created between January 1, 2016 and January 1, 2021

RELATED TO OR REFERRING TO YOUR assessment of the CITY'S compliance with the

terms of the NEGOTIATED SETTLEMENT AGREEMENT.  Please include in your response

ALL drafts, memoranda, notes, or other materials related to the Oakland Police Department's

performance with respect to compliance with the terms of the NEGOTIATED SETTLEMENT

AGREEMENT.

4.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO THE CITY'S

decision to terminate PLAINTIFF'S employment.

5.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO THE CITY'S

decision to hire PLAINTIFF.  Please include in YOUR response ANY AND ALL

DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO YOUR

assessment of PLAINTIFF'S fitness for the role of Chief of Police in Oakland AND your

assessment of the fitness for the role of Chief of Police in Oakland of ALL other candidates for

that position.

6.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO THE

performance of the POLICE COMMISSION.

7.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO this ACTION.

8.      ALL COMMUNICATIONS with any third party RELATED TO this ACTION.

9.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO the PAWLIK INVESTIGATIONS.  Please include in YOUR response all drafts, memoranda, notes, and other materials in YOUR possession, custody, or control which relate to YOUR investigation of the PAWLIK shooting.

10.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO the Oakland Black Officers' Association's concerns RELATED TO diversity in recruitment within the Oakland Police Department presented to PLAINTIFF in October 2018.

11.     ALL COMMUNICATIONS by or between YOU and any CITY OFFICIAL or any third party that REFER or RELATE TO PLAINTIFF.

12.     ALL COMMUNICATIONS with the POLICE COMMISSION that REFER or RELATE TO PLAINTIFF.

13.     ALL DOCUMENTS AND COMMUNICATIONS REFERRING TO OR RELATED TO the NEGOTIATED SETTLEMENT AGREEMENT created on or after January 1, 2016.

14.     ALL transcripts of hearings CONCERNING the NEGOTIATED SETTLEMENT AGREEMENT since January 1, 2016.

15.     ALL DOCUMENTS AND COMMUNICATIONS REFERRING TO OR RELATED TO the PII REPORT.

16.     ALL DOCUMENTS AND COMMUNICATIONS REFERRING TO OR RELATED TO the CITY AUDITOR'S REPORT.

17.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO POLICE COMMISSION violations of the Brown Act or any other public meeting/disclosure law, regulation, rule, order, or other requirement.

18.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO THE scope of the POLICE COMMISSION'S authority.

19.     ALL COMMUNICATIONS with any member of the press or media RELATED TO PLAINTIFF.

20.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO POLICE COMMISSIONERS Jose Dorado and Ginale Harris's March 2018 interaction with two Oakland Police Department Neighborhood Services Coordinators, in which COMMISSIONER Harris sought information RELATED TO Oakland Police Department hiring processes and internal Oakland Police Department documents, and in which COMMISSIONER Dorado discussed the December 2, 2016 Ghost Ship fire.

21.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO POLICE COMMISSIONER Ginale Harris's September 2018 visit to the Oakland Police Department's Records Department to discuss a towing ticket and her subsequent discussion with PLAINTIFF in PLAINTIFF'S office at Oakland Police Department headquarters.

22.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO the POLICE COMMISSIONER statements made during the March 28, 2019 POLICE COMMISSION meeting, including ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO the lawfulness AND/OR appropriateness of the POLICE COMMISSIONERS statements.

23.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO ALL past, current, AND future investigations, probes, reviews, OR other inquiries that YOU OR THE CITY OR ANY of its agents, consultants, contractors,

subcontractors, private investigators, or attorneys conducted with respect to POLICE

COMMISSIONERS, the POLICE COMMISSION, or POLICE COMMISSIONER conduct,

including ANY witness interview notes OR transcripts, ANY draft reports, interim reports, final

reports, presentations, OR ANY other investigative work product, including, without limitation,

the investigation conducted by Public Interest Investigations regarding POLICE

COMMISSIONER Ginale Harris.

      24.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO the Administrative Instruction 71 investigation into the Oakland Black

Officer's Association open letter CONCERNING PLAINTIFF, Captain Bassett, and diversity

and race issues within OPD, including ALL DOCUMENTS AND COMMUNICATIONS

RELATED TO OR REFERRING TO the lawfulness of the POLICE COMMISSION'S requests

for information RELATED TO the status AND substance of the investigation.

      25.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO the POLICE COMMISSION'S demand to assign Deputy Chief LeRonne

Armstrong as the Oakland Police Department's liaison to the POLICE COMMISSION,

including ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING

TO the lawfulness of the POLICE COMMISSION'S demand.

      26.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO the POLICE COMMISSION subpoena CONCERNING the PAWLIK

INVESTIGATIONS, issued in June 2019, including ALL COMMUNICATIONS AND

DOCUMENTS RELATED TO OR REFERRING TO the lawfulness of the subpoena or the

Oakland Police Department's response to the subpoena.

27.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR

REFERRING TO the POLICE COMMISSION'S request for a presentation on the Oakland

Police Department's efforts to increase diversity and inclusion in its hiring practices to be

presented during the October 10, 2019 POLICE COMMISSION meeting, including ALL

DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO the

lawfulness or appropriateness of the POLICE COMMISSION'S response to the presentation

during the hearing.

28.     ALL DOCUMENTS AND COMMUNICATIONS THAT RELATE TO, REFER

TO, OR DESCRIBE the scope of the POLICE COMMISSION'S lawful authority.

# Attachment B

1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 7 | )    Case Number: C xx-xxxx |
| 8 | ) |
| | )    [MODEL] STIPULATED ORDER RE: |
| 9 | Plaintiff(s),  )    DISCOVERY OF ELECTRONICALLY |
| | )    STORED INFORMATION FOR |
| | )    STANDARD LITIGATION |
| 10 | vs.  ) |
| 11 | ) |
| | ) |
| 12 | Defendant(s).  ) |
| 13 | ) |

14 **1. PURPOSE**

15       This Order will govern discovery of electronically stored information ("ESI") in this

16 case as a supplement to the Federal Rules of Civil Procedure, this Court's Guidelines for the

17 Discovery of Electronically Stored Information, and any other applicable orders and rules.

18 **2. COOPERATION**

19       The parties are aware of the importance the Court places on cooperation and commit to

20 cooperate in good faith throughout the matter consistent with this Court's Guidelines for the

21 Discovery of ESI.

22 **3. LIAISON**

23       The parties have identified liaisons to each other who are and will be knowledgeable

24 about and responsible for discussing their respective ESI.  Each e-discovery liaison will be, or

25 have access to those who are, knowledgeable about the technical aspects of e-discovery,

26 including the location, nature, accessibility, format, collection, search methodologies, and

27 production of ESI in this matter. The parties will rely on the liaisons, as needed, to confer

28 about ESI and to help resolve disputes without court intervention.

**4.  PRESERVATION**

The parties have discussed their preservation obligations and needs and agree that preservation of potentially relevant ESI will be reasonable and proportionate. To reduce the costs and burdens of preservation and to ensure proper ESI is preserved, the parties agree that:

a)  Only ESI created or received between _____ and _____ will be preserved;

b)  The parties have exchanged a list of the types of ESI they believe should be preserved and the custodians, or general job titles or descriptions of custodians, for whom they believe ESI should be preserved, e.g., "HR head," "scientist," and "marketing manager." The parties shall add or remove custodians as reasonably necessary;

c)  The parties have agreed/will agree on the number of custodians per party for whom ESI will be preserved;

d)  These data sources are not reasonably accessible because of undue burden or cost pursuant to Fed. R. Civ. P. 26(b)(2)(B) and ESI from these sources will be preserved but not searched, reviewed, or produced:  [e.g., backup media of [named] system, systems no longer in use that cannot be accessed];

e)  Among the sources of data the parties agree are not reasonably accessible, the parties agree not to preserve the following: [e.g., backup media created before _____, digital voicemail, instant messaging, automatically saved versions of documents];

f)  In addition to the agreements above, the parties agree data from these sources (a) could contain relevant information but (b) under the proportionality factors, should not be preserved: _____.

**5.  SEARCH**

The parties agree that in responding to an initial Fed. R. Civ. P. 34 request, or earlier if appropriate, they will meet and confer about methods to search ESI in order to identify ESI that is subject to production in discovery and filter out ESI that is not subject to discovery.

**6.  PRODUCTION FORMATS**

The parties agree to produce documents in ☐ PDF, ☐TIFF, ☐native and/or ☐paper or a combination thereof (check all that apply)] file formats. If particular documents warrant a different format, the parties will cooperate to arrange for the mutually acceptable production of such documents. The parties agree not to degrade the searchability of documents as part of the document production process.

2

**7. PHASING**

When a party propounds discovery requests pursuant to Fed. R. Civ. P. 34, the parties agree to phase the production of ESI and the initial production will be from the following sources and custodians: _____.
Following the initial production, the parties will continue to prioritize the order of subsequent productions.

**8. DOCUMENTS PROTECTED FROM DISCOVERY**

   a) Pursuant to Fed. R. Evid. 502(d), the production of a privileged or work-product-protected document, whether inadvertent or otherwise, is not a waiver of privilege or protection from discovery in this case or in any other federal or state proceeding. For example, the mere production of privileged or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case or in any other federal or state proceeding.

   b) The parties have agreed upon a "quick peek" process pursuant to Fed. R. Civ. P. 26(b)(5) and reserve rights to assert privilege as follows _____ _____.

   c) Communications involving trial counsel that post-date the filing of the complaint need not be placed on a privilege log. Communications may be identified on a privilege log by category, rather than individually, if appropriate.

**9. MODIFICATION**

This Stipulated Order may be modified by a Stipulated Order of the parties or by the Court for good cause shown.

   **IT IS SO STIPULATED**, through Counsel of Record.

Dated: _____     _____

                                        Counsel for Plaintiff

Dated: _____     _____

                                        Counsel for Defendant

   **IT IS ORDERED** that the forgoing Agreement is approved.

Dated: _____     _____

                                        UNITED STATES DISTRICT/MAGISTRATE JUDGE

3

# Attachment C

KEKER, VAN NEST & PETERS LLP
JOHN W. KEKER - # 49092
jkeker@keker.com
R. JAMES SLAUGHTER - # 192813
rslaughter@keker.com
BRYN WILLIAMS - # 301699
bwilliams@keker.com
NICHOLAS GREEN - # 323959
ngreen@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:      415 397 7188

Attorneys for Plaintiff ANNE KIRKPATRICK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISIONS

| | |
|---|---|
| ANNE KIRKPATRICK, an individual<br><br>          Plaintiff,<br><br>      v.<br><br>THE CITY OF OAKLAND, CALIFORNIA,<br>a public corporation,<br><br>          Defendant. | Case No.<br><br>**COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983**<br><br><br>**DEMAND FOR JURY TRIAL** |

1389483

Plaintiff Anne Kirkpatrick, by and through her counsel of record, for her Complaint against Defendant the City of Oakland, California, alleges as follows:

### NATURE OF THE CASE

1.      The Oakland Police Commission is the product of hard work, creative thinking, and close collaboration—it represents an innovative and progressive step towards effective civilian oversight and the restoration of public confidence in the Oakland Police Department ("OPD").

2.      Unfortunately, some Oakland Police Commissioners have no regard for the law or the scope of their power and authority.  Despite holding critical positions of public trust, those same Commissioners routinely abuse their power and ignore their oath of office.  By way of example, some Commissioners corruptly look for special treatment from OPD in their personal affairs.  Others frequently abuse and harass OPD staff and interfere in day-to-day operations, including by seeking unlawful access to confidential documents.  Commissioners regularly attempt to exceed their authority.  Anybody who speaks out about these abuses is bullied, threatened, and retaliated against.

3.      For nearly three years, Chief Kirkpatrick raised a series of alarms about this Commissioner misconduct, which she believed violated the law.  Those alarms went largely unheeded.  Finally, caving to pressure from those same lawless Commissioners, the City fired its most progressive Chief in decades in retaliation for blowing the whistle.

4.      Put simply, the City, acting through its agents Mayor Libby Schaaf and the Police Commission, fired Chief Kirkpatrick in retaliation for her repeated reports of Police Commission misconduct.  The Chief's termination violated the California Labor Code and the Chief's federal constitutional rights.  Through this lawsuit, Chief Kirkpatrick seeks to shine a brighter light on this abuse of the public trust and to be made whole for the injuries she suffered as a result of the City's unlawful conduct.

### THE PARTIES

5.      Plaintiff Anne Kirkpatrick is a law enforcement professional with deep experience, including senior leadership roles within the Spokane, Washington Police Department, the

2

1389483

Chicago, Illinois Police Department, and most recently as Chief of the Oakland Police

Department. Chief Kirkpatrick is a resident and citizen of the State of Washington.

6.      Defendant, the City of Oakland, California, is a public municipal corporation and a

California Charter City situated within Alameda County, California.

**JURISDICTION**

7.      This Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C.

§ 1332, because this is a civil suit between citizens of two different states and the amount in

controversy exceeds $75,000.

8.      This Court also has subject matter jurisdiction over Chief Kirkpatrick's First

Amendment Claim pursuant to 28 U.S.C. § 1331, because it arises under the Constitution and

laws of the United States. The Court has supplemental subject matter jurisdiction over Chief

Kirkpatrick's claim under California Labor Code § 1102.5 pursuant 28 U.S.C. § 1367(a), because

that claim is so related to the claim in the action within the Court's original jurisdiction that it

forms part of the same case or controversy.

9.      The Court has personal jurisdiction over the City because it is a California

municipal corporation organized under a charter adopted pursuant to the Constitution of the State

of California.

**VENUE**

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the only

Defendant in this action, the City, resides in this District, and a substantial part of the events or

omissions giving rise to the claim occurred in this District.

**INTRADISTRICT ASSIGNMENT**

11.     Pursuant to Local Rules 3-2(c) and 3-2(d), this case may be assigned to either the

Oakland or San Francisco Divisions of this Court, because a substantial part of the events or

omissions giving rise to Chief Kirkpatrick's claims occurred in Alameda County, California.

**CLAIM PRESENTATION**

12.     Pursuant to Cal. Gov't Code §§ 905, 910, and 915, Chief Kirkpatrick presented her

claim for damages to the City of Oakland on May 6, 2020. Her claim included all required

3

1389483

elements under § 910, including: Chief Kirkpatrick's name and post office address, the post office address for notices related to the claim, the date, place, and other circumstances of the occurrence that gave rise to her claim, a general description of the City's indebtedness and the Chief's injury, the names of the City employees who caused the Chief's injury, and the fact that the Chief's injuries exceed the jurisdictional minimum for an unlimited civil case under the laws of the State of California.

13.     The City of Oakland rejected Chief Kirkpatrick's claim by letter dated June 25, 2020.  This civil suit for damages is therefore authorized under The Government Claims Act, Cal. Gov't Code § 945.4.

## FACTUAL ALLEGATIONS

### A.     Measure LL and the Oakland Police Commission

14.     When Chief Kirkpatrick arrived at OPD on February 27, 2017, she took the helm of a Department still reeling from a series of destabilizing events that undermined OPD's credibility and respect in the community it serves.

15.     A reformer and advocate for police transparency, Chief Kirkpatrick began her tenure as Chief of Police against the backdrop of a citizen ballot initiative called Measure LL, approved by Oakland residents in the November 2016 elections.  Measure LL created the current manifestation of the Oakland Police Commission, a body designed to provide robust civilian oversight of OPD and restore public faith and confidence the department.

16.     Under Measure LL, the Commission received a specific mandate: to oversee, review, and reform OPD's "policies, procedures, customs, and General Orders[.]"  The text of the initiative enumerated six areas of responsibility and authority within the Commission's purview:

        i)     conduct public hearings at least annually related to policy and procedures;

        ii)    propose changes to policies and procedures;

        iii)   exercise oversight authority to approve or reject OPD's own suggested changes to Department policies and procedures;

        iv)    review and comment, at its discretion, on all other policies and procedures;

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

v)      review the City's budget for OPD to ensure it is in alignment with OPD's policies and procedures; and

vi)      substantial input into hiring and firing the Chief of Police.

17.      The Police Commission's hiring and firing authority includes the ability to propose four candidates from whom the Mayor may choose to hire as Chief, as well as the ability to fire the Chief of Police for cause.  Where, as in Chief Kirkpatrick's case, the Chief is fired without cause, the Mayor must consent.

18.      Under Measure LL, the scope of the Commission's authority is clear—it is empowered to examine and, if necessary, adjust OPD's governing policies and procedures.  It may also exercise authority with respect to OPD's most senior leadership in the form of its hiring and firing power.  Those are the limits of the Commission's authority.

19.      But, in its oversight role, the Police Commission has no authority over the day-to-day operations of the Department; it is not empowered to direct or assign lower-level OPD staff and it is explicitly prohibited from accessing legally protected OPD personnel records except in certain limited circumstances.

20.      Following Measure LL's enactment, the Police Commission began meeting in November 2017, about nine months after the City hired Chief Kirkpatrick.

21.      It was a rocky start—three Commissioners left their roles in the Police Commission's first months.  In addition, the Police Commission suffered from significant tension between mayoral appointees and Selection Panel appointees.[1]

22.      As a mayoral appointee herself and a newcomer to Oakland, Chief Kirkpatrick received her share of animosity from the Selection Panel appointees on the Police Commission.

23.      Compounding these problems, the Police Commission evidenced a misunderstanding of its role right from the start.  Although the scope of its authority is clearly limited to policy and procedure, the Police Commission sought to involve itself in the daily

_____

[1] Measure LL gave the Mayor of Oakland authority to appoint three of the first regular members of the Police Commission and then created a "Selection Panel" empowered to recommend candidates for the remaining positions to the Oakland City Council for subsequent appointment.

5

1389483

affairs and operations of OPD and acted as if OPD employees were Police Commission staff.

24.    In addition, the City failed to provide the Police Commission with the necessary staff and support for a successful start, shortcomings that the Police Commission wrongly attributed to OPD.  When Police Commission meetings eventually began in the late fall of 2017, they were chaotic, often marked by discordant exchanges between Commissioners, OPD representatives, other City officials, and the community.

**B.    Chief Kirkpatrick's Reports of Commissioner Misconduct**

25.    Even under these challenging circumstances, Chief Kirkpatrick's time as OPD's leader was marked by many successes and improvements.

26.    For example, during Chief Kirkpatrick's tenure, the City's homicide rate decreased to its lowest level in twenty years, and the City was on pace for a sixty-four-year low homicide rate at the time of the Chief's termination.  Other notable reform efforts included OPD's implementation of new policies, strategy, and training around police-citizen encounters that resulted in a fifty percent reduction in stops involving African-American and Latinx citizens.  The Chief's reform efforts extended to OPD's disciplinary process as well; according to an outside Disparity in Discipline Study, OPD made significant strides in reducing divergent disciplinary outcomes during Chief Kirkpatrick's time leading the Department.

27.    But a series of incidents involving individual Police Commissioners ultimately drove the Chief to submit multiple reports of inappropriate and unlawful conduct to the Oakland City Attorney's Office, the City Administrator, and the Mayor of Oakland—the officials she understood had the capacity to take action to stop the Commissioner's unlawful conduct and prevent future recurrences.

28.    But City leaders all ignored Chief Kirkpatrick's repeated reports of Commission misconduct.  Instead, the Police Commission and Mayor orchestrated Chief Kirkpatrick's termination in retaliation for the Chief's repeated whistleblowing.

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

1                   **1.**     **Commissioners Threaten Neighborhood Services**

2           29.     Chief Kirkpatrick's first report of Commissioner misconduct arose out of two

3 Commissioners' inappropriate efforts to steer resources towards their own neighborhoods and

4 related bullying, threats, and intimidation of two low-level OPD employees.

5           30.     On March 2, 2018, Commissioners Ginale Harris and Jose Dorado met with two

6 supervisory OPD Neighborhood Services Coordinators ("NSCs") who work with the community

7 to facilitate partnerships between citizens and the Department.

8           31.     During this encounter, Commissioner Harris made several demands, including for

9 information related to OPD hiring processes and internal OPD documents.

10           32.     Commissioner Harris told these two OPD employees that she "had a history of

11 having people fired" and that she believed NSCs "should be Oakland residents."

12           33.     Commissioner Dorado, for his part, expressed displeasure with the NSCs assigned

13 to his neighborhood before emphasizing his view that the Ghost Ship fire, an event that resulted

14 in thirty-six deaths, could have been prevented "had the NSC [done] her job."

15           34.     Upon receiving a report of this incident, Chief Kirkpatrick made a report to the

16 City Attorney's Office and City Administrator Sabrina Landreth.

17           35.     The Chief made this report because she reasonably believed that Commissioner

18 Harris and Commissioner Dorado violated Oakland regulations prohibiting misuse of official

19 positions for personal gain.

20                  **2.**     **Commissioner Harris Seeks Special Treatment**

21           36.     Chief Kirkpatrick submitted her next report of Police Commission misconduct in

22 connection with an individual Commissioner's corrupt efforts to obtain special treatment from

23 OPD.

24           37.     On September 17, 2018 Chief Kirkpatrick was working in her office on the eighth

25 floor of OPD headquarters when Officer Johnna Watson, a staff assistant to the Chief, reported

26 that Commissioner Harris was "basically throwing a fit" over a tow ticket in the Records

27 Department.

28

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION
OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

38. When citizens receive citations or fines, they may pay them in person in the Records Department.

39. A supervisor from Records arrived and told the Chief that Commissioner Harris had displayed her Commission badge to Records Staff and asked if they "knew who I am?" The Chief also understood that Commissioner Harris felt she had been illegally towed, that she was willing to pay her citation, but refused to pay the fee for a tow truck.

40. Records staff told Commissioner Harris that she could pursue a hearing if she felt she was towed illegally, to which Commissioner Harris replied along the lines of "do I need to call the Chief" or "I'm going to have to call the Chief."

41. The Chief understood that Commissioner Harris was asking for a personal favor and special treatment.

42. Because her staff had escalated the matter to her desk, Chief Kirkpatrick felt that the situation was serious. She instructed Officer Watson to bring Commissioner Harris to her office.

43. When Commissioner Harris arrived, the Chief told her that she would not grant any favors for Police Commissioners and recommended that Commissioner Harris follow the ordinary appeals process. Commissioner Harris then denied that she was seeking "a favor," and ultimately left the Chief's office without obtaining any change in her fine.

44. After Commissioner Harris left, the Chief documented the events in an internal report.

45. Chief Kirkpatrick also sent an email to City leaders, informing them of the confrontation. The Chief wrote that Commissioner Harris was "bullying" her staff and expressed concerns regarding retaliation.

3. **The Police Commission Insults Alameda County's Public Defender**

46. On March 28, 2019, Alameda County Public Defender Brendon Woods addressed a Police Commission meeting that Chief Kirkpatrick attended. In the middle of Woods's remarks, Commissioner Harris interjected to the effect that Woods's "skin color is black" but that he "may not live like a black man."

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

47.     Woods took offense and responded with a brief personal history.

48.     The next day, the Chief sent an email to City leaders titled "Potential Complaint," and explained that she found Harris's remark "so unacceptable that I personally apologized to Mr. Wood[s]."

49.     The Chief believed that this incident possibly triggered her mandatory reporting obligation under City Administrative Instruction 71 ("AI 71"), a policy governing harassment and workplace misconduct.  Indeed, in the Chief's view, a comment of this tenor would subject an OPD Officer to serious discipline.

50.     The final line of her email is particularly ominous in retrospect: "I am concerned that the Police Commission could be retaliatory toward me for reporting this to you."

**4.      The Police Commission Seeks Confidential Information**

51.     The Chief submitted several reports to City leadership related to Police Commissioners' unlawful efforts to obtain confidential personnel information in connection with an investigation into racial bias within OPD, as well as Police Commissioners' attempts to intimidate and harass the Chief into commenting on the investigation in violation of her legal duty of confidentiality.

52.     Sometime in October 2018, Sergeant Aaron Smith, the President of the Oakland Black Officers' Association ("OBOA"), sought a meeting with Chief Kirkpatrick.  She understood this meeting to involve Smith's difficulties with his supervisor, Captain Jake Bassett. The Chief knew that many perceived Bassett to be a poor communicator, and although she found him quite competent, the Chief had received complaints regarding his leadership style in the past. At the time, Bassett oversaw the OPD Academy, which also retained responsibility for recruitment efforts.

53.     The Chief partially misunderstood the nature of Smith's visit.  She believed Smith's complaint was with Bassett's communication skills and leadership; while Smith did have such concerns, he also wanted to raise issues related to Bassett's handling of diversity and recruiting.  By her own admission, Chief Kirkpatrick missed the possible bias issues in Smith's presentation because the focus of his remarks was directed towards moving a different individual,

9

Virginia Gleason, into the position overseeing recruiting. Gleason was the Deputy Director of the Bureau of Support Services and Chief Kirkpatrick's top civilian aide.

54. In part due to concerns about a non-union civilian employee supervising sworn officers and union members, the Chief did not immediately take action, although she was working on a solution behind the scenes.

55. Ninety days after her meeting with Smith, the OBOA released an open letter that was highly critical of the Chief, Captain Bassett, and diversity and race issues within OPD. The letter caused serious disruption within the Department. The Chief immediately recognized that an AI 71 investigation was appropriate and welcomed outside scrutiny of the issues OBOA presented in its letter.

56. After the City announced an investigation, the Police Commission placed a status update on the probe on every meeting agenda. But, Chief Kirkpatrick could not speak to the issue in any capacity because she was legally precluded from discussing an open internal investigation. Moreover, she could in no circumstance comment on an investigation of which she was a focus. Nevertheless, in a transparent effort to harass and intimidate the Chief, the Police Commission continued noticing a status report that it knew the Chief could not lawfully provide, even after the Chief informed them that she could not answer any questions.

57. By April 2019, the situation had reached a boiling point. The Chief attended a Police Commission meeting where the status of the AI 71 investigation was again on the agenda. After refusing to address the topic, the Chief drafted an email to Mayor Schaaf and City Administrator Landreth (among others), titled "Complaint," where she decried the Police Commission's conduct. She explained that it was her "understanding that employment law prevents me from addressing" the issue and lamented that she was "being challenged as insubordinate" for refusing to violate her legal obligations.

### 5. The Police Commission Inappropriately Directs Staff

58. Chief Kirkpatrick reported again on the Police Commission's campaign of interference in the early summer of 2019. On May 29, 2019, Commissioner Harris emailed Chief Kirkpatrick to request that Deputy Chief LeRonne Armstrong serve as OPD's liaison to the Police

10

1389483

Commission.  In the request, Commissioner Harris explained that "I often have many question[s] in regards to East Oakland that I believe and trust that Deputy Armstrong can answer.  I do appreciate your staff that you bring to the meetings, however they are not from East Oakland or Oakland period.  I am a firm believer that you can only be an expert if you have experienced it."

59.    After some back and forth with Commissioners Harris and Regina Jackson, Chief Kirkpatrick ultimately informed them that she had spoken to Deputy Chief Armstrong and that he was not interested in serving as a liaison.

60.    Commissioner Jackson responded that the Commission "would like to have DC Armstrong be the liaison whether he likes it or not."

61.    Finally, on June 5, 2019, the Chief sought the intervention of City leaders, writing that they needed to explain the issue of having a commissioner directing staff to the Police Commission.

62.    On June 20, 2019, in the face of repeated demands and inaction from City administrators, the Chief concluded she had no recourse; she relented and assigned Deputy Chief Armstrong as the OPD liaison to the Police Commission.

**6.    The Police Commission Serves an Unlawful Subpoena**

63.    In the early summer of 2019, Chief Kirkpatrick raised further concerns about the lawfulness of Police Commission activity with senior City officials.

64.    OPD's internal investigations into the shooting death of Joshua Pawlik were coming to a close; OPD officers shot and killed Pawlik, a homeless man, after they observed him sleeping with a firearm.  Eventually, the Executive Force Review Board, the Community Police Review Agency, and Chief Kirkpatrick concluded that the use of force in the Pawlik shooting was within OPD policy.

65.    The Police Commission and federal monitor Robert Warshaw were not satisfied with OPD's review and Commissioners sought to obtain confidential records related to the

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

Department's internal investigation.[2]  Chief Kirkpatrick could not lawfully comply because the requested files contained protected personnel records, leading to several contentious Police Commission meetings.

66.     The Chief reasonably believed that Commissioners were again attempting to force her to disclose confidential information in violation of law and the terms of her contract.  Despite repeated requests, nobody in City Administration was willing to appear and defend the Chief at the Police Commission's meetings.

67.     In June 2019, the Police Commission issued a subpoena for all of OPD's internal communications related to the Pawlik case.  Although Measure LL did vest the Police Commission with subpoena power, this request exceeded the lawful boundaries of that power because it sought information protected by state law.  The Chief believed this request was unlawful and reported it to City administrators.  Ultimately, the Chief delivered the subpoenaed materials to Mike Nisparos, the head of the CPRA.  In his role at the CPRA, Nisparos was authorized to view sensitive personnel information, unlike the Commissioners.  Nisparos refused to turn over the communications to the Police Commission, telling the Chief that he believed the Police Commissioners were acting maliciously.

**7.     The Commission Harasses and Intimidates Senior OPD Staff**

68.     The Police Commission's campaign of intimidation, harassment, and interference with OPD leadership reached its climax in the fall of 2019.

69.     Representatives from the Police Commission informed Chief Kirkpatrick's senior civilian aide, Virginia Gleason, that the Police Commission desired a report on OPD's efforts to increase diversity and inclusion in its hiring practices.  Gleason was now responsible for leading these efforts, so preparation and presentation of the report were her responsibility.  Gleason informed Chrissy Love, the administrator in charge of scheduling for the Police Commission, that

---

[2] Chief Warshaw serves as a court-appointed federal monitor under a negotiated settlement agreement entered into by the City of Oakland and several civil rights plaintiffs, arising out of a case that predated Chief Kirkpatrick's tenure with OPD.

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

the first-choice date, October 10, 2019, conflicted with Gleason's pre-approved family vacation. Love and Gleason agreed on October 24, 2019 instead.

70.     Then, without Gleason's advanced knowledge, the Police Commission placed her presentation on the agenda for October 10.  The Police Commission knew Gleason had planned to be out of town on that date and sought to embarrass both Gleason and OPD by scheduling the presentation for a time when Gleason could not appear.  Nevertheless, Gleason canceled her vacation, attended the October 10, 2019 meeting, and delivered her report.  Chief Kirkpatrick also attended the meeting.

71.     But the Police Commission was not to be denied; Commissioners launched into heated criticism of Gleason's report almost immediately.  At least one Commissioner called the report "disgraceful."  Commissioner Harris told Gleason that, based on the content of the report, she "should be ashamed of herself."  The Commissioners' breathtakingly abusive and harassing conduct, unbecoming of public officials—and recorded on video—was a bridge too far.  Chief Kirkpatrick directed Gleason to step off the dais and took the microphone herself.  She admonished the Police Commission not to "speak to our staff in that manner" and emphasized that targeted abuse "is not acceptable."  The Chief demanded an apology on Gleason's behalf; Commissioner Harris responded that "[s]he will not get one from me.  And neither will you."

72.     The next day, the Chief wrote a "Formal Complaint," addressed to Barbara Parker (the City Attorney) and City Administrator Landreth, among others.  Her Complaint described the facts leading to the conflagration at the October 10, 2019 meeting in detail.  She also noted that Commissioner Smith and John Alden, the new director of the CPRA, reached out to her following the meeting.  Alden, she reported, characterized the events as "horrifying" and told the Chief that the Commissioners' motivations were "personal."  The Chief also noted that Deputy Chief Armstrong had told Gleason that the Police Commission knew the change in meeting date would interfere with Gleason's vacation and that it was "personal."  The Chief further observed that the Police Commission continued to notice the OBOA investigation for a status update and had noticed it for the October 10 meeting.

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

73.     Chief Kirkpatrick's report noted her belief that the Commissioners' behavior could be retaliation for the Chief's report of Harris's challenge to her tow ticket.  Her complaint ended by listing the other senior OPD staff present at the Commission meeting: Assistant Chief Darren Allison, Lieutenant Bobby Hookfin, Deputy Chief Roland Holmgren, and Lieutenant Wilson Lau.

**C.     Chief Kirkpatrick's Termination**

74.     At an open session of the Oakland City Council on January 28, 2020, Councilmember Rebecca Kaplan revealed the existence of a highly confidential internal investigation into repeated instances of misconduct by Police Commissioner Ginale Harris. Councilmember Kaplan disclosed a document that described the scope of the investigation and its approximate cost.

75.     Chief Kirkpatrick was involved in several of the incidents under scrutiny, including Commissioner Harris's threats to two NSCs in March 2018 and the September 2018 tow ticket incident.  The investigative team, from Public Interest Investigations, interviewed Chief Kirkpatrick in May 2019.  To be clear, Chief Kirkpatrick did not commission the investigation, nor did she direct its aims or conduct.  Her sole involvement was as a percipient witness to several of the events the City believed merited further investigation.  Notably, the very document Councilmember Kaplan disclosed, outlining the scope of the investigation, highlighted that Chief Kirkpatrick was already on record as being concerned about the prospect of retaliation for her reports related to Commissioner Harris's misconduct.

76.     Two days after Councilmember Kaplan revealed the investigation of Commissioner Harris, on January 30, 2020, an article appeared in the Oakland Post describing the investigation and suggesting that it was the product of "repeated moves by the Chief of Police Anne Kirkpatrick and the City Administrator Sabrina Landreth against Oakland Police Commission Vice Chair Ginale Harris."  The retaliation Chief Kirkpatrick feared had begun in earnest.

77.     Following the article's publication, the City Council met in closed session on February 5, 2020.  Less than two weeks later, Mayor Schaaf visited Chief Kirkpatrick in her home and told the Chief that the Police Commission intended to fire her.  Mayor Schaaf also

14

1389483

1   suggested that the federal monitor, Robert Warshaw, supported firing the Chief.  The Mayor

2   asked Chief Kirkpatrick not to return to work.

3      78.  On Thursday, February 20, 2020, Mayor Schaaf called Chief Kirkpatrick and

4   informed her over the telephone that the City had terminated her employment as Chief of Police

5   without cause, effective immediately.  The City never offered the Chief an administrative hearing

6   as required under the Peace Officer's Bill of Rights, nor did it afford her an opportunity to appeal

7   the City's decision before a neutral decision maker.

8   

**FIRST CAUSE OF ACTION**

9   

**FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5**

10      79.  Chief Kirkpatrick reincorporates and realleges all preceding paragraphs as if set

11   forth fully herein.

12      80.  At all relevant times, through her termination on February 20, 2020, the City of

13   Oakland employed Anne Kirkpatrick in the position of Chief of Police.

14      81.  Chief Kirkpatrick provided information related to Police Commissioner

15   misconduct, which was not publicly known, to her employer the City of Oakland, a public body.

16   The information disclosed included, without limitation:

17        i)  Commissioners Harris's and Dorado's attempts to bully and harass,

18   through threats and intimidation, two OPD Neighborhood Services Coordinators in an effort to

19   obtain preferential policing for their own neighborhoods;

20        ii)  Commissioner Harris's misuse of her official position in an effort to obtain

21   special treatment from OPD;

22        iii)  The Police Commission's unlawful attempts to obtain confidential

23   employment records to which it had no right of access;

24        iv)  The Police Commission's harassment and open contempt for OPD staff.

25      82.  Chief Kirkpatrick had reasonable cause to believe that the information she

26   provided disclosed violations of state law and local regulations, including without limitation:

27        i)  Unlawful attempts to obtain confidential peace officer personnel records in

28   violation of Cal. Penal Code § 832.7 and Oakland Municipal Code § 2.45.80;

15

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION
OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

ii)  Unlawful attempts to misuse official positions for personal gain in violation of Cal. Penal Code § 68(a) and Oakland Municipal Code § 2.25.06; and

iii)  Abuse of authority and retaliatory conduct in violation of Oakland Municipal Code § 2.24.100.

83.  The City of Oakland discharged Chief Kirkpatrick, effective February 20, 2020.

84.  Chief Kirkpatrick's disclosures were, at a minimum, a contributing factor in the City's decision to terminate her employment at OPD. Chief Kirkpatrick was terminated only four months after making a "formal complaint" against the Police Commissioners, expressing her belief that Commissioners were retaliating against her, at least in part, due to her *prior* reports of misconduct. Indeed, the Chief's reports, made in close temporal proximity to her termination, disclosed blatant corruption and misconduct by the very officials that terminated her employment. Throughout her employment as Chief of Police, Chief Kirkpatrick expressed concern, in writing, that the Police Commission might retaliate against her for reporting Commissioner misconduct; those fears eventually became reality in February 2020.

85.  Chief Kirkpatrick was damaged by her unlawful discharge, in at least the following ways:

i)  Lost compensation from February 2020 through the conclusion of her contractual term of employment, February 26, 2022.

ii)  Lost health, retirement, and fringe benefits through the conclusion of her contractual term of employment, February 26, 2022.

iii)  Mental suffering caused by the City's extreme and outrageous conduct in terminating her employment for reporting Commissioner misconduct.

## SECOND CAUSE OF ACTION
## FOR VIOLATION OF FIRST AMENDMENT RIGHTS, 42 U.S.C § 1983

86.  Chief Kirkpatrick reincorporates and realleges all preceding paragraphs as if set forth fully herein.

87.  Chief Kirkpatrick's reports to City administrators amounted to protected speech that substantially addressed matters of public concern. The Chief's reports concerned

16

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

1    wrongdoing at high levels of City government, within a body specifically created to provide

2    accountable civilian oversight and restore public confidence and trust in OPD.  The Chief also

3    disclosed corrupt acts, self-serving conduct, and violations of law.  The Chief's speech bore

4    directly on critical issues of governmental mismanagement at systemic levels involving an

5    essential public safety agency, and were not mere employment grievances.

6         88.    The Chief's reports were not made in the ordinary course of her job duties, which

7    involved managing OPD's day-to-day operations.  Instead, her speech was made in her capacity

8    as a concerned citizen, and involved reports that were necessary to root out public corruption.

9    The Chief directed her protected speech to the only City administrators potentially capable of

10   putting an end to Commissioner misconduct.

11        89.    The Chief's protected speech, made in her capacity as a private citizen and which

12   substantially addressed matters of public concern, was a substantial motivating factor in the

13   City's adverse employment action.  Specifically, the City terminated the Chief's employment in

14   direct retaliation for her repeated whistleblowing activities.  The City fired the Chief on February

15   20, 2020, only four months after her October 11, 2019 "formal complaint."

16        90.    The City had no adequate justification for terminating the Chief's employment

17   based on her protected whistleblowing speech under *Pickering v. Board of Education of*

18   *Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968).  The Chief's

19   protected speech did not disrupt the City's ability to control its work environment or the

20   relationships between coworkers within OPD; indeed just the opposite is true.  Nor did the

21   Chief's speech impair her ability to perform her job duties or obstruct OPD's routine operations.

22        91.    The Chief's protected speech was the logical and proximate cause of her

23   termination.  The City fired Chief Kirkpatrick *because* of her repeated efforts to cast sunshine on

24   Police Commissioner misconduct.

25        92.    Oakland Mayor Libby Schaaf and the Police Commission jointly terminated Chief

26   Kirkpatrick.  These individuals, acting on behalf of the City and as the City's agents, are the City

27   officials responsible for establishing final policy with respect to OPD, as evidenced by

28   § 604(b)(10) of the Oakland City Charter and Measure LL.  As such, the Chief's termination was

17

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION
OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

the decision of a final policymaker for purposes of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

93.     Chief Kirkpatrick was damaged by her retaliatory discharge, in at least the following ways:

i)     Lost earnings from February 20, 2020 through the conclusion of her contractual term of employment, February 26, 2022.

ii)     Lost health, retirement, and fringe benefits from February 20, 2020 through the conclusion of her contractual term of employment, February 26, 2022.

iii)     Mental suffering caused by the City's extreme and outrageous conduct in terminating her employment for reporting Commissioner misconduct.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Anne Kirkpatrick prays for judgment against the City of Oakland as follows:

1.     A judgment that the City terminated Chief Kirkpatrick in retaliation for protected disclosures to a public body, in violation of Cal. Labor Code § 1102.5;

2.     A judgment that the City violated Chief Kirkpatrick's rights under the First Amendment to the United States Constitution;

3.     General damages according to proof, including, without limitation, mental pain and anguish cause by the City's extreme and outrageous conduct;

4.     Special damages according to proof, including without limitation:

i)     Lost earnings for the period between February 20, 2020 and February 26, 2022, inclusive;

ii)     Lost future health, retirement, and fringe benefits for the period between February 20, 2020 and February 26, 2022, inclusive;

iii)     Damage to future earning potential through injury to professional reputation;

5.     Prejudgment interest in an amount according to proof;

6.     Reasonable attorneys' fees and costs;

18

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

7.     Any such other relief as the Court may deem just and proper.

**Plaintiff Anne Kirkpatrick demands a trial by jury.**

Dated:  August 19, 2020                                KEKER, VAN NEST & PETERS LLP


                                                By:    */s/ R. James Slaughter*
                                                       JOHN W. KEKER
                                                       R. JAMES SLAUGHTER
                                                       BRYN WILLIAMS
                                                       NICHOLAS GREEN

                                                       Attorneys for Plaintiff ANNE
                                                       KIRKPATRICK

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION
OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

# EXHIBIT C

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| ANNE KIRKPATRICK <br> *Plaintiff* | ) <br> ) <br> ) |
| v. | )    Civil Action No. 3:20-cv-05843-JSC |
| THE CITY OF OAKLAND, CALIFORNIA <br> *Defendant* | ) <br> ) <br> ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  WARSHAW & ASSOCIATES

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
See Attachment A.

| Place: Keker, Van Nest & Peters LLP <br>      633 Battery Street <br>      San Francisco, CA  94111 | Date and Time: <br> April 23, 2021 <br> 9:00 a.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  March 24, 2021

|  | |
|---|---|
| *CLERK OF COURT* | |
| | OR     */s/ R. James Slaughter* |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |
| | R. James Slaughter |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Anne Kirkpatrick
_____ , who issues or requests this subpoena, are:
R. James Slaughter, Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111; (415) 391-5400,
rslaughter@keker.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).


American LegalNet, Inc. <br> www.FormsWorkFlow.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 3:20-cv-05843-JSC

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* Warshaw & Associates _____

on *(date)* March 24, 2021 _____

    ☒ I served the subpoena by delivering a copy to the named person as follows: By electronic mail pursuant to an

agreement between the Plaintiff and the witness. _____

_____ on *(date)* March 24, 2021 _____ ; or

    ☐ I returned the subpoena unexecuted because: _____

_____

    Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

    $ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 _____

    I declare under penalty of perjury that this information is true.

Date: March 24, 2021 _____       */s/ Jennifer Gray* _____

                                                *Server's signature*

                                   Jennifer Gray, Legal Secretary _____

                                              *Printed name and title*

                                   Keker, Van Nest & Peters LLP
                                   633 Battery Street
                                   San Francisco, CA 94111

                                              *Server's address*

Additional information regarding attempted service, etc.:


American LegalNet, Inc.
www.FormsWorkFlow.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

---



## ATTACHMENT A

**Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action**

For purposes of this subpoena, the following defined terms shall have the following meaning:

## DEFINITIONS

1.      "YOU" and "YOUR" shall mean Warshaw & Associates and any and all agents, representatives, attorneys, or anyone else acting or purporting to act on YOUR behalf or at YOUR direction.  This definition shall include, but is not limited to, Robin Busch-Wheaton and John Girvin.

2.      The term "THE CITY" shall refer to the City of Oakland, California, all of its employees, agents, and CITY OFFICIALS, and any entity acting at the direction or on behalf of the City of Oakland, including without limitation contractors, subcontractors, and consultants.

3.      The term "CITY OFFICIALS" shall refer to the Mayor of the City of Oakland, the Oakland City Council, the Police Commission and all past and present Police Commissioners, the City Clerk and Clerk's Office employees, the City Attorney and City Attorney Office employees, the City Auditor and Auditor Office employees, the City's Human Resources Department, and the Oakland Police Department and all of its employees.

4.      The term "NEGOTIATED SETTLEMENT AGREEMENT" shall refer to the settlement agreement entered into by THE CITY and the Plaintiffs in *Delphine Allen v. City of Oakland*, Case No. 3:00-cv-04599-WHO, in the United States District Court for the Northern District of California, originally commenced in December 2000.

1666152.v2

5.      This "ACTION" shall refer to the above-captioned litigation, *Anne Kirkpatrick v. The City of Oakland, California*, No. 3:20-cv-05843-JSC, currently pending in the United States District Court for the Northern District of California.

6.      The term "PLAINTIFF" shall refer to Chief Anne Kirkpatrick.

7.      The term "POLICE COMMISSION" shall refer to the City of Oakland's Police Commission.  The term "POLICE COMMISSIONERS" shall refer to ALL past AND present members of the POLICE COMMISSION.

8.      The term "PAWLIK SHOOTING" shall refer to the officer-involved shooting of Joshua Pawlik on March 11, 2018 in Oakland, California.

9.      The term "PAWLIK INVESTIGATIONS" shall refer to ALL investigations into the PAWLIK SHOOTING, including those undertaken by YOU, the Oakland Police Department, the Community Police Review Agency/Community Police Review Board, or any other investigating entity.

10.      The term "PII REPORT" shall refer to the report Public Interest Investigations prepared regarding POLICE COMMISSIONER Ginale Harris and released on March 2, 2020.

11.      The term "CITY AUDITOR REPORT" shall refer to the investigative report about the POLICE COMMISSION released by the Oakland City Auditor on June 1, 2020 and entitled "Performance Audit of the Oakland Police Commission."

12.      "COMMUNICATION" includes any form of transmitting, receiving or exchanging information or ideas from one person to another, including without limitation correspondence, letters, personal and professional electronic mail, face-to-face communications, telephone calls, text or SMS messages, postings, or messages (including status updates, wall comments, or groups joined) through social media services (including but not limited to

LinkedIn, Twitter, Facebook, and Instagram) or other instant messaging services (including but not limited to iMessage, WhatsApp, Slack, Skype, and Microsoft Teams), voicemails, faxes, telegrams, memoranda, reports, discussions, conversations, negotiations, agreements, notes or other forms of information or ideas exchanged, whether oral, electronic or written.

13.    "DOCUMENT" shall have the broadest possible meaning under Federal Rule of Civil Procedure 34 and refers to, without limitation, printed, typed, handwritten, drawn or other graphic matter of any kind or nature, electronically stored information and metadata (regardless of form of storage or media (*e.g.*, server, hard drive, flash drive, CD, DVD, disk, diskette, tape, etc.)), and other data compilations from which information can be obtained and translated, if necessary, into reasonably usable forms (including without limitation databases). This includes the original, and all copies which are annotated or otherwise not identical to the original or to each other, whether by interlineation, receipt stamp, notation, indication of copy sent or received, or otherwise—such documents are deemed separate documents within the meaning of this term.

14.    "PERSON" refers to natural persons and entities including but not limited to corporations, partnerships, firms, proprietorships, joint ventures, unions, associations, groups, federations, governmental agencies, or any other organization or entity and his, her, its, or their officers, agents, and employees, and all predecessors in interest, successors, affiliates, subsidiaries, and related entities.

15.    The terms "REFLECTING," "REFERRING," "RELATING," "IN CONNECTION WITH" or "CONCERNING" (and all variations on those words) shall be construed in their most inclusive sense, and shall mean reflecting, pertaining to, consisting of, mentioning, pertaining to, involving, describing, discussing, detailing, supporting, contradicting, constituting, embodying, or in any way logically or factually connecting with the matter

discussed. A document "REFERRING TO" or "RELATING TO" a given subject is any document that reflects, constitutes, contains, embodies, pertains to, mentions, consists of, comprises, shows, comments on, evidences, describes, or in any other way references that subject.

16.     The term "INCLUDING" means including but not limited to.

17.     The terms "and" and "or" shall be construed in the conjunctive or disjunctive, whichever makes the request more inclusive.

18.     The use of the singular form of any term includes the plural and vice versa.

19.     The terms "each," "any," "all," and "every" are interchangeable.

20.     Any pronoun shall be construed to refer to the masculine, feminine, or neutral gender as in each case is most appropriate.

## **INSTRUCTIONS**

1.     These requests shall apply to all DOCUMENTS in YOUR possession, custody or control at the present time or coming into YOUR possession, custody or control at any time during the matter captioned above. If YOU know of the existence, past or present, of any DOCUMENTS or things requested below, but are unable to produce such DOCUMENTS or things because they are not presently in YOUR possession, custody, or control, YOU shall so state and shall identify such DOCUMENTS or things, and the PERSON who has possession, custody or control of the DOCUMENTS or things.

2.     If no DOCUMENTS are responsive to a particular request, YOU are to state that no responsive DOCUMENTS exist AND otherwise respond to all parts of the request for which DOCUMENTS do exist.

3.      All DOCUMENTS shall be produced as they are maintained in the usual course of business, including in the file folders or file cartons in which they have been maintained, stored, clipped, stapled or otherwise arranged in the same form and manner as they were found. Family members shall not be separated—i.e., parent/child relationships shall be maintained at all times.  If YOU choose to produce DOCUMENTS by Document Request, YOU shall identify the Document Request to which the DOCUMENT is responsive.

4.      Electronically stored information ("ESI") shall be produced in accordance with the Northern District of California's Model Stipulated Order re Discovery of Electronically Stored Information for Standard Litigation.  *See* **Attachment B.**

5.      For any responsive DOCUMENTS or tangible things that have been lost or destroyed, YOU shall provide a written statement setting forth:

(a)     the date of the DOCUMENT;

(b)     the identity of the DOCUMENT;

(c)     the nature of the DOCUMENT *(e.g.,* letter, memorandum, chart); and

(d)     the identity of the PERSON(S) who authored the DOCUMENT and all recipients thereof.

6.      If you decline to produce any DOCUMENT or part thereof based on a claim of privilege or any other claim, describe the nature and basis of your claim and the information withheld in a manner sufficient:

(a)     to disclose the facts upon which YOU rely in asserting YOUR claim;

(b)     to permit the grounds and reasons for withholding the information to be identified unambiguously;

(c)     to permit the information withheld to be identified unambiguously; and

(d)      to allow PLAINTIFF or the Court to determine the appropriateness of the

privilege claim.

7.      If YOU claim privilege or protection to part of a DOCUMENT, YOU shall redact

that portion which is privileged or protected and produce the remainder.  All redactions shall also

be included on the privilege log described in the preceding numbered paragraph.

8.      These requests seek all responsive DOCUMENTS in their original language and,

if such original language is not English, these requests also seek all English-language translations

that may exist for any such DOCUMENTS.

9.      You shall keep and produce a record of the source of each DOCUMENT

produced.  This shall include the name and location of the file where each DOCUMENT was

located and the name of the PERSON, group or department having possession, custody or

control of each DOCUMENT.

10.      Each unique DOCUMENT is to be produced without abbreviation or redaction.

11.      Each page of each DOCUMENT that you produce in response to these requests

should include a unique production number.

12.      If subsequent to service of an answer or objection to any request, you obtain or

become aware of further DOCUMENTS or things pertaining to said request, you are required to

serve an amended answer producing such documents or things, pursuant to Rule 26(e) of the

Federal Rules of Civil Procedure.

13.      Please take notice that these instructions are submitted for the purposes of

discovery and are not to be taken as waiving any objections which may be made at trial to the

introduction of evidence of subjections covered by these requests or as an admission at the trial

of the relevance or materiality of any of the matters covered by these requests.

## DOCUMENTS REQUESTED

1.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR
REFERRING TO PLAINTIFF'S employment performance.

2.      ALL DOCUMENTS that support, refute, or otherwise RELATE TO ANY
allegation in the Complaint, attached to this subpoena as **Attachment C.**

3.      ALL DOCUMENTS created between January 1, 2016 and January 1, 2021
RELATED TO OR REFERRING TO YOUR assessment of the CITY's compliance with the
terms of the NEGOTIATED SETTLEMENT AGREEMENT.  Please include in your response
ALL drafts, memoranda, notes, or other materials related to the Oakland Police Department's
performance with respect to compliance with the terms of the NEGOTIATED SETTLEMENT
AGREEMENT.

4.      ALL DOCUMENTS AND COMMUNICATIONS between YOU and CITY
OFFICIALS regarding PLAINTIFF, PLAINTIFF'S employment performance, and THE CITY'S
decision to terminate PLAINTIFF'S employment.

5.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO THE CITY'S
decision to hire PLAINTIFF.  Please include in YOUR response ANY AND ALL
DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO YOUR
assessment of PLAINTIFF's fitness for the role of Chief of Police in Oakland AND your
assessment of the fitness for the role of Chief of Police in Oakland of ALL other candidates for
that position.

6.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO THE
performance of the POLICE COMMISSION.

7.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO this ACTION.

8.      ALL COMMUNICATIONS with any third party RELATED TO this ACTION.

9.      ALL DOCUMENTS AND COMMUNICATIONS RELATED TO the PAWLIK

INVESTIGATIONS.  Please include in YOUR response all drafts, memoranda, notes, and other

materials in YOUR possession, custody, or control which relate to YOUR investigation of the

PAWLIK shooting.

10.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO the Oakland

Black Officers' Association's concerns RELATED TO diversity in recruitment within the

Oakland Police Department presented to PLAINTIFF in October 2018.

11.     ALL COMMUNICATIONS by or between YOU and any CITY OFFICIAL or

any third party that REFER or RELATE TO PLAINTIFF.

12.     ALL COMMUNICATIONS with the POLICE COMMISSION that REFER or

RELATE TO PLAINTIFF.

13.     ALL reports and draft reports regarding THE CITY'S compliance with the

NEGOTIATED SETTLEMENT AGREEMENT created on or after January 1, 2016.

14.     ALL transcripts of hearings CONCERNING the NEGOTIATED SETTLEMENT

AGREEMENT held since January 1, 2016.

15.     ALL DOCUMENTS AND COMMUNICATIONS REFERRING TO OR

RELATED TO the PII REPORT.

16.     ALL DOCUMENTS AND COMMUNICATIONS REFERRING TO OR

RELATED TO the CITY AUDITOR'S REPORT.

17.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO POLICE

COMMISSION violations of the Brown Act or any other public meeting/disclosure law,

regulation, rule, order, or other requirement.

18.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO THE scope of the POLICE COMMISSION'S authority.

19.     ALL COMMUNICATIONS with any member of the press or media RELATED TO PLAINTIFF.

20.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO POLICE COMMISSIONERS Jose Dorado and Ginale Harris's March 2018 interaction with two Oakland Police Department Neighborhood Services Coordinators, in which COMMISSIONER Harris sought information RELATED TO Oakland Police Department hiring processes and internal Oakland Police Department documents, and in which COMMISSIONER Dorado discussed the December 2, 2016 Ghost Ship fire.

21.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO POLICE COMMISSIONER Ginale Harris's September 2018 visit to the Oakland Police Department's Records Department to discuss a towing ticket and her subsequent discussion with PLAINTIFF in PLAINTIFF's office at Oakland Police Department headquarters.

22.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO the POLICE COMMISSIONER statements made during the March 28, 2019 POLICE COMMISSION meeting, including ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO the lawfulness AND/OR appropriateness of the POLICE COMMISSIONERS statements.

23.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO ALL past, current, AND future investigations, probes, reviews, OR other inquiries that YOU OR THE CITY OR ANY of its agents, consultants, contractors, subcontractors, private investigators, or attorneys conducted with respect to POLICE

COMMISSIONERS, the POLICE COMMISSION, or POLICE COMMISSIONER conduct,
including ANY witness interview notes OR transcripts, ANY draft reports, interim reports, final
reports, presentations, OR ANY other investigative work product, including, without limitation,
the investigation conducted by Public Interest Investigations regarding POLICE
COMMISSIONER Ginale Harris.

24.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR
REFERRING TO the Administrative Instruction 71 investigation into the Oakland Black
Officer's Association open letter CONCERNING PLAINTIFF, Captain Bassett, and diversity
and race issues within OPD, including ALL DOCUMENTS AND COMMUNICATIONS
RELATED TO OR REFERRING TO the lawfulness of the POLICE COMMISSION'S requests
for information RELATED TO the status AND substance of the investigation.

25.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR
REFERRING TO the POLICE COMMISSION'S demand to assign Deputy Chief LeRonne
Armstrong as the Oakland Police Department's liaison to the POLICE COMMISSION,
including ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING
TO the lawfulness of the POLICE COMMISSION'S demand.

26.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR
REFERRING TO the POLICE COMMISSION subpoena CONCERNING the PAWLIK
INVESTIGATIONS, issued in June 2019, including ALL COMMUNICATIONS AND
DOCUMENTS RELATED TO OR REFERRING TO the lawfulness of the subpoena or the
Oakland Police Department's response to the subpoena.

27.     ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR
REFERRING TO the POLICE COMMISSION's request for a presentation on the Oakland

Police Department's efforts to increase diversity and inclusion in its hiring practices to be presented during the October 10, 2019 POLICE COMMISSION meeting, including ALL DOCUMENTS AND COMMUNICATIONS RELATED TO OR REFERRING TO the lawfulness or appropriateness of the POLICE COMMISSION'S response to the presentation during the hearing.

28.     ALL DOCUMENTS AND COMMUNICATIONS THAT RELATE TO, REFER TO, OR DESCRIBE the scope of the POLICE COMMISSION'S lawful authority.

# Attachment B

1
2
3
4
5

**UNITED STATES DISTRICT COURT**

6

**NORTHERN DISTRICT OF CALIFORNIA**

7            )   Case Number: C xx-xxxx
             )
8            )   [MODEL] STIPULATED ORDER RE:
             )   DISCOVERY OF ELECTRONICALLY
9            )   STORED INFORMATION FOR
             )   STANDARD LITIGATION
Plaintiff(s),   )
             )
10  vs.          )
             )
11           )
             )
12  Defendant(s).  )
             )
13 _____)

14  **1.  PURPOSE**

15          This Order will govern discovery of electronically stored information ("ESI") in this

16  case as a supplement to the Federal Rules of Civil Procedure, this Court's Guidelines for the

17  Discovery of Electronically Stored Information, and any other applicable orders and rules.

18  **2.  COOPERATION**

19          The parties are aware of the importance the Court places on cooperation and commit to

20  cooperate in good faith throughout the matter consistent with this Court's Guidelines for the

21  Discovery of ESI.

22  **3.  LIAISON**

23          The parties have identified liaisons to each other who are and will be knowledgeable

24  about and responsible for discussing their respective ESI.  Each e-discovery liaison will be, or

25  have access to those who are, knowledgeable about the technical aspects of e-discovery,

26  including the location, nature, accessibility, format, collection, search methodologies, and

27  production of ESI in this matter. The parties will rely on the liaisons, as needed, to confer

28  about ESI and to help resolve disputes without court intervention.

**4.  PRESERVATION**

The parties have discussed their preservation obligations and needs and agree that preservation of potentially relevant ESI will be reasonable and proportionate. To reduce the costs and burdens of preservation and to ensure proper ESI is preserved, the parties agree that:

a)  Only ESI created or received between _____ and _____ will be preserved;

b)  The parties have exchanged a list of the types of ESI they believe should be preserved and the custodians, or general job titles or descriptions of custodians, for whom they believe ESI should be preserved, e.g., "HR head," "scientist," and "marketing manager." The parties shall add or remove custodians as reasonably necessary;

c)  The parties have agreed/will agree on the number of custodians per party for whom ESI will be preserved;

d)  These data sources are not reasonably accessible because of undue burden or cost pursuant to Fed. R. Civ. P. 26(b)(2)(B) and ESI from these sources will be preserved but not searched, reviewed, or produced:  [e.g., backup media of [named] system, systems no longer in use that cannot be accessed];

e)  Among the sources of data the parties agree are not reasonably accessible, the parties agree not to preserve the following: [e.g., backup media created before _____, digital voicemail, instant messaging, automatically saved versions of documents];

f)  In addition to the agreements above, the parties agree data from these sources (a) could contain relevant information but (b) under the proportionality factors, should not be preserved: _____.

**5.  SEARCH**

The parties agree that in responding to an initial Fed. R. Civ. P. 34 request, or earlier if appropriate, they will meet and confer about methods to search ESI in order to identify ESI that is subject to production in discovery and filter out ESI that is not subject to discovery.

**6.  PRODUCTION FORMATS**

The parties agree to produce documents in ☐ PDF, ☐TIFF, ☐native and/or ☐paper or a combination thereof (check all that apply)] file formats. If particular documents warrant a different format, the parties will cooperate to arrange for the mutually acceptable production of such documents. The parties agree not to degrade the searchability of documents as part of the document production process.

**7. PHASING**

When a party propounds discovery requests pursuant to Fed. R. Civ. P. 34, the parties agree to phase the production of ESI and the initial production will be from the following sources and custodians: _____.
Following the initial production, the parties will continue to prioritize the order of subsequent productions.

**8. DOCUMENTS PROTECTED FROM DISCOVERY**

a) Pursuant to Fed. R. Evid. 502(d), the production of a privileged or work-product-protected document, whether inadvertent or otherwise, is not a waiver of privilege or protection from discovery in this case or in any other federal or state proceeding. For example, the mere production of privileged or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case or in any other federal or state proceeding.

b) The parties have agreed upon a "quick peek" process pursuant to Fed. R. Civ. P. 26(b)(5) and reserve rights to assert privilege as follows _____ _____.

c) Communications involving trial counsel that post-date the filing of the complaint need not be placed on a privilege log. Communications may be identified on a privilege log by category, rather than individually, if appropriate.

**9. MODIFICATION**

This Stipulated Order may be modified by a Stipulated Order of the parties or by the Court for good cause shown.

**IT IS SO STIPULATED**, through Counsel of Record.

Dated: _____    _____

Counsel for Plaintiff

Dated: _____    _____

Counsel for Defendant

**IT IS ORDERED** that the forgoing Agreement is approved.

Dated: _____    _____

UNITED STATES DISTRICT/MAGISTRATE JUDGE

3

# Attachment C

1  KEKER, VAN NEST & PETERS LLP
   JOHN W. KEKER - # 49092
2  jkeker@keker.com
   R. JAMES SLAUGHTER - # 192813
3  rslaughter@keker.com
   BRYN WILLIAMS - # 301699
4  bwilliams@keker.com
   NICHOLAS GREEN - # 323959
5  ngreen@keker.com
   633 Battery Street
6  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
7  Facsimile:    415 397 7188

8  Attorneys for Plaintiff ANNE KIRKPATRICK

9            UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11          SAN FRANCISCO/OAKLAND DIVISIONS

12  ANNE KIRKPATRICK, an individual          Case No.

13              Plaintiff,                    **COMPLAINT FOR RETALIATORY
                                              DISCHARGE, CALIFORNIA LABOR
14       v.                                   CODE § 1102.5, AND VIOLATION OF
                                              FEDERAL CONSTITUTIONAL RIGHTS,
15  THE CITY OF OAKLAND, CALIFORNIA,          42 U.S.C. § 1983**
    a public corporation,
16
                Defendant.
17                                            **DEMAND FOR JURY TRIAL**

18

19

20

21

22

23

24

25

26

27

28

1389483

Plaintiff Anne Kirkpatrick, by and through her counsel of record, for her Complaint against Defendant the City of Oakland, California, alleges as follows:

## NATURE OF THE CASE

1. The Oakland Police Commission is the product of hard work, creative thinking, and close collaboration—it represents an innovative and progressive step towards effective civilian oversight and the restoration of public confidence in the Oakland Police Department ("OPD").

2. Unfortunately, some Oakland Police Commissioners have no regard for the law or the scope of their power and authority. Despite holding critical positions of public trust, those same Commissioners routinely abuse their power and ignore their oath of office. By way of example, some Commissioners corruptly look for special treatment from OPD in their personal affairs. Others frequently abuse and harass OPD staff and interfere in day-to-day operations, including by seeking unlawful access to confidential documents. Commissioners regularly attempt to exceed their authority. Anybody who speaks out about these abuses is bullied, threatened, and retaliated against.

3. For nearly three years, Chief Kirkpatrick raised a series of alarms about this Commissioner misconduct, which she believed violated the law. Those alarms went largely unheeded. Finally, caving to pressure from those same lawless Commissioners, the City fired its most progressive Chief in decades in retaliation for blowing the whistle.

4. Put simply, the City, acting through its agents Mayor Libby Schaaf and the Police Commission, fired Chief Kirkpatrick in retaliation for her repeated reports of Police Commission misconduct. The Chief's termination violated the California Labor Code and the Chief's federal constitutional rights. Through this lawsuit, Chief Kirkpatrick seeks to shine a brighter light on this abuse of the public trust and to be made whole for the injuries she suffered as a result of the City's unlawful conduct.

## THE PARTIES

5. Plaintiff Anne Kirkpatrick is a law enforcement professional with deep experience, including senior leadership roles within the Spokane, Washington Police Department, the

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

Chicago, Illinois Police Department, and most recently as Chief of the Oakland Police

Department.  Chief Kirkpatrick is a resident and citizen of the State of Washington.

6.       Defendant, the City of Oakland, California, is a public municipal corporation and a

California Charter City situated within Alameda County, California.

## JURISDICTION

7.       This Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C.

§ 1332, because this is a civil suit between citizens of two different states and the amount in

controversy exceeds $75,000.

8.       This Court also has subject matter jurisdiction over Chief Kirkpatrick's First

Amendment Claim pursuant to 28 U.S.C. § 1331, because it arises under the Constitution and

laws of the United States.  The Court has supplemental subject matter jurisdiction over Chief

Kirkpatrick's claim under California Labor Code § 1102.5 pursuant 28 U.S.C. § 1367(a), because

that claim is so related to the claim in the action within the Court's original jurisdiction that it

forms part of the same case or controversy.

9.       The Court has personal jurisdiction over the City because it is a California

municipal corporation organized under a charter adopted pursuant to the Constitution of the State

of California.

## VENUE

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the only

Defendant in this action, the City, resides in this District, and a substantial part of the events or

omissions giving rise to the claim occurred in this District.

## INTRADISTRICT ASSIGNMENT

11.      Pursuant to Local Rules 3-2(c) and 3-2(d), this case may be assigned to either the

Oakland or San Francisco Divisions of this Court, because a substantial part of the events or

omissions giving rise to Chief Kirkpatrick's claims occurred in Alameda County, California.

## CLAIM PRESENTATION

12.      Pursuant to Cal. Gov't Code §§ 905, 910, and 915, Chief Kirkpatrick presented her

claim for damages to the City of Oakland on May 6, 2020.  Her claim included all required

3

elements under § 910, including: Chief Kirkpatrick's name and post office address, the post office

address for notices related to the claim, the date, place, and other circumstances of the occurrence

that gave rise to her claim, a general description of the City's indebtedness and the Chief's injury,

the names of the City employees who caused the Chief's injury, and the fact that the Chief's

injuries exceed the jurisdictional minimum for an unlimited civil case under the laws of the State

of California.

13.     The City of Oakland rejected Chief Kirkpatrick's claim by letter dated June 25,

2020.  This civil suit for damages is therefore authorized under The Government Claims Act, Cal.

Gov't Code § 945.4.

## FACTUAL ALLEGATIONS

### A.     Measure LL and the Oakland Police Commission

14.     When Chief Kirkpatrick arrived at OPD on February 27, 2017, she took the helm

of a Department still reeling from a series of destabilizing events that undermined OPD's

credibility and respect in the community it serves.

15.     A reformer and advocate for police transparency, Chief Kirkpatrick began her

tenure as Chief of Police against the backdrop of a citizen ballot initiative called Measure LL,

approved by Oakland residents in the November 2016 elections.  Measure LL created the current

manifestation of the Oakland Police Commission, a body designed to provide robust civilian

oversight of OPD and restore public faith and confidence the department.

16.     Under Measure LL, the Commission received a specific mandate: to oversee,

review, and reform OPD's "policies, procedures, customs, and General Orders[.]"  The text of the

initiative enumerated six areas of responsibility and authority within the Commission's purview:

        i)      conduct public hearings at least annually related to policy and procedures;

        ii)     propose changes to policies and procedures;

        iii)    exercise oversight authority to approve or reject OPD's own suggested

changes to Department policies and procedures;

        iv)    review and comment, at its discretion, on all other policies and procedures;

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION
OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

v) review the City's budget for OPD to ensure it is in alignment with OPD's policies and procedures; and

vi) substantial input into hiring and firing the Chief of Police.

17. The Police Commission's hiring and firing authority includes the ability to propose four candidates from whom the Mayor may choose to hire as Chief, as well as the ability to fire the Chief of Police for cause. Where, as in Chief Kirkpatrick's case, the Chief is fired without cause, the Mayor must consent.

18. Under Measure LL, the scope of the Commission's authority is clear—it is empowered to examine and, if necessary, adjust OPD's governing policies and procedures. It may also exercise authority with respect to OPD's most senior leadership in the form of its hiring and firing power. Those are the limits of the Commission's authority.

19. But, in its oversight role, the Police Commission has no authority over the day-to-day operations of the Department; it is not empowered to direct or assign lower-level OPD staff and it is explicitly prohibited from accessing legally protected OPD personnel records except in certain limited circumstances.

20. Following Measure LL's enactment, the Police Commission began meeting in November 2017, about nine months after the City hired Chief Kirkpatrick.

21. It was a rocky start—three Commissioners left their roles in the Police Commission's first months. In addition, the Police Commission suffered from significant tension between mayoral appointees and Selection Panel appointees.[1]

22. As a mayoral appointee herself and a newcomer to Oakland, Chief Kirkpatrick received her share of animosity from the Selection Panel appointees on the Police Commission.

23. Compounding these problems, the Police Commission evidenced a misunderstanding of its role right from the start. Although the scope of its authority is clearly limited to policy and procedure, the Police Commission sought to involve itself in the daily

---

[1] Measure LL gave the Mayor of Oakland authority to appoint three of the first regular members of the Police Commission and then created a "Selection Panel" empowered to recommend candidates for the remaining positions to the Oakland City Council for subsequent appointment.

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

affairs and operations of OPD and acted as if OPD employees were Police Commission staff.

24.     In addition, the City failed to provide the Police Commission with the necessary staff and support for a successful start, shortcomings that the Police Commission wrongly attributed to OPD.  When Police Commission meetings eventually began in the late fall of 2017, they were chaotic, often marked by discordant exchanges between Commissioners, OPD representatives, other City officials, and the community.

**B.     Chief Kirkpatrick's Reports of Commissioner Misconduct**

25.     Even under these challenging circumstances, Chief Kirkpatrick's time as OPD's leader was marked by many successes and improvements.

26.     For example, during Chief Kirkpatrick's tenure, the City's homicide rate decreased to its lowest level in twenty years, and the City was on pace for a sixty-four-year low homicide rate at the time of the Chief's termination.  Other notable reform efforts included OPD's implementation of new policies, strategy, and training around police-citizen encounters that resulted in a fifty percent reduction in stops involving African-American and Latinx citizens.  The Chief's reform efforts extended to OPD's disciplinary process as well; according to an outside Disparity in Discipline Study, OPD made significant strides in reducing divergent disciplinary outcomes during Chief Kirkpatrick's time leading the Department.

27.     But a series of incidents involving individual Police Commissioners ultimately drove the Chief to submit multiple reports of inappropriate and unlawful conduct to the Oakland City Attorney's Office, the City Administrator, and the Mayor of Oakland—the officials she understood had the capacity to take action to stop the Commissioner's unlawful conduct and prevent future recurrences.

28.     But City leaders all ignored Chief Kirkpatrick's repeated reports of Commission misconduct.  Instead, the Police Commission and Mayor orchestrated Chief Kirkpatrick's termination in retaliation for the Chief's repeated whistleblowing.

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

**1.     Commissioners Threaten Neighborhood Services**

29.     Chief Kirkpatrick's first report of Commissioner misconduct arose out of two Commissioners' inappropriate efforts to steer resources towards their own neighborhoods and related bullying, threats, and intimidation of two low-level OPD employees.

30.     On March 2, 2018, Commissioners Ginale Harris and Jose Dorado met with two supervisory OPD Neighborhood Services Coordinators ("NSCs") who work with the community to facilitate partnerships between citizens and the Department.

31.     During this encounter, Commissioner Harris made several demands, including for information related to OPD hiring processes and internal OPD documents.

32.     Commissioner Harris told these two OPD employees that she "had a history of having people fired" and that she believed NSCs "should be Oakland residents."

33.     Commissioner Dorado, for his part, expressed displeasure with the NSCs assigned to his neighborhood before emphasizing his view that the Ghost Ship fire, an event that resulted in thirty-six deaths, could have been prevented "had the NSC [done] her job."

34.     Upon receiving a report of this incident, Chief Kirkpatrick made a report to the City Attorney's Office and City Administrator Sabrina Landreth.

35.     The Chief made this report because she reasonably believed that Commissioner Harris and Commissioner Dorado violated Oakland regulations prohibiting misuse of official positions for personal gain.

**2.     Commissioner Harris Seeks Special Treatment**

36.     Chief Kirkpatrick submitted her next report of Police Commission misconduct in connection with an individual Commissioner's corrupt efforts to obtain special treatment from OPD.

37.     On September 17, 2018 Chief Kirkpatrick was working in her office on the eighth floor of OPD headquarters when Officer Johnna Watson, a staff assistant to the Chief, reported that Commissioner Harris was "basically throwing a fit" over a tow ticket in the Records Department.

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

38.   When citizens receive citations or fines, they may pay them in person in the Records Department.

39.   A supervisor from Records arrived and told the Chief that Commissioner Harris had displayed her Commission badge to Records Staff and asked if they "knew who I am?" The Chief also understood that Commissioner Harris felt she had been illegally towed, that she was willing to pay her citation, but refused to pay the fee for a tow truck.

40.   Records staff told Commissioner Harris that she could pursue a hearing if she felt she was towed illegally, to which Commissioner Harris replied along the lines of "do I need to call the Chief" or "I'm going to have to call the Chief."

41.   The Chief understood that Commissioner Harris was asking for a personal favor and special treatment.

42.   Because her staff had escalated the matter to her desk, Chief Kirkpatrick felt that the situation was serious. She instructed Officer Watson to bring Commissioner Harris to her office.

43.   When Commissioner Harris arrived, the Chief told her that she would not grant any favors for Police Commissioners and recommended that Commissioner Harris follow the ordinary appeals process. Commissioner Harris then denied that she was seeking "a favor," and ultimately left the Chief's office without obtaining any change in her fine.

44.   After Commissioner Harris left, the Chief documented the events in an internal report.

45.   Chief Kirkpatrick also sent an email to City leaders, informing them of the confrontation. The Chief wrote that Commissioner Harris was "bullying" her staff and expressed concerns regarding retaliation.

### 3.   The Police Commission Insults Alameda County's Public Defender

46.   On March 28, 2019, Alameda County Public Defender Brendon Woods addressed a Police Commission meeting that Chief Kirkpatrick attended. In the middle of Woods's remarks, Commissioner Harris interjected to the effect that Woods's "skin color is black" but that he "may not live like a black man."

8

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

47.     Woods took offense and responded with a brief personal history.

48.     The next day, the Chief sent an email to City leaders titled "Potential Complaint," and explained that she found Harris's remark "so unacceptable that I personally apologized to Mr. Wood[s]."

49.     The Chief believed that this incident possibly triggered her mandatory reporting obligation under City Administrative Instruction 71 ("AI 71"), a policy governing harassment and workplace misconduct.  Indeed, in the Chief's view, a comment of this tenor would subject an OPD Officer to serious discipline.

50.     The final line of her email is particularly ominous in retrospect: "I am concerned that the Police Commission could be retaliatory toward me for reporting this to you."

### 4.     The Police Commission Seeks Confidential Information

51.     The Chief submitted several reports to City leadership related to Police Commissioners' unlawful efforts to obtain confidential personnel information in connection with an investigation into racial bias within OPD, as well as Police Commissioners' attempts to intimidate and harass the Chief into commenting on the investigation in violation of her legal duty of confidentiality.

52.     Sometime in October 2018, Sergeant Aaron Smith, the President of the Oakland Black Officers' Association ("OBOA"), sought a meeting with Chief Kirkpatrick.  She understood this meeting to involve Smith's difficulties with his supervisor, Captain Jake Bassett. The Chief knew that many perceived Bassett to be a poor communicator, and although she found him quite competent, the Chief had received complaints regarding his leadership style in the past. At the time, Bassett oversaw the OPD Academy, which also retained responsibility for recruitment efforts.

53.     The Chief partially misunderstood the nature of Smith's visit.  She believed Smith's complaint was with Bassett's communication skills and leadership; while Smith did have such concerns, he also wanted to raise issues related to Bassett's handling of diversity and recruiting.  By her own admission, Chief Kirkpatrick missed the possible bias issues in Smith's presentation because the focus of his remarks was directed towards moving a different individual,

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

Virginia Gleason, into the position overseeing recruiting. Gleason was the Deputy Director of the Bureau of Support Services and Chief Kirkpatrick's top civilian aide.

54. In part due to concerns about a non-union civilian employee supervising sworn officers and union members, the Chief did not immediately take action, although she was working on a solution behind the scenes.

55. Ninety days after her meeting with Smith, the OBOA released an open letter that was highly critical of the Chief, Captain Bassett, and diversity and race issues within OPD. The letter caused serious disruption within the Department. The Chief immediately recognized that an AI 71 investigation was appropriate and welcomed outside scrutiny of the issues OBOA presented in its letter.

56. After the City announced an investigation, the Police Commission placed a status update on the probe on every meeting agenda. But, Chief Kirkpatrick could not speak to the issue in any capacity because she was legally precluded from discussing an open internal investigation. Moreover, she could in no circumstance comment on an investigation of which she was a focus. Nevertheless, in a transparent effort to harass and intimidate the Chief, the Police Commission continued noticing a status report that it knew the Chief could not lawfully provide, even after the Chief informed them that she could not answer any questions.

57. By April 2019, the situation had reached a boiling point. The Chief attended a Police Commission meeting where the status of the AI 71 investigation was again on the agenda. After refusing to address the topic, the Chief drafted an email to Mayor Schaaf and City Administrator Landreth (among others), titled "Complaint," where she decried the Police Commission's conduct. She explained that it was her "understanding that employment law prevents me from addressing" the issue and lamented that she was "being challenged as insubordinate" for refusing to violate her legal obligations.

### 5. The Police Commission Inappropriately Directs Staff

58. Chief Kirkpatrick reported again on the Police Commission's campaign of interference in the early summer of 2019. On May 29, 2019, Commissioner Harris emailed Chief Kirkpatrick to request that Deputy Chief LeRonne Armstrong serve as OPD's liaison to the Police

1389483

Commission.  In the request, Commissioner Harris explained that "I often have many question[s] in regards to East Oakland that I believe and trust that Deputy Armstrong can answer.  I do appreciate your staff that you bring to the meetings, however they are not from East Oakland or Oakland period.  I am a firm believer that you can only be an expert if you have experienced it."

59.    After some back and forth with Commissioners Harris and Regina Jackson, Chief Kirkpatrick ultimately informed them that she had spoken to Deputy Chief Armstrong and that he was not interested in serving as a liaison.

60.    Commissioner Jackson responded that the Commission "would like to have DC Armstrong be the liaison whether he likes it or not."

61.    Finally, on June 5, 2019, the Chief sought the intervention of City leaders, writing that they needed to explain the issue of having a commissioner directing staff to the Police Commission.

62.    On June 20, 2019, in the face of repeated demands and inaction from City administrators, the Chief concluded she had no recourse; she relented and assigned Deputy Chief Armstrong as the OPD liaison to the Police Commission.

**6.    The Police Commission Serves an Unlawful Subpoena**

63.    In the early summer of 2019, Chief Kirkpatrick raised further concerns about the lawfulness of Police Commission activity with senior City officials.

64.    OPD's internal investigations into the shooting death of Joshua Pawlik were coming to a close; OPD officers shot and killed Pawlik, a homeless man, after they observed him sleeping with a firearm.  Eventually, the Executive Force Review Board, the Community Police Review Agency, and Chief Kirkpatrick concluded that the use of force in the Pawlik shooting was within OPD policy.

65.    The Police Commission and federal monitor Robert Warshaw were not satisfied with OPD's review and Commissioners sought to obtain confidential records related to the

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

1   Department's internal investigation.[2]  Chief Kirkpatrick could not lawfully comply because the

2   requested files contained protected personnel records, leading to several contentious Police

3   Commission meetings.

4           66.     The Chief reasonably believed that Commissioners were again attempting to force

5   her to disclose confidential information in violation of law and the terms of her contract.  Despite

6   repeated requests, nobody in City Administration was willing to appear and defend the Chief at

7   the Police Commission's meetings.

8           67.     In June 2019, the Police Commission issued a subpoena for all of OPD's internal

9   communications related to the Pawlik case.  Although Measure LL did vest the Police

10  Commission with subpoena power, this request exceeded the lawful boundaries of that power

11  because it sought information protected by state law.  The Chief believed this request was

12  unlawful and reported it to City administrators.  Ultimately, the Chief delivered the subpoenaed

13  materials to Mike Nisparos, the head of the CPRA.  In his role at the CPRA, Nisparos was

14  authorized to view sensitive personnel information, unlike the Commissioners.  Nisparos refused

15  to turn over the communications to the Police Commission, telling the Chief that he believed the

16  Police Commissioners were acting maliciously.

17                  **7.      The Commission Harasses and Intimidates Senior OPD Staff**

18          68.     The Police Commission's campaign of intimidation, harassment, and interference

19  with OPD leadership reached its climax in the fall of 2019.

20          69.     Representatives from the Police Commission informed Chief Kirkpatrick's senior

21  civilian aide, Virginia Gleason, that the Police Commission desired a report on OPD's efforts to

22  increase diversity and inclusion in its hiring practices.  Gleason was now responsible for leading

23  these efforts, so preparation and presentation of the report were her responsibility.  Gleason

24  informed Chrissy Love, the administrator in charge of scheduling for the Police Commission, that

25

26

27  _____
    [2] Chief Warshaw serves as a court-appointed federal monitor under a negotiated settlement
28  agreement entered into by the City of Oakland and several civil rights plaintiffs, arising out of a
    case that predated Chief Kirkpatrick's tenure with OPD.

                                                    12
    COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION
                    OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
                                        Case No.

1389483

the first-choice date, October 10, 2019, conflicted with Gleason's pre-approved family vacation. Love and Gleason agreed on October 24, 2019 instead.

70.     Then, without Gleason's advanced knowledge, the Police Commission placed her presentation on the agenda for October 10.  The Police Commission knew Gleason had planned to be out of town on that date and sought to embarrass both Gleason and OPD by scheduling the presentation for a time when Gleason could not appear.  Nevertheless, Gleason canceled her vacation, attended the October 10, 2019 meeting, and delivered her report.  Chief Kirkpatrick also attended the meeting.

71.     But the Police Commission was not to be denied; Commissioners launched into heated criticism of Gleason's report almost immediately.  At least one Commissioner called the report "disgraceful."  Commissioner Harris told Gleason that, based on the content of the report, she "should be ashamed of herself."  The Commissioners' breathtakingly abusive and harassing conduct, unbecoming of public officials—and recorded on video—was a bridge too far.  Chief Kirkpatrick directed Gleason to step off the dais and took the microphone herself.  She admonished the Police Commission not to "speak to our staff in that manner" and emphasized that targeted abuse "is not acceptable."  The Chief demanded an apology on Gleason's behalf; Commissioner Harris responded that "[s]he will not get one from me.  And neither will you."

72.     The next day, the Chief wrote a "Formal Complaint," addressed to Barbara Parker (the City Attorney) and City Administrator Landreth, among others.  Her Complaint described the facts leading to the conflagration at the October 10, 2019 meeting in detail.  She also noted that Commissioner Smith and John Alden, the new director of the CPRA, reached out to her following the meeting.  Alden, she reported, characterized the events as "horrifying" and told the Chief that the Commissioners' motivations were "personal."  The Chief also noted that Deputy Chief Armstrong had told Gleason that the Police Commission knew the change in meeting date would interfere with Gleason's vacation and that it was "personal."  The Chief further observed that the Police Commission continued to notice the OBOA investigation for a status update and had noticed it for the October 10 meeting.

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

73.     Chief Kirkpatrick's report noted her belief that the Commissioners' behavior could be retaliation for the Chief's report of Harris's challenge to her tow ticket.  Her complaint ended by listing the other senior OPD staff present at the Commission meeting: Assistant Chief Darren Allison, Lieutenant Bobby Hookfin, Deputy Chief Roland Holmgren, and Lieutenant Wilson Lau.

**C.     Chief Kirkpatrick's Termination**

74.     At an open session of the Oakland City Council on January 28, 2020, Councilmember Rebecca Kaplan revealed the existence of a highly confidential internal investigation into repeated instances of misconduct by Police Commissioner Ginale Harris.  Councilmember Kaplan disclosed a document that described the scope of the investigation and its approximate cost.

75.     Chief Kirkpatrick was involved in several of the incidents under scrutiny, including Commissioner Harris's threats to two NSCs in March 2018 and the September 2018 tow ticket incident.  The investigative team, from Public Interest Investigations, interviewed Chief Kirkpatrick in May 2019.  To be clear, Chief Kirkpatrick did not commission the investigation, nor did she direct its aims or conduct.  Her sole involvement was as a percipient witness to several of the events the City believed merited further investigation.  Notably, the very document Councilmember Kaplan disclosed, outlining the scope of the investigation, highlighted that Chief Kirkpatrick was already on record as being concerned about the prospect of retaliation for her reports related to Commissioner Harris's misconduct.

76.     Two days after Councilmember Kaplan revealed the investigation of Commissioner Harris, on January 30, 2020, an article appeared in the Oakland Post describing the investigation and suggesting that it was the product of "repeated moves by the Chief of Police Anne Kirkpatrick and the City Administrator Sabrina Landreth against Oakland Police Commission Vice Chair Ginale Harris."  The retaliation Chief Kirkpatrick feared had begun in earnest.

77.     Following the article's publication, the City Council met in closed session on February 5, 2020.  Less than two weeks later, Mayor Schaaf visited Chief Kirkpatrick in her home and told the Chief that the Police Commission intended to fire her.  Mayor Schaaf also

14

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

suggested that the federal monitor, Robert Warshaw, supported firing the Chief. The Mayor asked Chief Kirkpatrick not to return to work.

78. On Thursday, February 20, 2020, Mayor Schaaf called Chief Kirkpatrick and informed her over the telephone that the City had terminated her employment as Chief of Police without cause, effective immediately. The City never offered the Chief an administrative hearing as required under the Peace Officer's Bill of Rights, nor did it afford her an opportunity to appeal the City's decision before a neutral decision maker.

**FIRST CAUSE OF ACTION**
**FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5**

79. Chief Kirkpatrick reincorporates and realleges all preceding paragraphs as if set forth fully herein.

80. At all relevant times, through her termination on February 20, 2020, the City of Oakland employed Anne Kirkpatrick in the position of Chief of Police.

81. Chief Kirkpatrick provided information related to Police Commissioner misconduct, which was not publicly known, to her employer the City of Oakland, a public body. The information disclosed included, without limitation:

i) Commissioners Harris's and Dorado's attempts to bully and harass, through threats and intimidation, two OPD Neighborhood Services Coordinators in an effort to obtain preferential policing for their own neighborhoods;

ii) Commissioner Harris's misuse of her official position in an effort to obtain special treatment from OPD;

iii) The Police Commission's unlawful attempts to obtain confidential employment records to which it had no right of access;

iv) The Police Commission's harassment and open contempt for OPD staff.

82. Chief Kirkpatrick had reasonable cause to believe that the information she provided disclosed violations of state law and local regulations, including without limitation:

i) Unlawful attempts to obtain confidential peace officer personnel records in violation of Cal. Penal Code § 832.7 and Oakland Municipal Code § 2.45.80;

15

1389483

ii)     Unlawful attempts to misuse official positions for personal gain in violation of Cal. Penal Code § 68(a) and Oakland Municipal Code § 2.25.06; and

iii)     Abuse of authority and retaliatory conduct in violation of Oakland Municipal Code § 2.24.100.

83.     The City of Oakland discharged Chief Kirkpatrick, effective February 20, 2020.

84.     Chief Kirkpatrick's disclosures were, at a minimum, a contributing factor in the City's decision to terminate her employment at OPD.  Chief Kirkpatrick was terminated only four months after making a "formal complaint" against the Police Commissioners, expressing her belief that Commissioners were retaliating against her, at least in part, due to her *prior* reports of misconduct.  Indeed, the Chief's reports, made in close temporal proximity to her termination, disclosed blatant corruption and misconduct by the very officials that terminated her employment. Throughout her employment as Chief of Police, Chief Kirkpatrick expressed concern, in writing, that the Police Commission might retaliate against her for reporting Commissioner misconduct; those fears eventually became reality in February 2020.

85.     Chief Kirkpatrick was damaged by her unlawful discharge, in at least the following ways:

i)     Lost compensation from February 2020 through the conclusion of her contractual term of employment, February 26, 2022.

ii)     Lost health, retirement, and fringe benefits through the conclusion of her contractual term of employment, February 26, 2022.

iii)     Mental suffering caused by the City's extreme and outrageous conduct in terminating her employment for reporting Commissioner misconduct.

## SECOND CAUSE OF ACTION
## FOR VIOLATION OF FIRST AMENDMENT RIGHTS, 42 U.S.C § 1983

86.     Chief Kirkpatrick reincorporates and realleges all preceding paragraphs as if set forth fully herein.

87.     Chief Kirkpatrick's reports to City administrators amounted to protected speech that substantially addressed matters of public concern.  The Chief's reports concerned

16

1389483

1  wrongdoing at high levels of City government, within a body specifically created to provide

2  accountable civilian oversight and restore public confidence and trust in OPD.  The Chief also

3  disclosed corrupt acts, self-serving conduct, and violations of law.  The Chief's speech bore

4  directly on critical issues of governmental mismanagement at systemic levels involving an

5  essential public safety agency, and were not mere employment grievances.

6      88.    The Chief's reports were not made in the ordinary course of her job duties, which

7  involved managing OPD's day-to-day operations.  Instead, her speech was made in her capacity

8  as a concerned citizen, and involved reports that were necessary to root out public corruption.

9  The Chief directed her protected speech to the only City administrators potentially capable of

10  putting an end to Commissioner misconduct.

11     89.    The Chief's protected speech, made in her capacity as a private citizen and which

12  substantially addressed matters of public concern, was a substantial motivating factor in the

13  City's adverse employment action.  Specifically, the City terminated the Chief's employment in

14  direct retaliation for her repeated whistleblowing activities.  The City fired the Chief on February

15  20, 2020, only four months after her October 11, 2019 "formal complaint."

16     90.    The City had no adequate justification for terminating the Chief's employment

17  based on her protected whistleblowing speech under *Pickering v. Board of Education of

18  Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968).  The Chief's

19  protected speech did not disrupt the City's ability to control its work environment or the

20  relationships between coworkers within OPD; indeed just the opposite is true.  Nor did the

21  Chief's speech impair her ability to perform her job duties or obstruct OPD's routine operations.

22     91.    The Chief's protected speech was the logical and proximate cause of her

23  termination.  The City fired Chief Kirkpatrick *because* of her repeated efforts to cast sunshine on

24  Police Commissioner misconduct.

25     92.    Oakland Mayor Libby Schaaf and the Police Commission jointly terminated Chief

26  Kirkpatrick.  These individuals, acting on behalf of the City and as the City's agents, are the City

27  officials responsible for establishing final policy with respect to OPD, as evidenced by

28  § 604(b)(10) of the Oakland City Charter and Measure LL.  As such, the Chief's termination was

17

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

the decision of a final policymaker for purposes of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

93.     Chief Kirkpatrick was damaged by her retaliatory discharge, in at least the following ways:

i)      Lost earnings from February 20, 2020 through the conclusion of her contractual term of employment, February 26, 2022.

ii)     Lost health, retirement, and fringe benefits from February 20, 2020 through the conclusion of her contractual term of employment, February 26, 2022.

iii)    Mental suffering caused by the City's extreme and outrageous conduct in terminating her employment for reporting Commissioner misconduct.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Anne Kirkpatrick prays for judgment against the City of Oakland as follows:

1.      A judgment that the City terminated Chief Kirkpatrick in retaliation for protected disclosures to a public body, in violation of Cal. Labor Code § 1102.5;

2.      A judgment that the City violated Chief Kirkpatrick's rights under the First Amendment to the United States Constitution;

3.      General damages according to proof, including, without limitation, mental pain and anguish cause by the City's extreme and outrageous conduct;

4.      Special damages according to proof, including without limitation:

i)      Lost earnings for the period between February 20, 2020 and February 26, 2022, inclusive;

ii)     Lost future health, retirement, and fringe benefits for the period between February 20, 2020 and February 26, 2022, inclusive;

iii)    Damage to future earning potential through injury to professional reputation;

5.      Prejudgment interest in an amount according to proof;

6.      Reasonable attorneys' fees and costs;

18

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

7.     Any such other relief as the Court may deem just and proper.

**Plaintiff Anne Kirkpatrick demands a trial by jury.**

Dated:  August 19, 2020                          KEKER, VAN NEST & PETERS LLP

                                                                By:    */s/ R. James Slaughter*
                                                                        JOHN W. KEKER
                                                                        R. JAMES SLAUGHTER
                                                                        BRYN WILLIAMS
                                                                        NICHOLAS GREEN

                                                                        Attorneys for Plaintiff ANNE
                                                                        KIRKPATRICK

COMPLAINT FOR RETALIATORY DISCHARGE, CALIFORNIA LABOR CODE § 1102.5, AND VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS, 42 U.S.C. § 1983
Case No.

1389483

# EXHIBIT D

# SWANSON & McNAMARA

300 Montgomery Street
Suite 1100
San Francisco, CA 94104
www.swansonmcnamara.com
Tel          (415) 477-3800
Fax          (415) 477-9010

**Via Email**

March 19, 2021

R. James Slaughter
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111
rslaughter@keker.com

> **Re:**      **Subpoenas in *Kirkpatrick v. The City of Oakland, California***

Dear Jamie:

We have received the subpoenas issued to Robert Warshaw and Police Performance Solutions seeking production of documents from Mr. Warshaw and/or his staff.  We understand your client intends to serve an identical subpoena on Warshaw & Associates in the near future.  We confirm that we are authorized to accept service of these three subpoenas.

As you are aware, Mr. Warshaw is the court-appointed Monitor and Compliance Director in the matter of *Allen, et al. v. City of Oakland, et al.*, Northern District of California Case 00-cv-4599 WHO.  The Amended Memorandum of Understanding re: Post-NSA Terms and Conditions, entered as a court order in that action on June 27, 2011, provides as follows:

> The Monitor may testify in this case regarding any matter relating to the implementation, enforcement or dissolution of this AMOU.  The Monitor shall not testify and/or respond to subpoenas or documents in other matters relating to the City and OPD, except as authorized by the Court.

AMOU (*Allen* Dkt. 620), ¶ 18; *see id.* at ¶ 3 (defining "Monitor" as the "outside monitoring body" charged with oversight of implementation of "best available practices and procedures for police management in the areas of supervision, training and accountability mechanisms, and to enhance the ability of the Oakland Police Department . . . to protect the lives, rights, dignity and property of the community it serves.").  In 2012, the court appointed a Compliance Director who would "serve until this case is terminated or until otherwise ordered by the Court" and who has "the same rights and privileges as have already been agreed to and/or ordered with respect to the Monitor, including those relating to testifying in this or other matters, confidentiality, and access to information and personnel."  Order re: Compliance Director (*Allen* Dkt. 885), 2.  In appointing a Compliance Director, the court specified that the Monitor's duties and responsibilities "remain unchanged and will stay in effect until this case is terminated" unless otherwise ordered.  *Id.* at 3.  In 2014, "all authority previously vested by the Court" in the previously-appointed Compliance Director was "transferred to the Court-appointed Monitor, Robert S. Warshaw."  (*Allen* Dkt. 973), 2.

# SWANSON & McNAMARA

R. James Slaughter
March 19, 2021
Page 2

As the *Allen* court has emphasized, "communications by the Monitor, including the consultations and recommendations [between the Monitor and the City and the Chief of Police], are confidential.  Any unauthorized disclosure shall be subject to sanctions."  Order Clarifying January 24, 2012 Order re: the Monitor's Authority (*Allen* Dkt. 694), 2.  "[T]he Monitor communicates with the Chief of Police only as an agent of the Court, and his communications therefore bear the same protection as communications from this Court."  Order Denying Intervenor's Motion for Clarification (*Allen* Dkt. 708), 1.

Accordingly, Mr. Warshaw, Police Performance Solutions, and Warshaw & Associates are unable to provide documents.  Each reserves and does not waive all other objections to the requests in your client's subpoenas.

I have enclosed for your convenience the court orders discussed above.

Sincerely,

Edward W. Swanson
August Gugelmann
Swanson & McNamara LLP

encl.

# EXHIBIT E

Gregory M. Fox, State Bar No. 070876
BERTRAND, FOX & ELLIOT
The Waterfront Building - 2749 Hyde Street
San Francisco, California 94109
*Email: gfox@bfesf.com*
Telephone:    415.353.0999
Facsimile:    415.353.0990

Barbara J. Parker Acting City Attorney, SBN 069722
Randolph W. Hall, Chief Asst. City Attorney, SBN 080142
Rocio V. Fierro, Supervising Deputy City Attorney, SBN 139565
OFFICE OF THE CITY ATTORNEY
CITY OF OAKLAND
One Frank H. Ogawa Plaza, Sixth Floor
Oakland, California 94612
Telephone:    510.238.3601
Facsimile:    510.238.6500
rvf/594025

Attorneys for Defendant CITY OF OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELPHINE ALLEN, et al., | **MASTER FILE:  No. C-00-4599-TEH** |
| Plaintiffs, | AMENDED MEMORANDUM OF UNDERSTANDING |
| vs. | RE:  POST NSA TERMS AND CONDITIONS ALLOWING FOR THE RESOLUTION OF |
| CITY OF OAKLAND, et al., | PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF AND FOR DISMISSAL OF THE |
| Defendants. | ACTION |

**A.    Introduction**

1.      The City of Oakland ("City") and the Plaintiffs (hereafter "The Parties") share a mutual interest in promoting effective and respectful policing.  The Parties therefore executed the document entitled "Settlement Agreement Re:  Pattern and Practice Claims "in the above-captioned matter, which was executed by Order of the Court on January 23, 2003.  That agreement between the Parties is commonly known as the Negotiated Settlement Agreement ("NSA").  Over the years the NSA has been

amended and revised by the Parties through stipulations approved by the Court.

2.      The NSA was comprised of Fifteen (15) detailed Articles, divided into 51 tasks, that formed the basis for an agreed upon reform program for the Oakland Police Department ("Department" or "OPD").  The NSA's reform program included three principal objectives.  First, OPD was to create new policies reflecting the contemporary practices nationwide for law enforcement management and operations.   Second, OPD was to train all personnel on the new policies.   Third, OPD was to demonstrate that its police officers' actual performance of duties was continuously consistent with the new policies and training.

3.      The NSA states that the "overall objective of this document is to provide for the expeditious implementation, initially with the oversight of an outside monitoring body (hereinafter the "Monitor"), of the best available practices and procedures for police management in the areas of supervision, training and accountability mechanisms, and to enhance the ability of the Oakland Police Department (hereinafter the "Department" or "OPD") to protect the lives, rights, dignity and property of the community it serves." (*NSA. Article I.*)

4.      The Monitor hired under the NSA has been commonly referred to as the Independent Monitoring Team ("IMT").   During the existence of the NSA, the Department's ongoing daily operations have been monitored by the IMT to assure that in actual practice the Department's operational activities are in "substantial compliance" with the requirements of the NSA, and as reflected in the Department's new and approved policies and training programs.

5.      The NSA mandates that "This Agreement shall, under no circumstances, exceed seven (7) years." (*NSA. Article XV. B. 3.*)  The NSA also mandates that the IMT's term of office "shall expire after a maximum of seven (7) years." (*NSA. Article XIII. B.*)  By Court Order the NSA was replaced and superseded based on the parties entering into a Memorandum of Understanding ("MOU") which expires January 22, 2012.

6.      The Parties agree that the City has accomplished the NSA's two goals of enacting the required policies and completing training of OPD personnel on these policies.  The Parties further agree that OPD has made significant progress in achieving practice compliance with the reforms. Nevertheless, the Parties agree that additional time is necessary for OPD to complete the reform work it

AMENDED MEMORANDUM OF UNDERSTANDING Re: POST NSA TERMS AND CONDITIONS

1    started under the NSA.

2    7.    The parties agreed on a Memorandum of Understanding ("MOU") governing the

3    compliance efforts by OPD and the auditing by the Monitor which was effective January 2010 and

4    expires January of 2012.  The parties have agreed that additional time is necessary for OPD to complete

5    the reform work started under the NSA and MOU.

6    8.    The Parties agree to this Amended Memorandum of Understanding (AMOU).  The

7    AMOU provides for the Court to continue to exercise jurisdiction of this action for all purposes,

8    consistent with the goal of achieving institutional reform.  The AMOU further provides for the City to

9    remain compliant with the reforms already achieved prior to the expiration of the NSA and original

10   MOU.  Finally, the AMOU requires the City to continue its work in achieving full and sustained

11   compliance with the Reform Tasks not completed under the NSA and the original MOU.

12   It is therefore agreed as follows:

13   9.    The NSA entered into on January 23, 2003, as ordered by the Court, expired and

14   terminated on January 22, 2010.  The material terms of the NSA were incorporated by reference into the

15   MOU and said material terms are again incorporated by reference into this AMOU.  However this

16   AMOU shall continue to supersede the NSA and, if complied with, shall resolve the complaint for

17   injunctive relief filed by Plaintiffs in the above captioned matter alleging a pattern or practice of

18   unconstitutional or otherwise unlawful policing in violation of 42 U.S.C. Section 1983.

19   **B.    Reform Tasks**

20   10.    The Parties agree that the City needs more time to meet the substantive requirements on

21   certain reform tasks and to demonstrate a one year compliance period on others (hereinafter,

22   "Remaining Reform Tasks").  Accordingly, pursuant to this AMOU the City agrees to continue the work

23   not completed under the NSA on the Remaining Reform Tasks.

24   11.    All Remaining Reform Tasks will be actively monitored by the Independent Monitor,

25   Police Performance Solutions LLC, pursuant to the terms and conditions of this AMOU.  Active

26   monitoring means that the Monitor will conduct the required audits, reviews, or studies to assess

27   whether OPD is complying with the substantive task requirements.  All Remaining Reform Tasks

28   subject to active monitoring are included in the Revised Active Monitoring Chart, which is attached

3

hereto as Exhibit 1 and incorporated by this reference.

12.   The City agrees to remain in substantial compliance with the reform tasks already accomplished under the NSA (hereinafter, "Accomplished Reform Tasks").  The Accomplished Reform Tasks will not be subject to active monitoring.   The Monitor may conduct random reviews of Accomplished Reform Tasks as necessary to determine whether the City has fallen out of substantial compliance and the extent and nature of the alleged deficiency. The Monitor will have access to information and documents related to all reform tasks, including those not listed in Exhibit 1. If the Monitor observes material non-compliance with an Accomplished Reform Task, the Monitor will report its observations and findings to the Parties.  The Parties will meet and confer and will consult with the Monitor regarding the actions the City must take to cure any alleged compliance deficiency.  If the Parties do not reach consensus, or the Monitor disagrees with the City's remedial measures, either the Parties or the Monitor will advise the Court.  The City will have the opportunity to present its case to the Court and, thereafter, the Court will issue a finding at the Court's discretion, or an order regarding the appropriate measures the City should take to cure the alleged compliance deficiency.

13.   The City agrees to meet its reform compliance obligations based on the substantive requirements for each task contained in the NSA and subsequent Stipulations filed with the Court.  The City will be deemed compliant with the reforms based on the agreed-upon standard of substantial compliance as defined in the NSA.  Substantial compliance is defined as meaning that "OPD has complied with the material provisions of the Agreement.  Materiality is determined by reference to the overall objectives of the NSA Agreement.  Non-compliance with technicalities, or, otherwise, minor failures to comply while generally complying with the NSA Agreement, shall not be deemed failure to substantially comply with the NSA Agreement." (*NSA, Article XV. Section B.3.*)

14.   The City agrees to use the compliance criteria and protocols already developed to determine whether the City is in substantial compliance, except that the Monitor, in cooperation with the City and Plaintiffs' counsel, may modify the agreed-upon criteria and protocols as necessary.

15.   The City agrees to comply with the provisions respecting the adoption of new or modified policies related to the reform tasks as provided under the NSA, Article XV, Section C.8.  Prior to implementing any new policies or any material changes to existing policies related to the Remaining

4

AMENDED MEMORANDUM OF UNDERSTANDING Re: POST NSA TERMS AND CONDITIONS

1  or Accomplished Reform Tasks, the City agrees to continue to provide drafts to the Monitor for review

2  and approval. The Monitor shall continue to review and approve any such policies to ensure that they

3  are consistent with the substantive provisions of the AMOU and the substantive requirements of the

4  NSA provisions incorporated herein. The City will provide these same policies to Plaintiffs for their

5  review and comment.

6  **C.    Independent Monitor**

7          16.    The City agrees to hire an Independent Monitor which is Police Performance Solutions

8  LLC. The Monitor will have the responsibilities and authority as provided in the original NSA, the

9  MOU and this AMOU, and by such Orders as the Court may deem appropriate pursuant to this

10  Agreement and the powers of the court. The Monitor has been retained by the City in full consultation

11  with the Plaintiffs' attorneys. If Police Performance Solutions LLC stops its monitoring work and needs

12  to be replaced the parties will meet and confer on a new Monitor. If the Parties are unable to agree on

13  the selection of a new Monitor the Parties may submit their respective nominees to the federal court for

14  a final selection by the Court. The costs of the Monitor will be borne by the City and shall be calculated

15  to fairly and reasonably compensate the Monitor for accomplishing the tasks and responsibilities set out

16  in this AMOU. In the event that any dispute arises regarding the payment of the Monitor's fees and

17  costs, the City, Plaintiffs' counsel, and the Monitor will attempt to resolve the dispute cooperatively

18  prior to seeking the Court's assistance. The Court retains the authority to resolve any disputes that may

19  arise regarding the reasonableness of fees and costs charged by the Monitor.

20          17.    The Monitor will be the agent of the Court and shall be subject to the supervision and

21  orders of the Court. The Monitor will have only the duties, responsibilities and authority conferred by

22  this AMOU. The role of the Monitor will be to assess compliance with the reform tasks as set out in this

23  AMOU. The Monitor will not and is not intended to replace or take over the role or duties of the Chief

24  of Police or other police or city officials. The Monitor shall offer the City and OPD technical assistance

25  regarding the implementation of the Reform Tasks and overall compliance with the requirements of the

26  AMOU.

27          18.    The Monitor may testify in this case regarding any matter relating to the implementation,

28  enforcement or dissolution of this AMOU. The Monitor shall not testify and/or respond to subpoenas or

AMENDED MEMORANDUM OF UNDERSTANDING Re: POST NSA TERMS AND CONDITIONS

documents in other matters relating to the City and OPD, except as authorized by the Court. The Monitor shall not be retained by any current or future litigant or claimant in a claim or suit against the City and its employees.

19.   The Monitor will report directly to the federal court.  The Monitor will provide regular public status reports to the Parties and the Court about the progress of OPD in achieving substantial and sustained practice compliance with the Remaining Reform Tasks; with the Accomplished Reform Tasks if necessary to report about OPD's material non-compliance; and as otherwise requested by the Court.

20.   The City and OPD agree to cooperate fully with the Monitor and to provide access to information and personnel in a timely fashion.  The provisions respecting access and limitations to OPD Documentation and Staff, and the treatment by the Monitor of confidential information contained in the NSA are incorporated herein by reference. (*NSA. Article XIII. Sections K, L, M, N, O and Q.*)

**D.    One Year Compliance Period**

21.   The City must demonstrate that it can maintain substantial compliance with the Remaining Reform Tasks for one year.  The Monitor will review each of the Remaining Reform Tasks to determine whether each has met the substantial compliance standards and has demonstrated compliance for one year.   Upon a finding by the Monitor that a Remaining Reform Task has demonstrated substantial compliance for one year - counting the period of compliance already achieved under the NSA and original MOU - said Task shall be removed from the Active Monitoring Tasks Chart and shall no longer be subject to active monitoring.

**E.    Compliance Unit**

22.   The City agrees to continue the work of the Office of Inspector General.  The City agrees to remain compliant with the substantive requirements of Tasks 50 and 51, as previously agreed, except that OPD will prepare an annual report describing the steps taken during the preceding year to comply with this AMOU.

**F.    Court Hearings, Motions, Meetings, and Meet and Confer Obligations**

23.   The Parties agree, unless subsequently agreed otherwise, to have a minimum of two status conferences before the Court during each year of the AMOU or as the Court Orders.  Additional status conferences will be held as ordered by the Court, including a petition by the Monitor.  The Parties

AMENDED MEMORANDUM OF UNDERSTANDING Re: POST NSA TERMS AND CONDITIONS

agree to continue to meet and confer on a monthly basis to try to resolve any issue of concern.  If a Party believes a status conference is necessary after a meet and confer process fails to resolve an issue, that Party may request the scheduling of an additional status conference with the Court.  The Parties agree to meet monthly with the City's attorneys, the Plaintiffs' attorneys, OPD members, OPOA representatives, and relevant City officials to ensure effective and timely communication among all the stakeholders and the Monitor regarding AMOU compliance issues.  The Parties agree to work together in scheduling these meetings only when necessary, and to provide for participation by telephone when appropriate.

24.     If the Monitor determines that the duties and the responsibilities of the Monitor under the AMOU cannot be carried out because of lack of cooperation, failure to provide information or documents, unwarranted delays by OPD, or that OPD is not proceeding in good faith in complying with the reform requirements under the AMOU, the Monitor may seek relief from the Court.

25.     Plaintiffs' counsel may bring motions based on their belief that the City or OPD is failing to comply with the provisions of this agreement after meeting and conferring between the Parties and the Monitor.  Plaintiffs' counsel may receive reasonable attorneys' fees and costs for bringing such motion at the discretion of the court.

26.     The Court has ordered that Plaintiffs' counsel be compensated for their regular work under this AMOU, and the Parties have agreed to execute a separate agreement for the payment of reasonable fees to Plaintiffs' counsel.  If the parties are unable to agree on a separate fees agreement for compensation for Plaintiffs' counsel either party may motion the Court for resolution of the matter.

27.     At any time during the pendency of this action, the City may petition the Court for relief from any provision of this AMOU, any NSA requirement or provision incorporated herein by reference, or any compliance requirement imposed by the Parties or the Monitor.  The City must demonstrate that (a) all good faith efforts have been taken to comply with the subject provision or requirement, (b) that implementation of the provision or requirement is operationally and/or fiscally onerous or impracticable, (c) that the provision or requirement is inconsistent with the overall purposes of the AMOU, or (d) that the provision or requirement is no longer an accepted or contemporary practice in law enforcement.

28.     The City will not be deemed in violation of any provision of the AMOU for the failure to perform any of its obligations if such failure is due to unforeseen circumstances.  "Unforeseen

1   circumstances" include conditions not reasonably foreseeable by the City at the time the AMOU was

2   executed: acts of God, catastrophic weather conditions, riots, insurrection, war, acts of a court of

3   competent jurisdiction or any similar circumstance for which the City is not responsible or which is not

4   within the City's control. Delays caused by unforeseen circumstances shall reasonably extend the time

5   of compliance.

6   G.   **Miscellaneous Provisions**

7           29.    This AMOU constitutes the entire agreement between the Parties relating to the above

8   captioned matter, and no other statement, promise or agreement, either written or oral, made by either

9   party or an agent of either party, that is not contained in the AMOU shall be enforceable. The Parties

10  agree, however, that the overall provisions and intent of the NSA, and those specific provisions

11  incorporated into the AMOU, inform the meaning and the purpose of the AMOU.

12          30.    This AMOU is enforceable only by the Parties to this action. No other person or entity is

13  intended to be a third party beneficiary of the provisions of the MOU. This AMOU may be modified or

14  amended only in writing by the Parties.

15          31.    If the Court determines that a provision of the AMOU is unenforceable, such provision

16  will be severed and all other provisions will remain valid and enforceable provided, however, that if the

17  severance of any provision materially alters the rights or obligations of the Parties they will, through

18  reasonable, good faith negotiations, agree upon such other amendments as may be necessary to restore

19  the Parties as closely as possible to the relative rights and obligations initially intended.

20          32.    Nothing in the AMOU is intended to alter the existing collective bargaining agreement

21  between the City and the Oakland Police Officer Association (OPOA), impair the collective bargaining

22  rights of the members of the OPOA, or alter the rights of the OPOA as intervenor in the above captioned

23  matter. The OPOA retains any and all rights under this AMOU which existed under the NSA, including

24  the right to appear in Court and participate in court proceedings.

25          33.    Nothing in the AMOU shall limit the power of the Oakland City Council, the Mayor, the

26  City Administrator, the City Attorney and the OPD from exercising their authority and satisfying their

27  duties as set forth in the Charter and other applicable law.

28          34.    Nothing in the AMOU shall be construed as the City's admission of liability, evidence of

8

AMENDED MEMORANDUM OF UNDERSTANDING Re: POST NSA TERMS AND CONDITIONS

liability, or proof of any violation of the mandates of the NSA, or of any local, state or federal law.

35.     The AMOU will remain in place for no longer than January 22, 2014, except that the City, the Parties or the Monitor may recommend that it be terminated sooner based on the OPD's progress in meeting its substantial compliance obligations.  Without further action, the AMOU shall terminate two (2) years from the effective date of the AMOU and that date is January 22, 2014.  If the City is not in substantial compliance by the time this AMOU expires, the Parties agree to meet and discuss the narrowing and/or continuation of this AMOU.

36.     The Parties agree that compliance with the AMOU will complete the full settlement of any and all claims the Plaintiffs may have against the Defendant City and its officials, officers, employees or agents, regarding the above-captioned matter.   The Court shall dismiss this entire action with prejudice based upon the following considerations: (a) the recommendation by the Monitor, the City, and/or Plaintiffs' counsel that the City has met its substantial compliance obligations under the AMOU, and the approval of this recommendation by the Court; (b) the stipulation of the Parties; or (c) the City's prevailing motion showing that it has met its substantial compliance obligations under the AMOU.

37.     The Court retains jurisdiction over this action for all purposes.  Accordingly, the Court retains the power to enforce the terms of the AMOU and to resolve all material disputes that may arise between the Parties, including those involving disputes concerning claims for attorneys' fees and costs by Plaintiffs' counsel.

38.     The Parties consent and seek entry of this AMOU as an Order of the Court.  This Order of the Court shall supersede the previous Court order which gave effect to the NSA and the original MOU.  The effective date of the original MOU was January 23, 2010.  The effective date of the expiration of the original MOU is January 22, 2012.  The effective start date of the AMOU shall be January 23, 2012.  The termination date of the AMOU is January 22, 2014 or sooner as provided herein.

///

///

///

///

AMENDED MEMORANDUM OF UNDERSTANDING Re: POST NSA TERMS AND CONDITIONS

1   The AMOU may be executed by the representative of the Parties in separate documents, and the Parties'

2   electronic signatures have the same force and effect as original signatures.

3

4                                                   Respectfully submitted,

5
                                                    Bertrand, Fox & Elliot
6

7   Dated: June 23, 2011                            By: _____ /s/ _____

8
                                                    Gregory M. Fox, Attorney for
9                                                   Defendant City of Oakland

10
                                                    City of Oakland
11

12  Dated: June 23, 2011                            By: _____ /s/ _____

13
                                                    Rocio V. Fierro, Attorney for
14                                                  Defendant City of Oakland

15  Dated: June 23, 2011                            By: _____ /s/ _____
                                                    P. Lamont Ewell, City Administrator
16                                                  City of Oakland

17

18  Dated:  June 23, 2011                           By: _____ /s/ _____
                                                    Chief  Anthony Batts
19                                                  Oakland Police Department

20                                                  Law Offices of John L. Burris

21

22  Dated: June 23, 2011                            By: _____ /s/ _____

23                                                  John L. Burris, Attorney for Plaintiffs

24
                                                    Law Offices of James B Chanin
25

26

27  Dated:  June 23, 2011                           By: _____ /s/ _____

28                                                  James Chanin, Attorney for Plaintiffs

10

AMENDED MEMORANDUM OF UNDERSTANDING Re: POST NSA TERMS AND CONDITIONS

06/27/2011



# EXHIBIT 1

## AMOU Chart of Active Monitoring Tasks
### June 22, 2011

| Task | Description | Active Monitoring |
|------|-------------|-------------------|
| 3 | Integrity Tests | Entire task |
| 5 | Complaint Procedures for IAD | Entire task |
| 20 | Span of Control | Entire task |
| 24 | Use of Force Reporting | Entire task |
| 25 | Use of Force Investigation and Reporting | Entire task |
| 26 | Force Review Boards | Entire task |
| 30 | Executive Force Review Boards | Entire task |
| 33 | Reporting Misconduct | Entire task |
| 34 | Stop Data | Entire task |
| 40 | PAS | Entire task |
| 41 | Use of PAS | Entire task |
| 42 | Field Training | Entire task |
| 45 | Consistency of Discipline | Only 45.1 – OPD maintains a centralized system for documenting and tracking discipline and corrective action.<br>Only 45.4 - Discipline is imposed in a manner that is fair and consistent |

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DELPHINE ALLEN, et al.,

                Plaintiffs,

        v.

CITY OF OAKLAND, et al.,

                Defendants.

MASTER CASE FILE
NO. C00-4599 TEH

ORDER CLARIFYING
JANUARY 24, 2012 ORDER RE:
THE MONITOR'S AUTHORITY

On January 24, 2012, the Court ordered the Chief of Police to "regularly consult with the Monitor on all major decisions that may impact compliance with the [Negotiated Settlement Agreement]." Jan. 24, 2012 Order at 3. If the Chief declines to act in accord with a recommendation by the Monitor, then the City Administrator and Mayor must make themselves available to discuss the intended action with the Monitor. *Id.* If the City refuses to implement one of the Monitor's recommendations, then the Court may schedule a hearing at which "the City will bear the burden of persuading the Court that its failure to follow the Monitor's recommendation will not have a negative impact on the City's compliance efforts." *Id.* The Court now clarifies that any hearings regarding recommendations that involve confidential personnel matters will be held under seal. The Court further clarifies that not all matters may require a hearing, particularly if it appears that the City is intentionally rejecting a recommendation of the Monitor for purposes of delay or is otherwise acting in bad faith.

In addition, the Monitor may recommend that certain actions be implemented within a short timeframe. The Monitor shall immediately notify the Court if he recommends that Defendants take any action within twenty-four hours or less. If necessary under the circumstances, the Court expects the parties to be available on short notice for any hearing conducted pursuant to the January 24, 2012 order.

United States District Court

For the Northern District of California

1    Finally, the Court reminds the parties and their personnel that communications by the

2    Monitor, including the consultations and recommendations discussed above, are

3    confidential.  Any unauthorized disclosure shall be subject to sanctions.

4

5    **IT IS SO ORDERED.**

6

7    Dated:   06/07/12

8                                          THELTON E. HENDERSON, JUDGE
                                          UNITED STATES DISTRICT COURT

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DELPHINE ALLEN, et al.,

                Plaintiffs,

      v.

CITY OF OAKLAND, et al.,

                Defendants.

MASTER CASE FILE
NO. C00-4599 TEH

ORDER DENYING
INTERVENOR'S MOTION FOR
CLARIFICATION

Intervenor Oakland Police Officers' Association ("OPOA") has filed a motion for clarification of this Court's order concerning the confidentiality of communications by the Monitor. The OPOA has no objection to keeping all such communications confidential from the public, but it does object to preventing its members from learning about conversations the Monitor may have with the Chief of Police concerning discipline of individual officers. The OPOA requests that the Court clarify that its confidentiality order does not apply to those situations. The Court now DENIES that request for the reasons discussed below.

As an initial matter, the OPOA's reliance on policies referring to the "chain of command" or the "Discipline Officer" is misplaced. The Monitor is neither the Department's "Discipline Officer" nor in the Chief's chain of command. Instead, the Monitor communicates with the Chief of Police only as an agent of the Court, and his communications therefore bear the same protection as communications from this Court.

Moreover, the Court is not persuaded that any officer's due process rights will be impacted by its order. The Monitor currently does not have the power to exercise the duties of the Chief of Police, City Administrator, Mayor, or any other City official. Thus, unless and until there is a receivership in place or the Court confers additional authorities on the Monitor, the Chief's disciplinary decisions remain his own, based on his own judgment and review of records contained in the disciplinary file. If the Chief's judgment differs from the

Monitor's, the Monitor will bring that issue to the Court, and the OPOA will have a full and fair opportunity to discuss the issue if the Court contemplates ordering the Chief to take a particular action. Under these circumstances, the Court does not find the confidentiality of communications between the Monitor and the Chief to violate any officer's due process rights.

Accordingly, with good cause appearing, the OPOA's motion for clarification is DENIED.[1]

**IT IS SO ORDERED.**

Dated: 08/07/12

_____
THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

---

[1]Plaintiffs correctly observe in their opposition that the OPOA did not follow the Court's Civil Local Rules in filing its motion. Nonetheless, because Plaintiffs have been heard in opposition and the Court is denying the requested relief, the Court finds no prejudice to ruling on the motion despite the procedural improprieties.

2

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DELPHINE ALLEN, et al.,

                    Plaintiffs,

        v.

CITY OF OAKLAND, et al.,

                    Defendants.

MASTER CASE FILE
NO. C00-4599 TEH

ORDER RE: COMPLIANCE
DIRECTOR

        Nearly ten years after the parties agreed to a consent decree that was to have been completed in five years but that remains incomplete, the Court was scheduled to hear Plaintiffs' motion to appoint a receiver. After reviewing Defendants' opposition to Plaintiffs' motion, it became clear that Defendants did not dispute many of the issues raised by Plaintiffs, including Plaintiffs' conclusion that Defendants would be unable to achieve compliance without further intervention by this Court. The Court ordered the parties to meet and confer to attempt to reach agreement on how this case should proceed and, following the parties' request, referred this case to a magistrate judge for settlement.

        Magistrate Judge Nathanael Cousins held a series of in-person and telephonic settlement conferences that culminated in the filing of a jointly proposed order on December 5, 2012. The parties were able to reach an agreement for additional oversight by a Court appointee who will have directive authority over Defendants relevant to the Negotiated Settlement Agreement ("NSA") and Amended Memorandum of Understanding ("AMOU").[1] The Court now approves the parties' agreement as modified below and therefore VACATES the hearing scheduled for December 13, 2012.

---

        [1]The NSA and AMOU were entered as orders of this Court on January 22, 2003, and June 27, 2011, respectively.

United States District Court
For the Northern District of California

1    IT IS HEREBY ORDERED that:

2

3    **A.**    **Appointment of a Compliance Director**

4        1.    The Court will appoint a Compliance Director whose mission will be to bring

5    Defendants into sustainable compliance with the NSA and AMOU.  As the Court's agent, the

6    Compliance Director will report directly to the Court and will not act as the agent of any

7    party to this action or any other entity or individual.

8        2.    The Compliance Director will have the same rights and privileges as have

9    already been agreed to and/or ordered with respect to the Monitor, including those relating to

10   testifying in this or other matters, confidentiality, and access to information and personnel.

11   Likewise, the Compliance Director shall not be retained by any current or future litigant or

12   claimant in a claim or suit against the City and its employees.

13       3.    The parties will meet and confer and attempt to make a joint recommendation to

14   the Court regarding the selection of the Compliance Director.  If they are not able to agree,

15   the parties will each recommend candidate(s) to the Court for consideration.  The parties'

16   recommendations, including descriptions of the candidates' qualifications for the position,

17   shall be filed under seal on or before **December 21, 2012**.  The selection of the Compliance

18   Director rests solely within the Court's discretion, and the Court will not be limited to the

19   parties' recommendations, whether separate or joint.

20       4.    The Compliance Director will be a full-time position based in Oakland for a

21   minimum of one year and at least until Defendants have achieved full compliance with the

22   NSA and AMOU.  The Compliance Director will serve until this case is terminated or until

23   otherwise ordered by the Court.  Any party may petition the Court to remove the Compliance

24   Director for good cause.

25       5.    The City will pay the costs of the Compliance Director and all costs related to the

26   Compliance Director's work, including the cost of providing commensurate support services

27   and office space.  The Compliance Director's salary will be established by the Court upon

28   appointment, and the Compliance Director will receive benefits commensurate with

United States District Court

For the Northern District of California

1  comparable City officials, such as the City Administrator and Chief of Police. The Court

2  expects the City to reach a prompt compensation agreement with the Compliance Director

3  upon appointment. If an agreement or any payment is unduly delayed, the Court will order

4  the City to pay the Compliance Director, as well as the Monitor, through the Court's registry.

5      6.    The AMOU will remain in effect except to the extent it conflicts with this order.

6  This includes the requirement that a task will not be removed from active monitoring until

7  Defendants have demonstrated substantial compliance for at least one year.

8

9  **B.    Role of the Monitor Upon Appointment of the Compliance Director**

10     1.    The requirement in the January 24, 2012 order for consultation with the Monitor

11 will terminate upon appointment of the Compliance Director. However, Defendants will not

12 implement any of the types of changes or actions identified in the January 24, 2012 order

13 without the Compliance Director's direction or approval.

14     2.    Unless otherwise ordered, the Monitor's duties and responsibilities will otherwise

15 remain unchanged and will stay in effect until this case is terminated. These duties include

16 the continuation of the Monitor's quarterly reports, drafts of which will be provided

17 simultaneously to the Compliance Director and the parties.

18     3.    The Monitor and the City shall meet and confer concerning compensation to be

19 paid to the Monitor for work performed after the current AMOU termination date of

20 January 22, 2014. If they cannot reach agreement, the matter will be resolved by the Court.

21 If any payment is unduly delayed, the Court will order the City to pay the Monitor, as well as

22 the Compliance Director, through the Court's registry.

23     4.    The Compliance Director and the Monitor will be independent positions that

24 report only to the Court and not to each other. However, the Court expects the Compliance

25 Director and the Monitor to work closely and in consultation with each other. Thus, for

26 example, any technical assistance or informal advice provided by the Monitor to Defendants

27 should include the Compliance Director whenever possible, and the Compliance Director

28 should consult with the Monitor on all major decisions.

3

United States District Court

For the Northern District of California

**C.    Duties of the Compliance Director**

1.    Within 30 days of his or her appointment, the Compliance Director will file a remedial action plan ("Plan") that both addresses deficiencies that led to noncompliance and explains how the Plan will facilitate sustainable compliance with all outstanding tasks by December 2013 or as soon thereafter as possible.  In developing the plan, the Compliance Director will consult with the Monitor, Plaintiffs, the Mayor, the City Administrator, the Chief of Police, and the Oakland Police Officers' Association ("OPOA").  The Compliance Director will work closely and communicate regularly with the Chief of Police, the Chief's staff, and other relevant City personnel to implement the Plan.  The Plan will include:

a.    A proposed budget, to be included as part of the Oakland Police Department ("OPD") budget, that is mutually agreed to by the Compliance Director, the Mayor, the City Administrator, and the Chief of Police for the fiscal year based on proposed expenditures for task compliance.

b.    A plan for the oversight, acquisition, and implementation of a personnel assessment system ("IPAS") that provides a sustainable early-warning system that will mitigate risk by identifying problems and trends at an early stage.  The Compliance Director will ensure that all parties are fully informed about both the procurement of new technology and how that technology will be used to identify problems and trends to ensure that officers are provided the requisite assistance at the earliest possible stage.

c.    Strategies to ensure that allegations made by citizens against the OPD are thoroughly and fairly investigated.

d.    Strategies to decrease the number of police misconduct complaints, claims, and lawsuits.

e.    Strategies to reduce the number of internal affairs investigations where improper findings are made.  This includes strategies to ensure that investigators apply the correct burden of proof, as well as strategies to ensure that complaints are not disposed of as "unfounded" or "not sustained" when sufficient evidence exists to support that the alleged conduct did occur.

4

f.    A list of persons responsible for each outstanding task or specific action item.  This requirement shall supersede the requirement for Defendants to file updated lists of persons responsible with the Court.

The above list of requirements is not exhaustive.  Likewise, the parties have agreed that tasks related to the following areas are key to driving the sustained cultural change envisioned by the parties when agreeing to the NSA and AMOU: collection of stop data, use of force, IPAS, sound management practices, and the quality of investigations by the Internal Affairs Division.  These areas are covered by Tasks 5, 20, 24, 25, 26, 30, 34, 40, and 41.  The Court agrees that the identified tasks are of utmost importance but, unless otherwise ordered, expects full and sustainable compliance with all NSA tasks.

2.    Within 60 days of his or her appointment, the Compliance Director will file a list of benchmarks for the OPD to address, resolve, and reduce: (1) incidents involving the unjustified use of force, including those involving the drawing and pointing of a firearm at a person or an officer-involved shooting; (2) incidents of racial profiling and bias-based policing; (3) citizen complaints; and (4) high-speed pursuits.  In developing these benchmarks, the Compliance Director will consult with the Monitor, Plaintiffs, the Mayor, the City Administrator, the Chief of Police, the OPOA, and, as necessary, subject-matter experts to ensure that the benchmarks are consistent with generally accepted police practices and national law enforcement standards.

3.    Beginning on May 15, 2013, and by the 15th of each month thereafter, the Compliance Director will file a monthly status report that will include any substantive changes to the Plan, including changes to persons responsible for specific tasks or action items, and the reasons for those changes.  The monthly status reports will also discuss progress toward achieving the benchmarks, reasons for any delayed progress, any corrective action taken by the Compliance Director to address inadequate progress, and any other matters deemed relevant by the Compliance Director.  These monthly reports will take the place of Defendants' biweekly reports, which shall be discontinued after May 15, 2013.

United States District Court

For the Northern District of California

5

4.    Prior to filing any documents with the Court, the Compliance Director will give the parties an opportunity to determine whether any portions of the documents should be filed under seal.  Requests to file documents under seal must be narrowly tailored and made in accordance with Civil Local Rule 79-5.

5.    The Compliance Director may, at his or her sole discretion, develop a corrective action plan for any task for which the Monitor finds Defendants to be out of compliance.  As part of any such plan, the Compliance Director will determine the nature and frequency of future internal compliance testing for that task.

6.    The Compliance Director will have the power to review, investigate, and take corrective action regarding OPD policies, procedures, and practices that are related to the objectives of the NSA and AMOU, even if such policies, procedures, or practices do not fall squarely within any specific NSA task.

7.    The Compliance Director will have the authority to direct specific actions by the City or OPD to attain or improve compliance levels, or remedy compliance errors, regarding all portions of the NSA and AMOU, including but not limited to: (1) changes to policies, the manual of rules, or standard operating procedures or practices; (2) personnel decisions, including but not limited to promotions; engagement of consultants; assignments; findings and disciplinary actions in misconduct cases and use-of-force reviews; the discipline or demotion of OPD officers holding the rank of Deputy Chief and Assistant Chief; and the discipline, demotion, or removal of the Chief of Police; (3) tactical initiatives that may have a direct or indirect impact on the NSA or AMOU; (4) procurement of equipment, including software, or other resources intended for the purpose of NSA and AMOU compliance; and (5) OPD programs or initiatives related to NSA tasks or objectives.  The Compliance Director will have the authority to direct the City Administrator as it pertains to outstanding tasks and other issues related to compliance and the overall NSA and AMOU objectives.  Unless otherwise ordered, the Compliance Director's exercise of authority will be limited by the following:

6

a.    The Compliance Director will have expenditure authority up to and including $250,000 for expenditures included in the Plan.  This is not a cumulative limit.  For individual expenditures greater than $250,000, the Compliance Director must comply with public expenditure rules and regulations, including Oakland Municipal Code article I, chapter 2.04.  The City Administrator will seek authorization of these expenditures under expedited public procurement processes.  The Compliance Director may seek an order from this Court if he or she experiences unreasonable funding delays.

b.    Members of OPD up to and including the rank of Captain will continue to be covered by the Meyers-Milias-Brown Act, the collective bargaining agreement, and OPOA members' rights to arbitrate and appeal disciplinary action.  The Compliance Director will have no authority to abridge, modify, or rescind any portion of those rights for these members.

c.    The Compliance Director will have no authority to rescind or otherwise modify working conditions referenced in the labor agreements between the City and the OPOA as those contracts relate to any member up to and including the rank of Captain.  "Working conditions" include the rights identified in the above subparagraph, as well as salary, hours, fringe benefits, holidays, days off, etc.

d.    Prior to removing the Chief of Police or disciplining or demoting the Chief of Police, an Assistant Chief, or a Deputy Chief, the Compliance Director will first provide written notice, including reasons for the intended action, to the parties and the affected individual and an opportunity for appeal to this Court.  Where practicable, the Compliance Director will consult with the Mayor, the City Administrator, and the Chief of Police prior to providing such notice.[2]  Within seven calendar days of the Compliance Director's written notice, the City, Plaintiffs, and the affected Chief, Assistant Chief, or Deputy Chief may oppose or support any such action, under applicable federal and state law, by filing a notice with the Court seeking an expedited briefing schedule and hearing.  The affected Chief,

_____

[2]Prior consultation may not always be practicable.  For example, the Compliance Director will not be expected to consult with the Chief of Police on a decision to discipline, demote, or remove the Chief of Police.

United States District Court
For the Northern District of California

Assistant Chief, or Deputy Chief will retain his or her employment and other rights pending the Court's decision.

          e.   In all disputes between the City and the Compliance Director relating to this order, except for the demotion, discipline, and removal decisions covered in the preceding subparagraph, the Compliance Director will consult with the Mayor, the City Administrator, the Chief of Police, and Plaintiffs in hopes of reaching consensus. If, after such consultation, the City and the Compliance Director remain in disagreement, the Compliance Director will provide written notice to the parties of the dispute and the Compliance Director's proposed direction. Within seven calendar days of the Compliance Director's written notice, the City may file a notice with the Court seeking an expedited hearing to determine whether the City should be excused from complying with the Compliance Director's direction. The City will comply with any direction that is not timely brought before the Court. The City's right to seek relief from the Court must not be abused and should generally be limited to matters related to employee discipline or expenditures in excess of $250,000. At any hearing on a disputed issue, the City will bear the burden of persuading the Court that the City's failure to follow the Compliance Director's direction will not harm the City's compliance with the NSA or AMOU. Plaintiffs will be a party to any such hearing, and their counsel will be entitled to recover reasonable attorneys' fees and costs from Defendants, as set forth below in paragraph D.

**D.**     **Attorneys' Fees and Costs**

        The parties shall meet and confer regarding reasonable attorneys' fees and costs relating to Plaintiffs' motion to appoint a receiver, any motion that may be filed pursuant to paragraphs A.4, B.7.d, or B.7.e of this order, and any work performed after January 22, 2014. Any disputes over attorneys' fees and costs that the parties cannot resolve independently will be submitted to Magistrate Judge Cousins. Nothing in this order alters the right of Plaintiffs' counsel to receive previously agreed upon or previously earned fees and costs under the AMOU.

E.      **Role of the OPOA**

        Unless otherwise ordered, the OPOA will retain its limited status in intervention until this case is terminated.  The Compliance Director will meet no less than once per quarter with the president of the OPOA to discuss the perspective of rank-and-file police officers on compliance efforts.

F.      **Further Proceedings**

        The parties shall appear for a status conference on **June 6, 2013, at 10:00 AM**, to discuss Defendants' progress toward compliance.  The parties and Intervenor OPOA shall file a joint status conference statement on or before **May 24, 2013**.

        The Court is hopeful that the appointment of an independent Compliance Director with significant control over the OPD will succeed – where City and OPD leaders have failed – in helping OPD finally achieve compliance with the NSA and, in the process, become more reflective of contemporary standards for professional policing.  If the remedy set forth in this order proves unsuccessful, and Defendants fail to make acceptable progress even under the direction of the person appointed pursuant to this order, the Court will institute proceedings to consider appropriate further remedies.  Such remedies may include, but are not limited to, contempt, monetary sanctions, expansion of the Compliance Director's powers, or a full receivership.

**IT IS SO ORDERED.**

Dated:   12/12/12

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

**United States District Court**
For the Northern District of California

9

# EXHIBIT I

United States District Court

For the Northern District of California

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5  DELPHINE ALLEN, et al.,

6               Plaintiffs,

7         v.

8  CITY OF OAKLAND, et al.,

9               Defendants.

MASTER CASE FILE
NO. C00-4599 TEH

ORDER MODIFYING
COMPLIANCE OVERSIGHT
MODEL

10

11      As the parties are well aware, the remedial phase of this case has extended far longer

12  than originally anticipated and far longer than the Court believes should have been necessary

13  had Defendants consistently acted with diligence to implement the reforms they agreed to

14  over eleven years ago.  The parties' Negotiated Settlement Agreement, entered as an order of

15  the Court on January 22, 2003, was designed to effectuate reforms within five years, with a

16  possible two-year extension.  Years later – and following two further Memoranda of

17  Understanding between the parties and the appointment of a second monitoring team –

18  Defendants remain out of compliance with a number of significant tasks.

19      On October 4, 2012, Plaintiffs filed a motion to appoint a receiver based on their

20  belief that a monitor alone was insufficient to bring Defendants into compliance.  While that

21  motion was pending, the parties reached an agreement with the assistance of Magistrate

22  Judge Nathanael Cousins and jointly proposed that the Court appoint a Compliance Director

23  in lieu of considering Plaintiffs' motion to appoint a receiver.  The Court approved the

24  parties' agreement, with modifications, on December 12, 2012.  The Compliance Director

25  position was designed to last a minimum of one year and at least until Defendants had

26  achieved full compliance with the settlement agreement.  After conducting a series of

27  interviews, the Court appointed Thomas C. Frazier as Compliance Director, effective

28  March 11, 2013.

United States District Court
For the Northern District of California

As we approach the one-year anniversary of Mr. Frazier's appointment, the Court has given serious consideration to whether the Compliance Director/Monitor model is the best approach to moving Defendants into compliance as quickly and sustainably as possible. At the heart of the dispute giving rise to the creation of the Compliance Director position lies the premise that compliance has not been more quickly attained because the Monitor lacks directive authority to ensure that Defendants correct identified deficiencies. The parties agreed to grant such authority – broad, essentially receiver-like powers in areas related to the negotiated reforms, including procurement authority for individual expenditures not exceeding $250,000 and the power to discipline, demote, or remove the Chief of Police – to a Compliance Director to be appointed by the Court. Although the Court considered granting these additional powers to the Monitor instead of creating a second position, it endorsed the parties' agreement to vest such powers in a separate individual. However, this arrangement has proven to be unnecessarily duplicative and has been less efficient and more expensive than the Court contemplated, and the Court finds that it would be more appropriate and effective to now concentrate the powers of the Compliance Director and Monitor into one position.

Accordingly, with good cause appearing, IT IS HEREBY ORDERED that:

1. The Court's appointment of Thomas C. Frazier as Compliance Director will terminate on **March 10, 2014**.

2. Effective immediately, all authority previously vested by the Court in Mr. Frazier is revoked and hereby transferred to the Court-appointed Monitor, Robert S. Warshaw, until otherwise ordered.

3. Between now and the expiration of his appointment, Mr. Frazier shall close down his office in an orderly manner and work closely with the Monitor to ensure a smooth transition and Defendants' uninterrupted progress.

4. Mr. Frazier and the Monitor shall immediately discuss all work in progress by the Compliance Director's office, and the Monitor shall determine what portion of that work is essential to moving the Department toward sustainable compliance or for an orderly

2

1  transition. Individuals paid hourly at Mr. Frazier's direction, including subject matter

2  experts, shall immediately cease all activity unless that work is deemed essential and

3  Mr. Frazier is unable to personally perform such work. All outstanding invoices for hourly

4  work and expenses must be submitted for the Court's approval on or before **March 10, 2014**.

5      5. Beginning on **April 15, 2014**, the Monitor shall file bimonthly reports discussing

6  Defendants' progress. Prior to filing each bimonthly report, the Monitor shall provide the

7  parties and Intervenor Oakland Police Officers' Association an opportunity to review the

8  report for the sole purpose of discussing with the Monitor whether any information is

9  confidential and subject to filing under seal. These reports will not replace the Monitor's

10 quarterly reports, which will continue to provide the official record of Defendants' progress.

11     6. The Monitor shall discuss with the parties necessary modifications to his contract

12 as a result of the expansion of his powers and duties, including whether he needs to have a

13 greater on-site presence and the amount of additional compensation that would be

14 appropriate. The Court expects the additional compensation, including travel expenses and

15 costs associated with any assistants, not to exceed $150,000 annually. Any disputes

16 regarding the contract modifications will be resolved by the Court.

18 **IT IS SO ORDERED.**

20 Dated: 02/12/14

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

*United States District Court*
For the Northern District of California

3

# EXHIBIT J

BARBARA PARKER, City Attorney (State Bar No. 69722)
MARIA BEE, Chief Assistant City Attorney (State Bar No. 167716)
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone:  510.238.2964
Facsimile:  510.238.6500
Email:      bjparker@oaklandcityattorney.org
            mbee@oaklandcityattorney.org

KATHARINE VAN DUSEN (State Bar No. 276021)
KENNETH NABITY (State Bar No. 287927)
DONOVAN L. BONNER (State Bar No. 329593)
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, California 94104-5500
Telephone:     415.391.4800
Facsimile:     415.989.1663
Email:     ef-ktv@cpdb.com
           ef-kpn@cpdb.com
           ef-dlb@cpdb.com

Attorneys for Defendant
THE CITY OF OAKLAND, CALIFORNIA

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| ANNE KIRKPATRICK, an individual,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF OAKLAND, CALIFORNIA, a public corporation,<br><br>Defendant. | Case No. 3:20-cv-05843-JSC<br><br>**DEFENDANT THE CITY OF OAKLAND, CALIFORNIA'S RESPONSE TO FIRST SET OF INTERROGATORIES PROPOUNDED BY PLAINTIFF ANNE KIRKPATRICK**<br><br>Trial Date:          May 16, 2022 |

PROPOUNDING PARTY:        Plaintiff ANNE KIRKPATRICK

RESPONDING PARTY:        Defendant THE CITY OF OAKLAND, CALIFORNIA

SET NO.:                One

///

///

///

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant THE CITY OF OAKLAND, CALIFORNIA ("Responding Party") hereby submits these objections and responses to the First Set of Interrogatories propounded by Plaintiff ANNE KIRKPATRICK ("Propounding Party").

## PRELIMINARY STATEMENT

Nothing in this response should be construed as an admission by Responding Party with respect to the admissibility or relevance of any fact, or of the truth or accuracy of any characterization or statement of any kind contained in Propounding Party's Interrogatories. Responding Party has not completed its investigation of the facts relating to this case, its discovery or its preparation for trial. All responses and objections contained herein are based only upon information that is presently available to and specifically known by Responding Party. It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts and add meaning to known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in and variations from the responses set forth herein. The following objections and responses are made without prejudice to Responding Party's right to produce at trial, or otherwise, evidence regarding any subsequently discovered information. Responding Party accordingly reserves the right to modify and amend any and all responses herein as research is completed and contentions are made.

## GENERAL OBJECTIONS

Responding Party generally objects to the Interrogatories as follows:

1.     Responding Party objects generally to the Interrogatories to the extent that they seek to elicit information that is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence;

2.     Responding Party objects generally to the Interrogatories to the extent that they are unreasonably overbroad in scope, and thus burdensome and oppressive, in that each such request seeks information pertaining to items and matters that are not relevant to the subject matter of this action, or, if relevant, so remote therefrom as to make its disclosure of little or no practical benefit

**DEFENDANT THE CITY OF OAKLAND, CALIFORNIA'S RESPONSE TO FIRST SET OF INTERROGATORIES PROPOUNDED BY PLAINTIFF ANNE KIRKPATRICK**

1  to Propounding Party, while placing a wholly unwarranted burden and expense on Responding

2  Party in locating, reviewing and producing the requested information;

3          3.      Responding Party objects generally to the Interrogatories to the extent that they are

4  burdensome and oppressive, in that ascertaining the information necessary to respond to them

5  would require the review and compilation of information from multiple locations, and voluminous

6  records and files, thereby involving substantial time of employees of Responding Party and great

7  expense to Responding Party, whereas the information sought to be obtained by Propounding

8  Party would be of little use or benefit to Propounding Party;

9          4.      Responding Party objects generally to the Interrogatories to the extent that they are

10  vague, uncertain and overbroad, being without limitation as to time or specific subject matter;

11          5.      Responding Party objects generally to the Interrogatories to the extent that they

12  seek information at least some of which is protected by the attorney-client privilege or the attorney

13  work-product doctrine, or both;

14          6.      Responding Party objects generally to the Interrogatories to the extent that they

15  seek to have Responding Party furnish information that is a matter of the public record, and

16  therefore, is equally available to the propounding party as to Responding Party;

17          7.      Responding Party objects generally to the Interrogatories to the extent that they

18  seek to have Responding Party furnish information that is proprietary to Responding Party and

19  contain confidential information;

20          8.      Responding Party objects to the interrogatories, and to any individual interrogatory

21  set forth therein, to the extent that they are compound and constitute an impermissible effort to

22  circumvent the 25 interrogatory limit set by Rule 33 of the Federal Rules of Civil Procedure;

23          9.      Responding Party objects that the definitions that precede the interrogatories render

24  them overbroad and unduly burdensome.  The definition of "You," "Your," "The City," or

25  "Defendant" includes thousands of individuals, including people who do not work for the City but

26  who are contractors, subcontractors, or consultants.  The term "CITY OFFICIALS" likewise

27  includes not just high-level City employees and officials, but also employees at all levels in

28  various departments.  The term "IDENTIFY" when used with facts requires the Responding Party

**DEFENDANT THE CITY OF OAKLAND, CALIFORNIA'S RESPONSE TO FIRST SET OF
INTERROGATORIES PROPOUNDED BY PLAINTIFF ANNE KIRKPATRICK**

1  not just to state the fact, but also to provide "the complete evidentiary basis" for the fact. The

2  terms "REFLECTING" "REFERRING" "RELATING" or "CONCERNING" have overly broad

3  definitions that encompass not just a direct relationship, but also any tangential relationship

4  whatsoever, resulting in essentially limitless interrogatories;

5        10.    Responding Party objects to the Instructions that precede the interrogatories as

6  creating a burden beyond that required by Federal Rule of Civil Procedure 33. Responding Party

7  is required, under Rule 33(b)(4), to state the grounds for its objections with specificity. It is not,

8  however, to log each and every attorney-client communication in the manner set forth in the

9  Instructions; and

10       11.    Responding Party expressly incorporates each of the foregoing General Objections

11  into each specific response to the requests set forth below as if set forth in full therein. An answer

12  to a request is not intended to be a waiver of any applicable specific or general objection to such

13  request.

14       Without waiver of the foregoing, Responding Party further responds as follows:

15                    **RESPONSES TO INTERROGATORIES**

16  **INTERROGATORY NO. 1:**

17       Describe YOUR entire basis, including an IDENTIFICATION of ALL evidence AND

18  DOCUMENTS upon which YOU intend to rely, for YOUR contention that PLAINTIFF'S reports

19  of POLICE COMMISSIONER misconduct were not a substantial motivating factor in YOUR

20  decision to terminate PLAINTIFF'S employment.

21  **RESPONSE TO INTERROGATORY NO. 1:**

22       Responding Party objects that this interrogatory is overly broad and unduly burdensome.

23  It requires Responding Party to provide its entire defense to this litigation, including by identifying

24  every fact, document, and piece of evidence that Responding Party *may* rely on at trial—in other

25  words, more detail than would be expected even in a trial brief. It is precisely the type of overly

26  broad, unduly burdensome interrogatory that courts routinely decline to enforce. *See, e.g., IBP,*

27  *Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998) ("To require specifically

28  'each and every' fact and application of law to fact… would too often require a laborious, time-

**DEFENDANT THE CITY OF OAKLAND, CALIFORNIA'S RESPONSE TO FIRST SET OF
INTERROGATORIES PROPOUNDED BY PLAINTIFF ANNE KIRKPATRICK**

1    consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and

2    trivial details.")  Responding Party will interpret this request as seeking the material or principal

3    basis for its contentions, rather than an exhaustive exposition of each and every fact that might

4    bear on its contentions in some way.

5         Responding Party further objects that the interrogatory is improper because it contains

6    multiple, unrelated subparts and thus constitutes at least ten separate interrogatories.  The

7    Complaint identifies five discrete reports alleging misconduct, and the interrogatory combines

8    each of these five reports into a single interrogatory.  Moreover, the interrogatory requires

9    Responding Party to provide both a narrative explanation, and to identify the documents and

10   evidence that it intends to rely on.  Those are discrete, unrelated interrogatories.

11        Responding Party further objects that identifying documents it intends to "rely on," at this

12   stage, is an improper request for attorney work product.  The determination whether Responding

13   Party *intends* to rely on a particular document in its defense of the action reflects counsel's mental

14   impressions and analysis.

15        Responding Party has not yet completed its analysis of the issues raised in the Action, and

16   it makes this response without prejudice to amendment based on further analysis or discovery.

17   Responding Party also objects to the extent this interrogatory seeks information protected from

18   disclosure by the attorney-client communication privilege or attorney work product protection.

19        Subject to the forgoing general and specific objections, Responding Party responds as

20   follows:

21        The Oakland Police Commission (the "Police Commission") was created by voter

22   initiative in 2016.  It was established to "oversee the Oakland Police Department" ("OPD") to

23   ensure that its "policies, practices and customs conform to the national standards of constitutional

24   policing."  (Oakland Charter section 604(a)(1).)  As part of its broad oversight authority, the

25   Police Commission has the power to "Acting separately or jointly with the Mayor, remove the

26   Chief of Police by a vote of not less than five affirmative votes."  (Section 604(b)(10).)  This

27   provision allows the Police Commission to ensure that the role of Chief of Police is filled by

28   someone who can work with the Police Commission effectively.

16150.004 4833-6412-9242                                    5                         Case No. 3:20-cv-05843-JSC

**DEFENDANT THE CITY OF OAKLAND, CALIFORNIA'S RESPONSE TO FIRST SET OF
INTERROGATORIES PROPOUNDED BY PLAINTIFF ANNE KIRKPATRICK**

1    Plaintiff's reports of alleged Police Commissioner misconduct did not motivate the City to

2  terminate Plaintiff's employment.  Instead, the seven members of the Police Commission who

3  voted to terminate Plaintiff's employment were motivated by Plaintiff's mishandling of critical

4  events, the Oakland Police Department's documented regression on key reforms under the

5  Negotiated Settlement Agreement ("NSA"), and Plaintiff's inability to work productively with the

6  various stakeholders in OPD's oversight and reform efforts.  The Police Commission reasonably

7  concluded that Plaintiff was not the right leader to reform OPD in ways it saw as necessary.

8    First, Police Commissioners disagreed with myriad decisions that Plaintiff made, and

9  reasonably believed that she mishandled high-profile matters, including, but not limited to:

10    -    Police Commissioners had concerns that Plaintiff was not as forthcoming as she

11  should have been, and was possibly dishonest, in the aftermath of OPD's involvement in an

12  August 16, 2017 Immigration and Customs Enforcement raid, including whether she lied to the

13  public in an OPD press release, stated falsely that OPD did not assist in the raid, claimed

14  incorrectly that charges had been filed against one of two detained individuals, and claimed to

15  have reviewed a warrant before the raid (despite questions whether she only saw the warrant *after*

16  the raid).  Police Commissioners formed an impression that Plaintiff's actions and judgment could

17  not be trusted because rather than acknowledge the Commission's concerns and/or any room for

18  improvement, she spun the facts and sought to avoid accountability.

19    -    Police Commissioners reasonably disagreed with Plaintiff's decision to promote

20  personnel believed to be involved in the cover up of sexual misconduct involving a minor.  The

21  Police Commission believed Plaintiff was secretive when making these promotions, and failed to

22  credibly explain why they occurred.

23    -    Police Commissioners reasonably believed Plaintiff failed to address complaints

24  from the Oakland Black Officers Association ("OBOA") about discrimination in hiring.  On

25  October 15, 2018, the President of the OBOA gave a presentation to Plaintiff concerning officer

26  misconduct, racial disparities, and discrimination in recruiting and hiring.  Plaintiff should have

27  acted immediately, but instead took no action whatsoever, not even to pass along the concerns.

28  Frustrated with Plaintiff's disregard for their concerns, the OBOA met with the Mayor and City

**DEFENDANT THE CITY OF OAKLAND, CALIFORNIA'S RESPONSE TO FIRST SET OF
INTERROGATORIES PROPOUNDED BY PLAINTIFF ANNE KIRKPATRICK**

1  Administrator to discuss the same issues.

2        The OBOA wrote an open letter, published in the local newspaper, critical of Plaintiff's

3  refusal to act.  The OBOA criticized Plaintiff's "inaction and unwillingness to address disparate

4  treatment in the hiring and retention of officers," and concluded that it "cannot continue with this

5  lack of leadership."

6        Police Commissioners—who had long-standing concerns of their own regarding racial bias

7  within the department—did not find it reasonable that Plaintiff had missed the bias issue.  Police

8  Commissioners believed that Oakland needed a police chief who affirmatively worked to root out

9  departmental racism, not one who missed the issue when it was presented to her in a meeting

10  scheduled for that purpose.

11      -    Police Commissioners reasonably disagreed with Plaintiff's interference in the

12  investigation of the March 11, 2018 officer-involved shooting of Joshua Pawlik, as well as her

13  decision to exonerate the four shooters and lieutenant supervisor involved.

14        Following the shooting, a series of investigations followed.  Ultimately, given the severity

15  of the use of force, the NSA required that an Executive Force Review Board ("EFRB") convene to

16  analyze the incident and investigations, and make recommendations to the Chief of Police.  The

17  conventional EFRB assembled, and presented its recommended findings to Plaintiff at the end of

18  January 2019.  Those findings concluded that the firing officers should be exonerated for their use

19  of force.  Plaintiff concurred on the exoneration.

20        Both the Police Commission and Monitor (acting as Compliance Director) chose to

21  exercise their oversight authority and conducted independent review and analysis.  Both overruled

22  Plaintiff's decision and recommended termination for the four shooters and the lieutenant

23  supervisor.

24        Police Commissioners reasonably believed that Plaintiff formed a conclusion concerning

25  the Pawlik shooting from which she refused to deviate *before* any investigation began, and

26  interfered in the investigation process.  It was not just Plaintiff's conclusions, but the manner in

27  which she reached the conclusions, that concerned Commissioners.

28        Second, Police Commissioners concluded that Plaintiff failed to follow through on her

**DEFENDANT THE CITY OF OAKLAND, CALIFORNIA'S RESPONSE TO FIRST SET OF
INTERROGATORIES PROPOUNDED BY PLAINTIFF ANNE KIRKPATRICK**

1   stated plans to "transform" OPD.  Police Commissioners reasonably believed that Plaintiff failed

2   to implement sufficient community policing, failed to create a safe space for OPD personnel to

3   report misconduct, and failed to address or update key policies.

4        Instead, Plaintiff regressed on key reform issues.  Indeed, on August 14, 2019, the City and

5   plaintiffs' counsel in the *Allen* matter filed a Joint Case Management Statement.  The 42-page

6   submission suggested that the City had not only made no meaningful progress in 2019 toward the

7   two open NSA tasks, but also fell *out of compliance* on four other tasks.  The regression occurred

8   entirely on Plaintiff's watch, and the Police Commission faulted Plaintiff's failed leadership.

9        That same month, the federal judge overseeing OPD's mandatory reforms under the NSA,

10  Judge William Orrick III, extensively criticized the City's regression on these issues at a public

11  hearing, including particular focus on racial disparities.  In a particularly troubling moment, and

12  following substantial criticism, Judge Orrick asked Plaintiff what the number one problem facing

13  OPD was, to which Plaintiff responded words to the effect of, "The narrative that we are not

14  moving forward."  Judge Orrick was visibly surprised with that answer in the circumstances, and

15  replied words to the effect of, "Communications?  That's what you think is your biggest

16  challenge?"  Plaintiff's answer showed not only that Plaintiff failed to grasp the seriousness of the

17  moment, or reasonable public perceptions of her own failings, but also raised additional questions

18  concerning her hostility to criticism and refusal to accept accountability.

19       Third, Police Commissioners reasonably concluded that Plaintiff bristled at its legitimate

20  attempts to guide OPD reforms and policies.

21       After years of deteriorating performance and growing concerns, the Commission

22  reasonably concluded that Plaintiff was ineffective due to her lack of candor, poor judgment, lack

23  of accountability, lack of focus, and general hostility to the Commission's proper oversight

24  function.

25       The Mayor realized that Plaintiff had lost the confidence of the Commission and the

26  Monitor, both critical stakeholders in OPD's reform efforts, and agreed that terminating Plaintiff

27  was necessary for the City to move forward.

28       Plaintiff's minor reports concerning Police Commissioners were irrelevant to the decision

**DEFENDANT THE CITY OF OAKLAND, CALIFORNIA'S RESPONSE TO FIRST SET OF
INTERROGATORIES PROPOUNDED BY PLAINTIFF ANNE KIRKPATRICK**

1  of any Police Commissioners or the Mayor.

2          As to the documents and evidence that support this explanation, the City stands on its

3  objection that such identification imposes an undue burden.  The City has produced thousands of

4  pages of documents that support this explanation, and is in the process of gathering, reviewing,

5  and producing substantially more.  Because this interrogatory covers the City's primary defensive

6  case, it is unreasonable to expect the City to identify the thousands of documents responsive to the

7  interrogatory.  Instead, the City states that all documents produced in discovery in this action,

8  including documents to be produced, support the explanation.  In addition, and without limit, the

9  City expects that it will rely on the testimony of Regina Jackson, Ginale Harris, Thomas Lloyd

10  Smith, Henry Gage III, Edwin Prather, Tara Anderson, José Dorado, Mayor Libby Schaaf, and

11  Plaintiff.

12  **INTERROGATORY NO. 2:**

13          Describe YOUR entire basis, including an IDENTIFICATION of ALL evidence AND

14  DOCUMENTS upon which YOU intend to rely, for YOUR contention that PLAINTIFF'S reports

15  of POLICE COMMISSIONER misconduct do not rise to the level of protected disclosures under

16  Labor Code Section 1102.5.

17  **RESPONSE TO INTERROGATORY NO. 2:**

18          Responding Party objects that this interrogatory is overly broad and unduly burdensome.

19  It requires Responding Party to provide its entire defense to this element of Plaintiff's claims,

20  including by identifying every fact, document, and piece of evidence that Responding Party *may*

21  rely on at trial—in other words, more detail than would be expected even in a trial brief.  It is

22  precisely the type of overly broad, unduly burdensome interrogatory that courts routinely decline

23  to enforce.  *See, e.g., IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. Kan. 1998)

24  ("To require specifically 'each and every' fact and application of law to fact… would too often

25  require a laborious, time-consuming analysis, search, and description of incidental, secondary, and

26  perhaps irrelevant and trivial details.")  Responding Party will interpret this request as seeking the

27  material or principal basis for its contentions, rather than an exhaustive exposition of each and

28  every fact that might bear on its contentions in some way.

**DEFENDANT THE CITY OF OAKLAND, CALIFORNIA'S RESPONSE TO FIRST SET OF
INTERROGATORIES PROPOUNDED BY PLAINTIFF ANNE KIRKPATRICK**